# EXHIBIT 1

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

**SNAP INC.**,
Petitioner

v.

**VAPORSTREAM, INC.**,
Patent Owner

U.S. Patent No. 9,306,886 B2
Issue Date: April 5, 2016

Title: Electronic Message Recipient Handling System and Method with
Separated Display of Message Content and Header Information

————————————

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 9,306,886 B2**

# Table of Contents

**Page**

I.    Mandatory Notices Under 37 C.F.R. § 42.8(A)(1) .........................................1

    A.    Real Party-In-Interest under 37 C.F.R. § 42.8(b)(1)............................1

    B.    Related Matters under 37 C.F.R. § 42.8(b)(2) ......................................1

    C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) .................2

    D.    Service Information.................................................................................3

    E.    Power of Attorney ..................................................................................3

II.   Fee Payment - 37 C.F.R. § 42.103 .................................................................3

III.  Requirements for *Inter Partes* Review under 37 C.F.R. §§ 42.104 and 42.108 ...............................................................................................................4

    A.    Grounds for Standing under 37 C.F.R. § 42.104(a)............................4

    B.    Identification of Challenge under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested ................................................4

    C.    Considerations Under 35 U.S.C. § 325(d) ...........................................4

IV.  Overview of The '886 Patent.............................................................................5

    A.    Level of Ordinary Skill in the Art .........................................................5

    B.    Overview of the Specification.................................................................6

    C.    The Challenged Claims ..........................................................................9

V.   Claim Construction Under 37 C.F.R. § 42.104(B)(3) ....................................9

VI.  Claims 1, 4, 5, 9-11, and 13 Are Unpatentable ...........................................10

    A.    Brief Summary and Date Qualification of the Prior Art....................10

        1.    Prior Art for Ground 1 [Wren + Berger]..................................10

            (a)    Overview of Wren [Ex. 1003] .......................................10

            (b)    Overview of Berger [Ex. 1004] .....................................13

        2.    Prior Art for Ground 2 [Wren + Berger + Hanna]...................16

            (a)    Hanna [Ex. 1005]...........................................................16

        3.    Prior Art for Ground 3 [Wren + Berger + Thorne].................18

            (a)    Overview of Thorne [Ex. 1006] ....................................18

**Table of Contents**
(continued)

Page

B.    Ground 1: Obviousness Over Wren and Berger ...............................20

    1.    Claim 1 .........................................................................20

        (a)    "A computer-implemented method of handling an electronic message at a recipient user device in a networked environment, the electronic message including a message content and a header information that corresponds to the message content, the recipient user device having access to electronic instructions, the method comprising:" (Preamble).....................................................................20

        (b)    "providing a plurality of reduced traceability displays via the recipient user device using a display generator that acts upon a display element of the recipient user device to provide the plurality of reduced traceability displays, the display generator including the electronic instructions, the plurality of reduced traceability displays including a first display presenting a header information of an electronic message received at the recipient user device and a second display presenting a message content of the electronic message, the message content including a media component," (Claim 1[a])..............................................................................25

        (c)    "the message content and the header information having been related to each other using a correlation previously assigned to each of the message content and the header information;" (Claim 1[b]) ..................................................................31

        (d)    "receiving a selection by the recipient user via the first display, the selection directed to a portion of a message list corresponding to the header information; and" (Claim 1[c])......................................44

**Table of Contents**
(continued)

(e)     "in response to the selection, providing the second
display via the recipient user device such that the
second display does not include a display of the
header information via the second display such
that a single screen capture of both the header
information and the media component is
prevented." (Claim 1[d])................................................47

2.    Dependent Claim 4: "A computer-implemented method
according to claim 1, wherein the recipient user device is
a device selected from the group consisting of a personal
computer, a workstation computer, a server computer, a
laptop computer, a handheld device, a mobile telephone,
a personal digital assistant, and any combinations
thereof."....................................................................................50

3.    Dependent Claim 5: "A computer-implemented method
according to claim 1, wherein the media component
includes information selected from the group consisting
of an image, video, audio, and any combinations
thereof."....................................................................................50

C.    Ground 2: Obviousness Over Wren, Berger, and Hanna..................50

1.    Dependent Claim 9: "A computer-implemented method
according to claim 1, wherein the header information and
the message content are received at the recipient user
device via a network, wherein the header information and
the message content are communicated over the network
separately.".............................................................................50

2.    Dependent Claim 10: "A computer-implemented method
according to claim 1, wherein message content is
received from a server computer and the method further
comprises deleting the message content including the
media component from the server computer." ........................62

**Table of Contents**
(continued)

Page

      3.    Dependent Claim 11: "A computer-implemented method according to claim 10, wherein said deleting the message content including the media component from the server computer occurs after said providing a second display." ........63

   D.    Ground 3: Obviousness Over Wren in view of Berger and Thorne ............................................................................................65

      1.    Dependent Claim 13: "A computer-implemented method according to claim 1, further comprising deleting the message content including the media component at a predetermined amount of time after being displayed such that after the second display is terminated from view, the message content including the media component is no longer available to the recipient user." .....................................65

VII.   Conclusion ......................................................................................70

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

## List of Exhibits

| Exh. No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 9,306,886 B2 to Joseph Collins and Jindas Shah (issued on April 5, 2016) |
| 1002 | Declaration of Sandeep Chatterjee, Ph.D. |
| 1003 | U.S. Patent Application Publication No. 2005/0021803 A1 to Paul I. Wren III (filed on June 9, 2003) ("Wren") |
| 1004 | U.S. Patent Application Publication No. 2003/0152203 A1 to Adam L. Berger (published on August 14, 2003) ("Berger") |
| 1005 | U.S. Patent No. 7,054,905 B1 to Stephen R. Hanna et al. (filed on March 30, 2000) ("Hanna") |
| 1006 | U.S. Patent No. 5,958,005 to John Thorne et al. (filed on July 17, 1997) ("Thorne") |
| 1007 | Excerpts from Eric A. Meyer, *Cascading Style Sheets: The Definitive Guide* (2d ed. 2004) ("Meyer") |
| 1008 | Excerpts from *The American Heritage Dictionary* (4th ed. 2000) |
| 1009 | Excerpts from *Merriam Webster's Collegiate Dictionary* (10th ed. 1996) |
| 1010 | Excerpts from *Random House Webster's Unabridged Dictionary* (2001) |
| 1011 | Excerpts from Rutkosky et al., *Microsoft Access 2000: Core and Expert Certification* (2000) |
| 1012 | Excerpts from *Microsoft Computer Dictionary* (5th ed. 2002) |
| 1013 | U.S. Patent No. 7,409,425 to Indran Naick and Jefferey Kenneth Wilson (filed on November 13, 2003) |

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

## List of Exhibits

| Exh. No. | Description of Document |
|---|---|
| **1014** | Exhibit D to Vaporstream's Infringement Contentions in the concurrent litigation, *Vaporstream, Inc. v. Snap Inc.*, Case No. 2:17-cv-00220-MLH-KS (C.D. Cal.) |

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

This is a petition for *Inter Partes* Review of claims 1, 4, 5, 9-11, and 13 of

U.S. Patent No. 9,306,886 (Ex. 1001) ("'886 patent").

# I.   MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

## A.   Real Party-In-Interest under 37 C.F.R. § 42.8(b)(1)

Snap Inc. ("Petitioner") is the real party-in-interest.

## B.   Related Matters under 37 C.F.R. § 42.8(b)(2)

The '886 patent is the subject of pending litigation involving Petitioner:

*Vaporstream, Inc. v. Snap Inc.*, Case No. 2:17-cv-00220-MLH-KS (C.D. Cal.), filed

in the U.S. District Court for the Central District of California on January 10, 2017.

The Complaint was served on Petitioner on January 11, 2017.

On November 16, 2017, Petitioner filed a petition for *inter partes* review of

U.S. Patent No. 8,886,739, a continuation of the same application to which the '886

patent claims priority.  *See Snap Inc. v. Vaporstream, Inc.*, IPR2018-00200.  No

institution decision has issued.

On December 14, 2017, Petitioner filed petition for *inter partes* review of U.S.

Patent No. 9,306,885, a continuation of the same application to which the '886 patent

claims priority.  *See Snap, Inc. v. Vaporstream*, IPR2018-00312. No institution

decision has issued.

On December 21, 2017, Petitioner filed petition for *inter partes* review of U.S.

Patent No. 9,313,155, a continuation of the same application to which the '886 patent

-1-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

claims priority.  *See Snap, Inc. v. Vaporstream*, IPR2018-00369.  No institution

decision has issued.

### C. Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

Petitioner provides the following designation of counsel.

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| Heidi L. Keefe (Reg. No. 40,673)<br>hkeefe@cooley.com<br>zSnapVaporstream@cooley.com<br><br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC 20004<br>Tel: (650) 843-5001<br>Fax: (650) 849-7400 | Andrew C. Mace (Reg. No. 63,342)<br>amace@cooley.com<br>zSnapVaporstream@cooley.com<br><br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave., NW, Suite 700<br>Washington D.C. 20004<br>Tel: (650) 843-5808<br>Fax: (650) 849-7400 |
| | Mark R. Weinstein (Admission *pro hac vice* pending)<br>mweinstein@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave. NW, Suite 700<br>Washington, DC 20004<br>Tel: (650) 843-5007<br>Fax: (650) 849-7400 |
| | Reuben Chen (Admission *pro hac vice* pending)<br>rchen@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave. NW, Suite 700<br>Washington, DC 20004<br>Tel: (650) 843-5480<br>Fax: (650) 849-7400 |

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| | Yuan Liang (Admission *pro hac vice* pending) yliang@cooley.com COOLEY LLP ATTN: Patent Group 1299 Pennsylvania Ave. NW, Suite 700 Washington, DC 20004 Tel: (730) 456-8656 Fax: (240) 503-3291 |

### D.    Service Information

This Petition is being served to the current correspondence address for the '886 patent, BIRCH TREE IP LAW & STRATEGY PLLC, 370 Farrell St., Suite 423, South Burlington, VT 05403.   Petitioner consents to electronic service at the addresses provided above for lead and back-up counsel.

### E.    Power of Attorney

Filed concurrently per 37 C.F.R. § 42.10(b).

## II.   FEE PAYMENT - 37 C.F.R. § 42.103

This Petition requests review of seven claims.   A payment of $23,000 is submitted herewith, based on a $9,000 request fee, and a post-institution fee of $14,000.  This Petition meets the fee requirements of 35 U.S.C. § 312(a)(1).

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

## III.   REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108

### A.   Grounds for Standing under 37 C.F.R. § 42.104(a)

Petitioner certifies that the '886 patent is available for *inter partes* review and that Petitioner is not barred or otherwise estopped from requesting *inter partes* review on the grounds identified.

### B.   Identification of Challenge under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested

The Petitioner respectfully requests the Board initiate IPR of claims 1, 4, 5, 9-11, and 13 based on the following:

| Ground | Claims | Basis for Challenge |
|:------:|:------:|---------------------|
| 1 | 1, 4, 5 | Obvious over Wren (Ex. 1003) in view of Berger (Ex. 1004) |
| 2 | 9-11 | Obvious over Wren in view of Berger and Hanna (Ex. 1005) |
| 3 | 13 | Obvious over Wren in view of Berger and Thorne (Ex. 1006) |

**Part VI** explains why the challenged claims are unpatentable.  Submitted with the present Petition is a Declaration of Sandeep Chatterjee, Ph.D. (Ex. 1002) ("Chatterjee"), a technical expert with decades of relevant technical experience. (Chatterjee, ¶¶1-9, Ex. A.)

### C.   Considerations Under 35 U.S.C. § 325(d)

The Wren, Berger, and Hanna references cited in Ground 1 and Ground 2 were

-4-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

not cited during the prosecution of the '886 patent.  Ground 3 adds the Thorne

reference solely with respect to the display and deletion limitations of dependent

claim 13.  Although Thorne was cited during the original prosecution of the '886

patent, it was merely cited in an Information Disclosure Statement (IDS) and not

substantively discussed.  There is no evidence that the Examiner ever evaluated

Thorne with respect to dependent claim 13, and the claims were allowed based on

limitations in the independent claims – for which this Petition cites the new Wren

and Berger references.   This Petition therefore relies on prior art and grounds of

unpatentability different from any presented during prosecution.

## IV.   OVERVIEW OF THE '886 PATENT

### A.   Level of Ordinary Skill in the Art

The '886 patent, entitled "Electronic Message Recipient Handling System and

Method with Separated Display of Message Content and Header Information,"

generally relates to the field of "electronic messaging."  ('886, 1:66-2:3.)  One of

ordinary skill in the art for purposes of the '886 patent would have possessed at least

a bachelor's degree in software engineering, computer science, or computer

engineering with at least two years of experience in the design and implementation

of systems for sending and receiving messages over a communications network,

such as the Internet (or equivalent degree or experience).  (Chatterjee, ¶¶13-15.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

### B.    Overview of the Specification

The '886 patent describes a series of techniques for sending an electronic
message from one user to another.  Figure 1 below shows "one embodiment of a
system **100** for electronic messaging depicting an electronic message **105** being sent
from one user to another."  ('886, 4:17-19.)



**FIG. 1**

-6-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

('886, Fig. 1.) "System **100** allows users of computers **110** and **115** to communicate with each other via one or more electronic messages, such as electronic message **105** over network **120**." ('886, 4:29-32.) System **100** may also include one or more server computers. ('886, 4:48-49.)

The '886 patent states that it discloses "[a]n electronic messaging system and method with reduced traceability." ('886, Abstract.) The challenged claims here focus on receive-side activities. For purposes of the challenged claims, therefore, the feature most pertinent to the "reduced traceability" method is providing a user interface for the recipient that has <u>separate</u> displays for the presentation of message "header information" and "message content." The specification explains that "header information for a particular electronic message, … may include, but is not limited to, a reply ID, a message ID, a date/time associated with the electronic message (*e.g.*, date/time of creation, date/time of delivery, etc.), a display name representing a sender of the electronic message, and any combinations thereof." ('886, 12:66-13:5.) The specification asserts that "separate display of header information and message content prevents a single screen capture at a user computer from creating a complete record of the electronic message." ('886, 18:6-9.)

Figures 10 and 11 below show examples of separate displays, the former showing only the header information (with no message content), and the latter showing only message content (with no header information):

-7-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2



**FIG. 10**

('886, Fig. 10.)  As shown above, "Fig. 10 illustrates an example display image **1000**
including a recipient address input portion **1005** and a message listing portion **1010**.
Message listing portion **1010** includes a list of header information **1015**, **1020**, **1025**
of three electronic messages.  Message listing portion **1010** includes a display name
and a date/time received for each of header information **1015**, **1020**, **1025**."  ('886,
14:38-44.)  "[A] user may select one of the electronic messages indicated by header
information **1015**, **1020**, **1025** …."  ('886, 14:66-15:2.)  Figure 11 shows an example
display that could occur in response to such a selection:

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2



**FIG. 11**

('886, Fig. 11.)  As explained in the '886 patent, Figure 11 above "illustrates one example display image **1100** presenting message content, independent of header information … upon selection of header information **1015** in display image **1000** of FIG. 10." ('886, 15:23-26.)

### C.    The Challenged Claims

This Petition challenges claims 1, 4, 5, 9-11, and 13, with claim 1 being the sole independent claim.  This Petition will use bracketed notations (*e.g.*, **[a]**, **[b]**, etc.) to refer to individual limitations of claim 1.  All other challenged claims depend from claim 1.

## V.    CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3)

For purposes of the prior art cited herein, Petitioner does not at this time contend that any term requires explicit construction by the Board under the broadest

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

reasonable interpretation standard.  Petitioner notes that the claim construction process in district court is currently ongoing, and reserves the right to advocate for explicit constructions under the narrower *Philips* standard.  Petitioner also reserves the right to raise indefiniteness issues in other proceedings where that challenge is available.

## VI.   CLAIMS 1, 4, 5, 9-11, AND 13 ARE UNPATENTABLE

### A.   Brief Summary and Date Qualification of the Prior Art

This Petition will provide an overview of each of the prior art references cited in the grounds listed, and then discuss those grounds.

#### 1.   Prior Art for Ground 1 [Wren + Berger]

##### (a)   Overview of Wren [Ex. 1003]

**Wren**, entitled "Messaging of Arbitrary-Length Video and Audio Content," purports to describe a method for easily recording a "movie message" and sending it to another user on a network such as the Internet.  (Wren, ¶0008.)  "The method can be enabled with a variety of devices such as a mobile phone … with an embedded or attached camera and digital signal processing capabilities to capture and encode an arbitrary length of video and audio into a format that can be streamed or attached to an electronic message."  (Wren, ¶0009.)  This Petition relies on Wren as the primary reference for disclosing the majority of the elements for claim 1. Wren qualifies as prior art under at least §§102(e) and 102(a) because it was a patent

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

application filed on June 9, 2003 and published on January 27, 2005, both dates

being before the earliest filing date for the '886 patent.

Wren describes a messaging system in which a sender can record video and

audio content and send it as a movie message to another user. Wren calls this a "one-

touch" messaging procedure because the sender can transmit a movie message with

minimal user input. "This one-touch procedure is invoked from a hard or soft button

while viewing an address-book entry, from a menu for initiating the recording and

sending of a movie message or from a voice or video call screen to record and send

a movie message simultaneously…." (Wren, ¶0028, Fig. 5.) Once the movie

message is recorded, the sender can choose to send the message via email. (Wren,

¶0029.) This embodiment does not require the sender to input an email address or

text for the subject or body of the message. Instead, "[t]he Send option will auto-

compose the message based on parameters submitted to the method from the point

of initiation." (*Id.*)

After the message is composed, Wren discloses two ways in which the video

and audio content can be provided with the message: **(1)** attaching the complete

video and audio message to the email message, or **(2)** inserting a URI into the

message identifying a network location where the video and audio data can be

-11-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

obtained for streaming delivery.  (Wren, ¶0029.)[1]  The message is then transmitted

via email.  (*Id.*)

On the recipient side, Figure 9 of Wren shows "an illustration of the end-user

experience receiving the one-touch message with a compatible mobile phone or PC

with a compatible e-mail client."  (Wren, ¶0022.)  In the case where the recipient

utilizes a mobile phone, Figures 9A and 9B show screen displays demonstrating how

the movie message is handled by the recipient device:

FIG 9A    FIG 9B 

---

[1] The term "URI" stands for Uniform Resource Identifier, which refers to a sequence

of characters that identifies a resource.  The most common type of URI is a Uniform

Resource Locator (URL), the familiar type of address used to identify resources on

the Internet and the Web (*e.g.*, <http://www.uspto.gov>).  The terms URL and URI

are often used interchangeably when the resources being identified are accessible

over the Internet, as is the case in Wren.  (*See* Chatterjee, ¶33 n.5.)

-12-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

(Wren, Figs. 9A, 9B.)  Figure 9A on the left shows an exemplary notification of the receipt of a movie message, in this case a movie message from "Jane Doe" at "9:30AM."  Figure 9A also includes a "**Play**" button; pressing that button brings up Figure 9B to play back the movie message content on the recipient's device.  (Wren, ¶0032 ("FIG. 9A shows a notification of a new message. FIG. 9B shows a view of the Movie once the user selects play from a new message notification.").)  Further details are provided below.

### (b)    Overview of Berger [Ex. 1004]

**Berger**, entitled "Message Accessing," describes a technique for generating a list of messages for display at a recipient's mobile phone.  (Berger, Abstract, ¶0007.)  Berger qualifies as prior art under §102(b).

The discussion of Wren in Figure 9A and Figure 9B shows an embodiment in which a recipient device can select and play back a *single* received movie message, but that embodiment does not appear to involve *multiple* received messages.  Wren thus does not appear to expressly show receiving a selection "**directed to a portion of a message list corresponding to the header information**," as recited in claim 1**[c]**.  This Petition has thus cited Berger for this claim limitation, as well as the "**correlation**" limitation of claim 1**[b]**.

-13-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

Berger discloses a mobile phone messaging system similar in many respects to Wren.  Figure 4 of Berger shows an exemplary mobile phone display containing a message list **120** showing five received messages:



(Berger, Fig. 4 (partial figure; yellow highlighting added).)  "FIG. 4 shows the list of available messages **120** displayed (**86**) to the user."  (Berger, ¶0041.)  "In FIG. 4, each entry occupies a single line of the display.  The line begins with an index **126** identifying the number of the message in the list."  (*Id.*)

For example, the first message ("1") in the message list **120** of Figure 4, which is shown highlighted above, shows a message from "**George Smith**" sent at "**11:00A**."  (Berger, ¶0041.)  "The user may then select (**88**) any of the messages for

-14-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

review by moving a cursor **132** up and down to reach the message of interest and

then pressing the SEND button **134**."  (Berger, ¶0042.)  The "cursor" is shown as

the triangle (▶) pointing to the message from "George Smith" in Figure 4.

Figure 5 discloses a page of markup language code used to generate the

message list in Figure 5:



FIGURE 5

(Berger, Fig. 5 (highlighting added).)  The information in Figure 5 is written in

Wireless Markup Language (WML), a well-known markup language that was used

to present pages of information to mobile devices.    (Chatterjee, ¶38.)    The

highlighted line of Figure 5 above shows the corresponding WML for the message

sent by "**George Smith**" at "**11:00AM**," which was displayed on the mobile phone

from Figure 4 above.  (*Id.* (citing Berger, ¶0050).)  That line includes not just the

-15-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

information displayed to the user (*i.e.*, "George Smith," "11:00AM"), but includes

an embedded Uniform Resource Locator (URL) for retrieving the message content

from the Internet in response to user selection.  (Berger, ¶0050.)  In that example,

the "**x=97236482342**" potion of the URL corresponds to a hash value that identifies

the user ID and the message number, and is used to specifically identify the desired

message content at the time of retrieval from the server where the content is stored.

(Berger, ¶¶0065-71.)

### 2.   Prior Art for Ground 2 [Wren + Berger + Hanna]

Ground 2 cites Wren and Berger from Ground 1 and adds the Hanna reference,

summarized below, to address limitations of dependent claims 9-11.

### (a)   Hanna [Ex. 1005]

The title of **Hanna** succinctly summarizes what the reference discloses—

"Replacing an Email Attachment with an Address Specifying Where the Attachment

Is Stored."  (Hanna, Cover Page.)  Hanna qualifies as prior art under §102(e).

Hanna describes a technique for using Uniform Resource Locators (URLs) to

transmit and retrieve documents over the Internet.   Hanna explains that email

messages "commonly include attachments, which are typically files containing

documents, or other types of data, that accompany the email message."  (Hanna,

1:25-27.)  An email attachment "can include any type of file or other data that can

be attached to an email message," such as "a document, a graphical image or a data

-16-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

file." (Hanna, 4:25-28.) Hanna purports to solve a series of problems that email

attachments can create. For example, Hanna explains that email attachments "can

give rise to a number of problems," such as (among others) imposing storage and

bandwidth burdens on the system, and failing to provide adequate means to control

access to the attachment. (Hanna, 1:27-49.)

Hanna purports to address such problems through a system in which an email

server receives an email message containing a file attachment, modifies the message

to replace the attachment with a URL, and then sends the modified message to the

recipient. (Hanna, 1:50-55, 2:3-5, 2:55-57, 5:1-12, 5:26-28; *see also id.,* Fig. 3.)

The email message recipient can then use the URL in the message to retrieve the

original attachment from the server. (Hanna, 4:37-47.) Additionally, the email

attachment can be automatically deleted from the server after expiration of a time

period, after all recipients have retrieved the attachment, or other criteria. (Hanna,

6:15-22.)

This Petition cites Hanna in combination with Wren and Berger for the

limitation of claim 9 reciting that "**the header information and the message

content are communicated over the network separately**." This Petition also cites

Hanna in connection with the requirement in claim 10 of "**deleting the message

content including the media component from the server computer**," and the

requirement in claim 11 that the deletion occurs "**after said providing a second**

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

**display**."  Further details are provided in the analysis below.

### 3.    Prior Art for Ground 3 [Wren + Berger + Thorne]

Ground 2 cites Wren and Berger from Ground 1 and adds the Thorne

reference, summarized below, to address the limitation of dependent claim 13.

### (a)    Overview of Thorne [Ex. 1006]

**Thorne**, entitled "Electronic Mail Security," discloses several techniques for

controlling or restricting access to electronic messages.  This Petition cites Thorne

solely in connection with the message access restriction features of dependent claim

13.  Thorne qualifies as prior art under §102(b).

Thorne describes a number of techniques for controlling access to electronic

messages based on a number of different security criteria.  For example, the system

can enforce a "maximum display time" that restricts the amount of time an email

message can be displayed by the user before the message is closed.  This technique

is shown in Figure 5B below:

-18-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2



(Thorne, Fig. 5B (highlighting added; partial figure).)  The yellow highlighted boxes
are further explained in Thorne:

> At **546** the E-Mail message is opened and the text displayed. The
> opening of the display starts a timer count, and at **548** this is observed
> to determine whether the maximum display time has been exceeded.
> This feature is provided in order to insure that a user does not bring the
> message up and leave it displayed for hours. At the passage of the
> specified display time, the application displays a "Display Time
> Exceeded" message, and processing to close the message is initiated.
> These steps are shown at **550** and **552**. The message display is then
> closed as if the user had issued a close command.

(Thorne, 10:35-45 (underlining added).)  As shown in the green highlighted box of
Figure 5B above, the system can thereafter delete the message:

> In due time the display is discontinued, either upon expiration of the
> maximum display time or pursuant to command of the user. At **560** the

-19-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

> message read times counter is incremented. A determination as to whether or not the times read or displayed has exceeded the specified maximum is made at **562**. <u>If this does occur the message is deleted and purged</u>. Notification is sent to the user and the sender. These steps are shown at **564**.

(Thorne, 11:5-12 (underlining added).)  Further details are provided in the discussion of Ground 3 below.

### B.  Ground 1: Obviousness Over Wren and Berger

#### 1.  Claim 1

(a)  **"A computer-implemented method of handling an electronic message at a recipient user device in a networked environment, the electronic message including a message content and a header information that corresponds to the message content, the recipient user device having access to electronic instructions, the method comprising:" (Preamble)**

The preamble of claim 1 is disclosed by <u>**Wren**</u>, which discloses a method of sending video messages to recipients.  As Wren explains: "The primary object of the invention is to provide an end-user with a one-touch messaging capability to send movie messages containing video and audio of arbitrary length to recipients independent of the recipient's device capabilities over a network such as the Internet."  (Wren, ¶0008.)

Wren discloses "[a] **computer-implemented method of handling an electronic message at a recipient user device in a networked environment**."  The

-20-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

"**recipient user device**" takes the form of a message recipient's device such as a mobile phone.  (Wren, ¶¶0008, 0009 ("The method can be enabled with a variety of devices such as a mobile phone . . . ."), 0004 ("The exchange of movie messages that contain video and audio between devices such as a PC or mobile phone is a frequent and convenient means of communication.").)  The recipient user device resides "**in a networked environment**" because the device can obtain the video message over a network such as the Internet.  (Wren, ¶0008 ("The primary object of the invention is to provide an end-user with a one-touch messaging capability <u>to send movie messages</u> containing video and audio of arbitrary length <u>to recipients</u> independent of the recipient's device capabilities <u>over a network such as the Internet</u>.").)

The claimed "**electronic message**" in Wren takes the form of a movie message containing video and audio as shown in Figures 9A and 9B, discussed further below.  (*See also* Wren, ¶0008.)  This is consistent with the '886 patent, which explains that "[a]n electronic message may be any electronic file, data, and/or other information transmitted between one or more user computers."  ('886, 7:50-52.)  The '886 patent further explains that "[a]n electronic message may include (e.g., as part of a message content) any of a wide variety of information including, but not limited to, text, an image, <u>video</u>[,]…<u>audio</u>[,] … other types of data, and any combinations thereof."  ('886, 7:52-60.)

-21-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

Wren further discloses that "**the electronic message includ[es] a message content and a header information that corresponds to the message content,**" as recited.  The "message content" and "header information" are clearly illustrated by Figures 9A and 9B of Wren shown below:

 **FIG 9A**



**FIG 9B**



(Wren, Figs. 9A, 9B.)  Figure 9A shows a screen display on the recipient device showing a notification of receipt of a movie message from "Jane Doe" at "9:30AM." Figure 9B shows the movie message being played in response to the recipient pressing the "Play" button.  (Wren, ¶0032 ("FIG. 9A shows a notification of a new message. FIG. 9B shows a view of the Movie once the user selects play from a new message notification.").)  The claimed "**message content**" in Wren corresponds, as noted, to the movie message content which is shown being played in Figure 9B.  This is consistent with the '886 specification, which explains that "[a]n electronic message may include (e.g., as part of <u>a message content</u>) any of a wide variety of information including, but not limited to, text, an image, <u>video</u> … other types of data,

-22-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

and any combinations thereof."  ('886, 7:52-60.)

The claimed "**header information that corresponds to the message content**" is the sender identification ("Jane Doe") and time ("9:30AM") shown in Figure 9A.  The '886 patent itself confirms that the information shown in Figure 9A clearly qualifies as "header information."  The patent states that header information "may include, but is not limited to, a reply ID, a message ID, a date/time associated with the electronic message (e.g., date/time of creation, date/time of delivery, etc.), a display name representing a sender of the electronic message, and any combinations thereof."  ('886, 12:66-13:5.)  Figure 10 of the '886 patent, in fact, shows header information (**1015**, **1020**, **1025**) containing the name of the sender ("Mary Smith") and the date and time associated with the message – similar to Wren. ('886, Fig. 10, 14:40-42 ("Message listing portion **1010** includes a list of header information **1015**, **1020**, **1025** of three electronic messages.").)

The header information in Wren also "**corresponds to the message content**" because it accompanies and is associated with the video content.  (Chatterjee, ¶55.) As shown above, in fact, the user can click "Play" from Figure 9A (which shows the "**header information**") to access the movie message content ("**message content**") in Figure 9B.  (Wren, ¶0032, Figs. 9A & 9B.)

With respect to the requirement of "[**a** **computer-implemented method of handling**" the electronic video message, the '886 patent explains that the "handling"

-23-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

includes any of a number possible actions such as, for example, storing or displaying

an electronic message.  (*See* '886, 8:16-20 ("[S]ystem **100** may handle (e.g., store,

deliver, display, etc.) a header information and a message content of a particular

electronic message . . . .").)  As shown above, Wren discloses a technique in which

the recipient mobile phone may receive a notification of a new movie message, and

then view the movie message content on the phone display.  (Wren, ¶0032, Figs. 9A-

9B.)   This clearly discloses a computer-implemented method of "handling" an

electronic message.

Finally, Wren discloses "**the recipient user device having access to**

**electronic instructions**."  A person of ordinary skill would have understood that

"**electronic instructions**" as recited in the preamble simply refers to executable

instructions that cause a computing device to perform a particular function.

(Chatterjee, ¶57, '886, *e.g.*, 2:50-53, 4:64-67, 5:39-44.)   As discussed, Wren

discloses a recipient user device that can receive a new video message and display it

to the user.  (Wren, ¶¶0031-32, Figs. 9A-9B.)  One of ordinary skill would have

understood that the recipient device could not perform these functions as described

in Wren without access to electronic instructions (*e.g.*, software) for performing

these functions.  (Chatterjee, ¶57.)

-24-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

> (b)    **"providing a plurality of reduced traceability displays via the recipient user device using a display generator that acts upon a display element of the recipient user device to provide the plurality of reduced traceability displays, the display generator including the electronic instructions, the plurality of reduced traceability displays including a first display presenting a header information of an electronic message received at the recipient user device and a second display presenting a message content of the electronic message, the message content including a media component," (Claim 1[a])**

This limitation is also disclosed by Wren.  The following table provides an explanation of how the Petition maps Wren's disclosures to claim 1[a]:

| Limitation of Claim 1[a] | Corresponding Disclosure from Wren |
|---|---|
| "recipient user device" | Receiver's mobile phone |
| "display generator" | Hardware, software, or firmware on receiver's mobile phone for generating the screen displays (*e.g.*, Figs. 9A, 9B) |
| "display element of the recipient user device" | The screen display on the recipient user's mobile phone |
| "plurality of reduced traceability displays | The "first display" and the "second display," specified below. |
| "a first display presenting a header information of an electronic message received at the recipient user device" | The screen display in Figure 9A presenting the message header information including the sender name ("Jane Doe") |
| "a second display presenting a message content of the electronic message, the message content including a media component" | The screen display in Figure 9B presenting the movie message content |

-25-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

Although claim 1**[a]** appears verbose, the key limitations pertain to the two

reduced traceability displays – the "**first display**" and the "**second display**," which

are disclosed by Figures 9A and 9B in Wren, respectively:

 FIG 9A


FIG 9B


(Wren, Figs. 9A, 9B, ¶0032.)  "FIG. 9 is an illustration of the end-user experience

receiving the one-touch message with a compatible mobile phone …."  (Wren,

¶0022.)  "FIG. 9A shows a notification of a new message. FIG. 9B shows a view of

the Movie once the user selects play from a new message notification."  (Wren,

¶0032.)

Figure 9A discloses "**a first display presenting a header information of an**

**electronic message received at the recipient user device**," because it shows the

message sender's name ("Jane Doe") and time ("9:30AM") associated with the

message.  As explained with respect to the preamble, these two pieces of information

qualify as "header information" of an electronic message.

Figure 9B shows "**a second display presenting a message content of the**

-26-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

**electronic message, the message content including a media component**," because

it presents the actual movie message content to the user.  (Wren, ¶0032.)

The display in Figure 9A ("first display") and the display in Figure 9B

("second display") together qualify as "**a plurality of <u>reduced traceability</u>**

**displays**."[2]  This is because the displays in Figures 9A and 9B display header

information and message content separately, which as explained by the '886

specification, enables reduced traceability.  (Chatterjee, ¶62 (citing '886, 9:18-22,

3:59-66).)

As shown, Figure 9A displays only header information and not any of the

movie message content.  Petitioner notes that Figure 9A

shows the text "New Movie," but nothing in Wren suggests

that this text was part of the message sent from Jane Doe.

(Chatterjee, ¶63.)  In fact, as noted, Wren refers to the movie

message as a "one-touch" message in which the sender can

send messages to a recipient without further user input.  (Wren, ¶¶0032, 0006-08.)



---

[2] Petitioner's arguments about the term "reduced traceability display" in the text are

based on the meaning of the term under its broadest reasonable

interpretation.  Petitioner reserves its right to advance a different position in district

court litigation not governed by the BRI standard.

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

In one embodiment, for example, the sender can simply select a recipient from an address book to have a movie message recorded and sent, without further input. (Wren, Claim 2 ("[T]he content is recorded, processed, and sent following a one-touch button press in the context of an address book entry, active audio or video call, or other menu without further user input.").)  Accordingly, nothing in Wren suggests that the sending user provided the "New Movie" text.

And the display in Figure 9B shows the movie message content, but clearly does not include any header information (*e.g.*, "Jane Doe" or "9:30AM").  To the extent the Patent Owner would speculate that the movie message content itself could contain identifying information about the sender and/or recipient, it would have been obvious that a video could be recorded without any such indication.  (Chatterjee, ¶64.)



Petitioner's mapping of "**a plurality of reduced traceability displays**" is consistent with the Patent Owner's infringement read in the underlying litigation. (*See* Infringement Contentions (Exhibit D), Ex. 1014, pp.4-5.)  Petitioner's mapping is further supported by the Patent Owner's current proposed construction of "reduced traceability displays" in the underlying litigation as "an arrangement of displays that enables reduced traceability of electronic messages (e.g. by separately displaying identifying information and message content)."  Because the Patent

-28-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

Owner's interpretation of this limitation should be no narrower under BRI, this limitation is thus satisfied by the separate display of identifying information and message content as disclosed in Figures 9A and 9B of Wren.

Moreover, as noted, the claimed "**recipient user device**" is the receiving mobile phone in Wren.  The claim requires that the reduced traceability displays be provided via the recipient user device "**using a display generator that acts upon a display element of the recipient user device to provide the plurality of reduced traceability displays, the display generator including the electronic instructions**."  But these limitations do not add anything that is not already disclosed by, or trivially obvious in view of, Wren.

In the underlying litigation, the Patent Owner has taken the position that "display generator" is not a means-plus-function limitation and should be construed as "software or hardware configured to provide information representing a display image for display on a user computer."  For purposes of this proceeding, and to streamline the Board's consideration of this Petition, Petitioner accepts this formulation as the "broadest reasonable interpretation."  Petitioner observes that the "software or hardware" formulation proposed by the Patent Owner is generally consistent with the functional way in which specification describes the claimed

-29-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

display generator.  ('886, 9:29-35.)[3]

It would have been obvious to a person of ordinary skill that the recipient

mobile device in Wren would have included a "display generator" (as described

above) in order to generate the screen displays of Figures 9A and 9B.  (Chatterjee,

---

[3] For purposes this proceeding, Petitioner does not contend that "display generator"

under its broadest reasonable interpretation is a means-plus-function

limitation.  Petitioner acknowledges that it has advanced a means-plus-function

argument in district court litigation, but the Board has recognized that there is

nothing improper about agreeing with a patent owner's position to streamline an IPR

proceeding while preserving an alternative position in separate litigation not

governed by the BRI standard.  *See Kingston Tech. Co. v. Polaris Innovations Ltd.*,

IPR2016-01621, Paper 8 at 7, 16 (P.T.A.B. Feb. 15, 2017) (rejecting patent owner's

arguments based on "Petitioner's prior allegation of indefiniteness … in the district

court" because "neither party argues in this proceeding that the term … is a means-

plus function term or that it is indefinite"); *Telit Wireless Sols. Inc. v. M2M Sols.

LLC,* IPR2016-00055, Paper 9 at 9 (P.T.A.B. Apr. 22, 2016) ("Patent Owner also

argues that Petitioner's proposed construction in this proceeding is in conflict with

positions Petitioner has taken in district court litigation …. However, we are not

bound by positions taken by an accused infringer in district court litigation.").

-30-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

¶67.)  In order to present the displays in Wren on the recipient device, the recipient device would have included at least hardware or software to provide representations of images ("**display generator**") for the mobile phone display (the "**display element**").  (*Id.*)  Indeed, generating displayable images on a display device for presentation to a user is one of the most fundamental functions of any computer system dating back to the earliest days of computing; in fact, the recipient mobile device in Wren could not generate and present displayable images without a "display generator" as defined above.  (*Id.*)  It thus would have been obvious to implement the screens in Figures 9A and 9B using a display generator.

Moreover, as explained in connection with the preamble, it would have been obvious that the mobile phone would have included "electronic instructions" for performing the functions of that device as disclosed in Wren.  (Chatterjee, ¶¶57, 68.)  In particular, one of ordinary skill would have understood that the display generator that provided the screen displays in Figures 9A and 9B of Wren would have included instructions (*e.g.*, software) for generating the displayable images and providing them to the mobile phone's display.  (Chatterjee, ¶68.)

> **(c)** **"the message content and the header information having been related to each other using a correlation previously assigned to each of the message content and the header information;" (Claim 1[b])**

This limitation is satisfied by Wren's disclosures of Figures 9A and 9B:

-31-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

FIG 9A



FIG 9B



(Wren, Figs. 9A, 9B, ¶0032.)  As discussed, "FIG. 9A shows a notification of a new message. FIG. 9B shows a view of the Movie once the user selects play from a new message notification."  (Wren, ¶0032.)  The header information shown in Figure 9A and the message content in Figure 9B are clearly "**related to each other using a correlation previously assigned to each of the message content and the header information**."  This is because, when the user presses "Play" in Figure 9A (which presents the header information), Figure 9B (which presents the message content) appears in response.  (Chatterjee, ¶69 (citing Exs. 1008, 1009).)

One of ordinary skill would have understood that, in order for the header information in Figure 9A to be able to link (through the "Play" button) to the movie message content in Figure 9B, there would have been a "**correlation**" assigned to the header information and movie message content so the phone could identify the movie message content that corresponds to the displayed header information. (Chatterjee, ¶70 (citing Ex. 1008 (providing definition of "correlation" as "[a]

-32-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

causal, complementary, parallel, or reciprocal relationship, especially a structural, functional, or qualitative correspondence between two comparable entities"); Ex. 1010 (providing definition of "correlation" as "[m]utual relation of two or more things, parts, etc.")).)

Moreover, the correlation between the header information and the message content was "**<u>previously</u> assigned**" because it would have been assigned before the claimed step of "**providing a plurality of reduced traceability displays**," which as explained, corresponds in Wren to the presentation of the displays in Figure 9A and Figure 9B.[4]  One of ordinary skill would have understood and found it obvious that the claimed "correlation" would be in place <u>prior</u> to the presentation of the displays in Figures 9A and 9B because as soon as Figure 9A is presented, the user has the option to press "Play" to trigger the display of Figure 9B.  (Chatterjee, ¶70.)

---

[4] The limitation "a correlation previously assigned to each of the message content and the header information" is recited as part of the step of "providing a plurality of reduced traceability displays."  The term "previous[]" in "previously assigned" thus relates to the claimed "providing" of the reduced traceability displays.  Under the broadest reasonable interpretation, therefore, the claimed "correlation" need only have been assigned previous to the providing of the reduced traceability displays.

-33-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

FIG 9A     FIG 9B 

Petitioner acknowledges that Wren does not disclose the details of how the correlation between the header information and the message content was assigned, but this does not disqualify Wren from satisfying this limitation. The claim simply requires "a correlation previously assigned to each of the message content and the header information," which does not under its broadest reasonable interpretation impose any constraints on how the claimed "correlation" should be established. (Chatterjee, ¶71.)

To the extent the Patent Owner raises any issue with respect to this limitation, it is also obvious over Wren in further view of **Berger**. As explained in the summary above, Berger discloses a technique for displaying and selecting among multiple

-34-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

received messages using a mobile phone.  (Berger, ¶¶0007, 0008.)  Berger explains

that, in one embodiment, each message is previously assigned a "message number"

(*e.g.*, "1", "2", "3", "4", "5", as shown at right) that identifies that message, and is

used to retrieve that message from a list of

messages displayed on the mobile phone.

(Berger, Fig. 4, ¶¶0042, 0043, 0052-57,

Claims 19, 23.)  As Berger explains:



> [T]he message server must have a way
> to "remember", between transactions
> with the phone client, (a) which user is
> using the phone, and (b) <u>which message
> the user wants to access</u>.

> One typical way to do this uses a Java servlet mechanism to
> <u>embed, in the URLs included in the list provided from the server to the
> browser, the information needed to</u> authenticate the user and <u>identify
> the desired message</u>. <u>The server knows</u> the user's ID and <u>the message
> identifier when it assembles the list to be sent to the browser</u>.

(Berger, ¶¶0052-53.)  Thus:

> If (**90**) the user selects a link corresponding to an email message (*e.g.*,
> <u>message 1, 2, or 4</u>), the browser **73** in the phone sends a corresponding
> HTTP request (**92**) for that message to the UM server **64**.  The UM
> server software responds by fetching the requested message from the
> email message repository and delivering (**94**) the message (in the form

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

> of a web page, using HTTP) to the phone. The browser on the phone
> then displays the message to the user.

(Berger, ¶0043.)

Berger makes clear that the "message number" previously assigned by the server (*e.g.*, "1") to each row of displayed header information (*e.g.*, "George Smith 11:00A") is used to retrieve the corresponding message content:

> When the user selects a particular message, his browser returns an
> HTTP request that includes the message number and the user ID. For
> instance, imagine that the URL for the messaging server is
> http://www.x.com and the user's ID is 123456. The URL corresponding
> to a request to view email message #6 for this user might be, in this
> case,
>
> > http://www.x.com/email.jsp?u=123456&m=6

(Berger, ¶¶0054, 0055 (internal quotations omitted).)  "When the user selects this email from the displayed list, the browser would send an HTTP request for '/email?u=123456&m=6' to the messaging server,…. Because the messaging server would have stored the information about the messages, the messaging server would recognize the return URL as a request for the sixth email message for user 123456's email, and would generate the appropriate web page to send back to the user." (Berger, ¶¶0056-57.)

Berger also discloses an alternative embodiment in which the "message number" and "user ID" are combined into a single cryptographic hash value that is

-36-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

included in the URL.  (Berger, ¶¶0062-71.)  As explained in Berger:

> [R]ather than encoding the userID and message number explicitly in
> the URL that is included in the list sent to the phone, the message server
> instead applies the hashing function to these two values as described,
> stores an entry in the hash column, and encodes the URL (108) in the
> following way:
>
> > http://www.x.com/email.jsp?x=[hash]

(Berger, ¶0065, 0066.)  When the server receives the hash URL from the mobile

phone, "the server consults the currently active table of hashes, decodes the hash

into a (user, message number), and delivers to the phone the desired message number

for that user."  (Berger, ¶0071.)

   Both of these embodiments separately and independently disclose "**the
message content and the header information having been related to each other
using a correlation previously assigned to each of the message content and the
header information**."  The "correlation" is established through the message number

(in the first embodiment), or the hash value (in the second embodiment).   As

discussed above, the user ID and message number, or their hash, is encoded into the

URL that accompanies the header information of each message in the list displayed

on the phone. (Berger, Fig. 5, ¶¶0050, 0053, 0065-70.) Figure 5, for example, shows

a listing for a received message from "George Smith" with the URL:

<http://www.x.com/email.jsp?x=97236482342>, the "x=" value identifying the

-37-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

hash generated from the message number and that identifies the message content.
Because the header information for each message is accompanied by message
number/hash, and the message number/hash is used to access the content
information, Berger discloses a correlation assigned to both the message content and
header information. (Chatterjee, ¶76.)

Indeed, the correlation between the header information and message content
established by the message number/hash in Berger is remarkably similar to the
correlation established by a "message ID" as described in the '886 patent.
(Chatterjee, ¶77 (citing '886, 8:16-33, 17:47-50).) And just like the message number
and hash in Berger, the message ID in the '886 patent is passed to the server upon
selection of the corresponding header information, and then used by the server to
retrieve the message content from storage and deliver it to the recipient. ('886, 15:9-
20.)

**Rationale and Motivation to Combine**: It would have been obvious to
combine Wren and Berger, with no change in their respective functions, predictably
resulting in the mobile phone user interface of Wren (as shown in Figure 9A and
Figure 9B) in which the received movie message was associated with a previously
assigned message identifier (such as the message number or hash in Berger), which
correlated both the message header information (as shown in Figure 9A) and the
movie content (as shown in Figure 9B). (Chatterjee, ¶¶78-87.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

A person of ordinary skill would have found this to be a straightforward combination for a number of reasons. (Chatterjee, ¶79.) To begin with, as shown in more detail in the next ("message list") claim limitation below, the teachings of Berger would have provided a distinct improvement to the mobile device display of Wren – the ability to display and allow selection from among a multiplicity of received messages. (Chatterjee, ¶¶79, 92.)

Although the exemplary screen displays in Figure 9A and Figure 9B of Wren show a single received message, it was well-known to persons of ordinary skill, and just about anyone who had used email or other forms of electronic messaging, that a user could receive multiple messages through her device. (Chatterjee, ¶79.) This has been known since the earliest days of electronic messaging, and as Berger confirms, was also known to occur in the context of messages received by mobile phones. (*Id.* (citing Berger, Fig. 4, ¶0041).) One of ordinary skill would have found the teachings of Berger instructive in improving the recipient mobile device in Wren to display a list of multiple messages and allow a recipient to select a message from the list. (Chatterjee, ¶79.) As Berger expressly confirms, its techniques provide a "simple seamless user interface." (Berger, ¶0028.)

One of ordinary skill would have readily understood that, when multiple received messages can be displayed in a list – as would be the case in the combination of Wren and Berger – there needs to be some way to connect each of

-39-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

the header information shown in the message list with the underlying message content. (Chatterjee, ¶80.) In fact, the ability to correlate two pieces of information through a common value (such as the message number or hash in Berger) is basic knowledge of a person of ordinary skill, and fundamental to just about any system that needs to retrieve data upon request. (Chatterjee, ¶81.) It would thus have been obvious to assign a message identifier to each message (such as the message number or hash in Berger) in order to allow the device of Wren to retrieve the movie message that corresponds to the selected header information. (Chatterjee, ¶¶80, 81.)

One of ordinary skill would have further recognized that the message list techniques in Berger are a particularly good technological fit with the mobile device of Wren. (Chatterjee, ¶82.) Wren and Berger are analogous references in the same field of mobile communications, and both references confront common issues relating to presenting received messages on mobile devices with smaller screens. (*See id.*; Berger, ¶¶0006, 0032; Wren, ¶¶0022, 0032, Figs 9A-9B (using multiple screens on a mobile phone), 9C (using single screen on a PC with a larger display).)

Both references also use similar techniques for delivering message content to the recipient device. (Chatterjee, ¶83.) As noted, Berger discloses that message content can be retrieved from a storage location on the Internet by activating a URL embedded in the header information. (Berger, ¶¶0053-57, 0081 ("Various platforms for embedding of the locators can be used.").) And Wren discloses that its movie

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

message content can be retrieved by activating an embedded URI.  (Wren, ¶0011 ("[T]he video and audio streams to a remote disk that is available on the world-wide web and a message is created and sent with a URI to the streamed media embedded in the body of the message…. When the message is received, an end-user can click on … the URI to play the video and audio."); *see also id.*, Abstract, ¶0025.)  As noted, the "URI" in Wren and the "URL" in Berger are interchangeable in this context.  (Chatterjee, ¶¶33 n.5, 83.)  Because the recipient mobile phone in Wren already has the ability to retrieve message content using a URI/URL, incorporating the teachings of Berger would have been technologically straightforward, and a person of ordinary skill would have had every expectation of success.  Indeed, the synergistic and complementary nature of the systems disclosed in Wren and Berger would have provided a further motivation to combine.  (Chatterjee, ¶83.)

Berger provides additional express motivations.  Berger explains that its URL delivery technique (using message numbers/hashes) allows the message content to be optimized for delivery based on the capabilities of the recipient device:

> To deliver the message to the phone may require that the UM server transform the content of the original message-which may be in a format not compatible with the target device or which may contain attachments in a format not compatible with the target device-so they are compatible with the target device. Delivering the message to the phone also requires that the UM server honors the constraints of the target device,

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

> including memory limitations which impose an upper limit on the file
> size of a document delivered to the device.

(Berger, ¶0044.)  It was well-known that target device limitations could be identified

to the server along with the URL request – such functionality (known as "User-

Agent") was built-into the design of HTTP.  (Chatterjee, ¶84; *see also* Berger, ¶0043

(explaining that message delivery occurs in response to an HTTP request from the

target phone).)  One of ordinary skill would have recognized that this benefit would

have been particularly significant in the context of video, which typically takes up

significantly more data and processing than other types of information, and thus,

creates a greater likelihood that a sender's video in its original form may exceed the

constraints of the target device.  (Chatterjee, ¶84.)  This benefit is also particularly

compelling for recipient mobile phones, which as Berger recognized, "typically have

limited memory capability, limited bandwidth, and cannot render some common

types of files in their native formats, for example, HTML, GIF, JPEG, MPEG, WAV,

PDF, MSWord, PowerPoint, and Excel."  (Berger, ¶0006.)  Wren similarly

recognizes these limitations, adding further express support for the motivation

provided in Berger.  (Wren, ¶0004 ("[T]he size of the movie message is

predetermined by the designers of the mobile phone based on the networking

capabilities of the device. In current art of mobile data technology, the size of the

movie message is constrained to less than 20 or 30 kilobytes as limited at the time

-42-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

of manufacturing.").)

Berger provides yet another express benefit in the form of security. (Chatterjee, ¶85 (citing Berger, ¶¶0059-63).)  As discussed, Berger discloses an embodiment where, "rather than encoding the userID and message number explicitly in the URL that is included in the list sent to the phone, the message server instead applies the hashing function to these two values."  (Berger, ¶0065.)  Berger explains that such a technique prevents the potential scenario where a "malicious third party," "[e]quipped with the knowledge of another person's user ID, … could, even without physical access to the user's phone, access that person's messages simply by visiting (for example) the URL http://www.x.com/email.jsp?u=123456m=4 to see the user's fourth most recent message."  (Berger, ¶0061.)

As noted, Wren uses email, a private form of person-to-person messaging, to facilitate the delivery of message content.  (Wren, ¶¶0010, 0029.)  It was well-known to persons of ordinary skill in the art that privacy and security were important to just about any user of computer messaging products, including email.  (Chatterjee, ¶85.)  As of July 2005, entire industries existed that offered encryption and various other various privacy and security solutions to protect the confidentiality of electronic messages.  (*Id.*)  One of ordinary skill would have understood that the security and privacy mechanisms in Berger, including encryption and access control features discussed above, would have made the video message communications system of

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

Wren more desirable.  (*Id.*)

Finally, Berger makes clear that its teachings do not depend on the type of messages received – "[a]ny kind of message could be received."  (Berger, ¶0079.) And Berger specifically identifies video as a type of message that can be received. (Berger, ¶¶0001, 0079 ("Although we have used the words audio, voice, and video to describe certain kinds of messages received, other kinds of multimedia messages may also be handled in similar ways.").)  One of ordinary skill in the art would have understood that the correlation techniques in Berger would have been suitable for organizing any type of message content, including the movie messages on the mobile device of Wren.  (Chatterjee, ¶85.)  Berger also uses industry standard technologies such as "typical" WAP browsers "installed on mobile phones."  (Berger, ¶0030.) One of ordinary skill would have thus appreciated that using the message list techniques in Berger would have provided the additional benefit of built-in compatibility with an installed base of mobile phones that had used standard WAP browsers.  (Chatterjee, ¶87.)

> **(d)** **"receiving a selection by the recipient user via the first display, the selection directed to a portion of a message list corresponding to the header information; and" (Claim 1[c])**

Figure 9A of Wren (the "**first display**") shows that the recipient user can select a message by pressing the "Play" option to present the movie content:

-44-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

**FIG 9A**



**FIG 9B**



(Wren, Figs. 9A, 9B, ¶0032.)  As discussed, "FIG. 9A shows a notification of a new message. FIG. 9B shows a view of the Movie <u>once the user selects play from a new message notification</u>."  (Wren, ¶0032.)  Wren thus discloses "**receiving a selection by the recipient user via the first display**," the selection directed to the header information shown in Figure 9A.

As explained for claim 1**[b]**, Figure 9A of Wren displays only a single message, and as such, does not appear to expressly disclose a "**selection directed to a portion of a message list corresponding to the header information**."  But this additional feature would have been obvious in further view of Berger, as previously mentioned.

Berger discloses a mobile phone that can display a message list that displays header information – the same header information in Wren (sender name and date) – and allows a user to select a message from that list.  Figure 4 of Berger shows an example of such a list as displayed in a mobile phone:

-45-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2



(Berger, Fig. 4 (highlighting added; partial figure); *see also id.*, ¶0041.)  "In FIG. 4, each entry occupies a single line of the display. The line begins with an index **126** identifying the number of the message in the list."  (Berger, ¶0041.)

For example, the first message in the message list **120**, highlighted in yellow, shows header information for a message sent by "**George Smith**" at "**11:00A**," the same two categories of header information shown in Figure 9A of Wren ("**Jane Doe**" and "**9:30AM**").  (*Compare,* Wren, Fig. 9A, *with,* Berger, ¶0041 ("For text messages, the title is the name of the sender of the message. After the title, the time **130** when the message was sent appears.").)  Berger explains that "[t]he user may then select (**88**) any of the messages for review by moving a cursor **132** up and down

-46-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

to reach the message of interest and then pressing the SEND button **134**.  A variety

of other techniques could be used to enable the user to select a message, including a

touchscreen or pointing device, available on some mobile devices." (Berger, ¶0042.)

The combination of Wren and Berger thus renders obvious the step of
"**receiving a selection by the recipient user via the first display, the selection
directed to a portion of a message list corresponding to the header
information**."  (Chatterjee, ¶92.)   Under the combination of Wren and Berger,
Figure 9A of Wren ("first display") would be further adapted to display a message
list containing multiple messages, each item in the list listing header information as
disclosed in Berger.  The selection in Wren, under this combination, would thus be
"**directed to a portion of a message list corresponding to the header
information**" because the user would select the message by placing the cursor on
the header information corresponding to that message (*e.g.*, "George Smith,"
"11:00A"), as disclosed in Berger and explained above.  (Berger, ¶0042.)   The
motivation to combine Wren and Berger was described in the preceding limitation,
and applies here.  (Chatterjee, ¶¶78-87, 93.)

> **(e)**  **"in response to the selection, providing the second
> display via the recipient user device such that the
> second display does not include a display of the header
> information via the second display such that a single
> screen capture of both the header information and the
> media component is prevented." (Claim 1[d])**

Figure 9B of Wren (the "**second display**") shows that, in response to the

-47-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

selection, the recipient user is presented with the movie message content but is <u>not</u> presented with any of the header information:

**FIG 9A**



**FIG 9B**



(Wren, Figs. 9A, 9B.)   As discussed, "FIG. 9A shows a notification of a new message. FIG. 9B shows a view of the Movie <u>once the user selects play</u> from a new message notification." (Wren, ¶0032.)  Moreover, as shown above, Figure 9B shows only the video content – the header information from Figure 9A (*i.e.*, "Jane Doe," "9:30AM") is not shown.   Wren thus discloses "**in response to the selection, providing the second display via the recipient user device such that the second display does not include a display of the header information via the second display**."[5]

---

[5] As explained for claim 1**[c]**, it would have been obvious that the claimed "selection" was "directed to a portion of a message list corresponding to the header

-48-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

Wren further discloses that "**a single screen capture of both the header information and the media component is prevented**," because the header information and media component are presented on separate screens of Figure 9A and Figure 9B, respectively. A screen capture of the "first display" of Figure 9A of Wren (or the message list of Berger) would capture header information, but none of the message content or media component. Conversely, a screen capture of the "second display" of Figure 9B of Wren might capture some of the media component (*e.g.*, a frame of the movie message), but would not capture any of the header information. Thus, a "single screen capture" of both the header and media component is prevented. (Chatterjee, ¶¶95-96.) The '886 specification confirms that not displaying header information with the message content prevents a single screen capture of both pieces of information. ('886, 9:18-22, 18:6-9.) Petitioner's mapping of this limitation is further consistent with the Patent Owner's infringement read in the underlying litigation. (*See* Infringement Contentions (Exhibit D), Ex. 1014, p.9-10.)

---

information" as disclosed in Berger. The selection in Berger activates a URL to retrieve the message content, which as discussed, is a functionality the mobile phone in Wren already has. (Wren, ¶0011 ("When the message is received, an end-user can click on … the URI to play the video and audio."), Abstract, Claim 7.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

    **2.**    **Dependent Claim 4: "A computer-implemented method according to claim 1, wherein the recipient user device is a device selected from the group consisting of a personal computer, a workstation computer, a server computer, a laptop computer, a handheld device, a mobile telephone, a personal digital assistant, and any combinations thereof."**

As explained for claim 1, Wren discloses a recipient user device in the form of at least a mobile phone. (Wren, ¶¶0008, 0009, 0004, 0022 ("FIG. 9 is an illustration of the end-user experience receiving the one-touch message with a compatible mobile phone …."").)

    **3.**    **Dependent Claim 5: "A computer-implemented method according to claim 1, wherein the media component includes information selected from the group consisting of an image, video, audio, and any combinations thereof."**

As explained for claim 1, Wren discloses that the media component includes at least video and audio information. (Wren, ¶0008 ("[M]ovie messages containing video and audio …."); *see also id.*, Fig. 9B).)

**C.**    **Ground 2: Obviousness Over Wren, Berger, and Hanna**

    **1.**    **Dependent Claim 9: "A computer-implemented method according to claim 1, wherein the header information and the message content are received at the recipient user device via a network, wherein the header information and the message content are communicated over the network separately."**

As explained for claim 1, the recipient device receives the header information (Figure 9A) and movie message content (Figure 9B) over a network. (*E.g.*, Wren, ¶0031-32.) Wren therefore discloses that "**header information and the message**

-50-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

**content are received at the recipient device via a network**," as claimed.  In some

instances, the movie message in Wren is transmitted from the sending device as a

file attachment to an email message.  (*E.g.*, Wren, ¶¶0002 ("[T]he invention relates

to multimedia devices conditionally sending audiovisual messages that are

automatically addressed to recipients based on one-touch activation and contain <u>an</u>

<u>attachment with the video and audio recording</u> …."), 0025 ("Sending transmits the

message to a recipient as either a fully contained message with the movie attached

…."), Abstract.)  The email containing the video attachment is then received by a

server.  (Wren, ¶0029 ("Once composition is complete, the method will attach the

complete video and audio message …, assemble and send a message using an

interoperable protocol such as the IETF e-mail protocols of the receiving

server,….").)

But Wren does not disclose the detailed mechanics of how the movie message,

including the header information and video content, is transmitted from the server

to the recipient's mobile phone.  This Petition thus cites to **<u>Berger</u>** and **<u>Hanna</u>** to

show that "**the header information and the message content are communicated**

**over the network separately**."

As discussed in **Part VI.A.2(a)**, Hanna discloses a system in which a server

receives from a sending device an email message containing a file attachment, and

replaces the file attachment in the email with a URL.  (Hanna, 2:3-5 ("One

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

embodiment of the present invention provides a system that replaces an attachment

to an email message with a reference to a location where the attachment is stored."),

2:55-57 ("[T]he reference specifying the location of the attachment includes a

uniform resource locator (URL)."), 5:1-12, 5:26-28.)  The modified email message

is then transmitted to the recipients.  (Hanna, 5:39-40.)

Hanna explains how the message recipient can retrieve the original attachment

using the URL:

> Upon receiving modified email message **202** including URL **206** (step
> **312**), recipient **114** uses URL **206** to retrieve attachment **204** from file
> server **111** (step **314**). This may involve allowing a user to explicitly
> request attachment **204** by clicking on URL **206**.
>
> In order to receive attachment **204**, recipient **114** may have to be
> authenticated to file server **111**. This can be accomplished using any of
> a number of authentication mechanisms, such as a password, a shared
> secret, public key cryptography and/or digital certificates.

(Hanna, 5:57-66.)

As discussed previously, Berger teaches that a URL to the message content

can be embedded in the header information sent from the server to the recipient

device, such that upon user selection of the displayed header information, the URL

is activated to retrieve the corresponding message content.  (Berger, ¶¶0053-57,

0081 ("Various platforms for embedding of the locators can be used.").)  Berger

makes clear that the URL itself need not be displayed.  (Berger, Fig. 4 (showing a

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

message list with no displayed URL), Fig. 5 (showing the code underlying the

displayed text, which includes the embedded URL).)

The combination of Wren with Berger and Hanna thus fully discloses and

renders obvious the requirement that "**the header information and the message**

**content are communicated over the network separately**."   (Chatterjee, ¶105.)

Under this combination, the header information in Wren (such as the sender name

and date/time shown in Figure 9A) is sent separately from the message content (the

movie message shown in Figure 9B).  This is because a message is initially sent from

the server to the recipient device that does not include an attachment containing the

movie message content – that message instead includes only the header information

and a URL as disclosed in Berger and Hanna, the URL identifying the location of

the movie message content on a server.  The recipient's mobile phone can later

retrieve the movie message content (as shown in Figure 9B of Wren) from the server

using the URL in a separate transmission according to the techniques of Berger and

Hanna.  Under this scenario, therefore, the header information is communicated

separately from the movie message content.

Petitioner anticipates that the Patent Owner may attempt to argue that the

communication of header information under this combination somehow also

includes message content, but any such argument is easily refuted.  Because this

Petition cites Figures 9A and 9B in Wren for the claimed "**electronic message**," the

-53-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

**"message content including a media component"** under the proposed combination

contains only the video message content shown in Figure 9B, with no additional

user-provided text or other content.  (Wren, Fig. 9B (showing only video content).)

As discussed, Wren refers to the movie message shown in Figure 9B as a "one-

touch" message that the sender can send to a recipient without additional input such

as text.  (Wren, ¶¶0022, 0032.)  For example, the sender can simply select a recipient

from an address book to have a movie message recorded and sent, without any

further input.  (Wren, ¶¶0028, ("This one-touch procedure is invoked from a hard or

soft button while viewing an address-book entry, from a menu for initiating the

recording and sending of a movie message or from a voice or video call screen to

record and send a movie message simultaneously with the call."), 0029 ("The Send

option will auto-compose the message based on parameters submitted to the method

from the point of initiation."), Claim 2.)  As such, there can be no argument that the

initial message delivered from the server to the recipient user device may include

some kind of non-video "**message content**."

The Patent Owner may alternatively attempt to argue that the URL contained

in the initial message to the recipient, under this combination, forms some part of

the "**message content**" as claimed.  Although this initial message does include a

URL inserted by the server (as taught by Hanna), the URL is merely a pointer to the

movie message content, and thus not part of the claimed "**message content**" itself.

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

That the URL is not part of the "message content," in the context of video messaging of Wren, is confirmed by the fact that while Wren contemplates embedding a URI into the email body as a way to deliver message content (Wren, *e.g.*, ¶0011), that URI is nowhere to be found in the figures showing the display of movie messages to the recipient. (Wren, Figs. 9A, 9B, 9C.)  As noted, Berger teaches how URLs can be associated with displayed elements (*e.g.*, the "Play" button in Figure 9A of Wren), but not displayed themselves. (Berger, Figs. 4, 5.)  Moreover, under the proposed combination in Ground 2, the URL does not even exist at the time the movie message in Wren ("**electronic message**") is transmitted from the sending device.  Rather, the URL is generated (based on the movie message content) only *after* the claimed "**electronic message**" has been received by the server, thus further confirming that the URL should not be mapped as part of the claimed "**message content**." (*E.g.*, Hanna, 2:3-5 ("One embodiment of the present invention provides a system that replaces an attachment to an email message with a reference to a location where the attachment is stored.").)

Finally, the mapping of the "**separate**" communication limitation using a URL sent with the header information is consistent with the '886 specification.  The '886 specification discloses an embodiment where a pointer to the message content (in the form of a "message ID" or "sequence number") is sent with the header information to the recipient device. ('886, 15:9-20 ("[C]omputer **320** requests a

-55-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

message content for a selected electronic message (*e.g.*, electronic message **330** via header information **1015**) from server **310**. In response to this action, server **310** may associate a message ID **from the selected header information** and communicate the message content having the corresponding message ID to computer **320**. Alternatively, where a sequence number is utilized for each electronic message, server **310** associates the sequence number of the selected electronic message with a corresponding message content and communicates the message content to computer **320**.").) That pointer, like the URL in Petitioner's combination, is then used to retrieve the message content in a separate communication. (*Id.*) The '886 patent itself thus confirms that the claimed "**separate**" communication can be implemented by sending a pointer (such as a URL) with the header information. (Chatterjee, ¶108.)

*Rationale and Motivation to Combine*: It would have been obvious to combine Wren with Berger and Hanna in the manner described above, and a person of ordinary skill would have had many motivations to make such a combination. (Chatterjee, ¶¶109-120.) The rationale and motivation to combine Wren with Berger has been discussed above, and applies equally here.

Moreover, as discussed previously, Wren already discloses an alternative to the attachment technique in which a URI is embedded into an email message identifying the network location of the movie message content (Wren, *e.g.*, ¶0029),

-56-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

thus confirming that the recipient mobile phone has a built-in ability to retrieve video message content using a URL, according to the teachings of Berger and Hanna. As further discussed, Berger similarly discloses accessing message content on the recipient device using a URL. (Berger, *e.g.*, ¶¶0050, 0056, 0057, 0071.) And Hanna, like Berger, discloses that the URL can include an identification of the file to be retrieved.   (Hanna, 5:41-45.)   Accordingly, one of ordinary skill would have regarded Wren, Berger, and Hanna as closely analogous references in the same field of electronic messaging that use similar techniques for delivering content. A person of ordinary skill would have thus found the incorporation of Hanna, which describes delivery of content to the recipient via a URL in more detail, to be technologically straightforward, and a person of ordinary skill would have had every expectation of success. Indeed, the synergistic and complementary nature of the systems disclosed in Hanna, Wren, and Berger would have provided a motivation to combine. (Chatterjee, ¶110.)

Moreover, as discussed above with respect to Berger, one of ordinary skill would have recognized that a URL-based delivery technique would have provided significant advantages to a movie messaging system such as Wren, including the ability to optimize the delivery of message content based on the capabilities of the recipient device. (Chatterjee, ¶111.) Those motivations apply equally to the further combination with Hanna.

-57-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

Hanna provides additional express motivations to combine. Hanna explains that its technique of replacing an email attachment with a URL prior to delivery provides superior message tracking because the system can log the recipient's request to retrieve the message content stored on the server, thus providing proof of receipt. (Hanna, 6:1-5 ("One of the advantages of the above-described embodiment is that it can provide better proof of receipt of a file. Proof of receipt is rarely provided for email messages. By forcing recipient **114** to log onto file server **111** to receive attachment **204**, proof of receipt can be obtained.").) The ability to track recipient access to the message content, in turn, benefits the server's storage and retention of those files. (Chatterjee, ¶112.) For example, based on tracking intended recipients' access of the file, the server could delete the file (and thus conserve storage space) after all of the intended recipients have successfully retrieved it. (Hanna, 6:15-22 ("Eventually, the system deletes attachment **204** from file server **111**…. It can take place after receiving a notification that all recipients of the email message have retrieved the attachment.").)

Wren also explains that a URL technique such as Hanna's allows the video message content to be streamed to the recipient device. (Chatterjee, ¶¶113-14.) It was well-known to persons of ordinary skill that streaming video content to a recipient had significant advantages over transmitting the complete video file to the recipient for playback, such as through an email attachment. (*Id.*)

-58-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

Thus, as explained at length, the URL delivery technique disclosed in Berger
and Hanna would have provided ample benefits in the form of optimized delivery
based on recipient device capabilities, superior tracking of message content retrieval,
and streaming for playback.  Moreover, as explained below, one of ordinary skill
would have appreciated that the URL-based delivery technique is further preferable
due to limitations associated with the delivery of emails with embedded attachments.
(Chatterjee, ¶¶115-120.)

Without a URL-based delivery technique, the entire video and audio content
in Wren would be attached to the email message itself.  (Wren, ¶¶0029 ("Once
composition is complete, the method will attach the complete video and audio
message or insert a URI that refers to the originating network location source for the
video and audio stream …."), 0031.)  That content would then be transmitted over
the network to the recipient's device when the message is delivered – regardless of
whether the recipient has any interest in viewing the video and audio content.  This
consumption of network bandwidth is exacerbated by the fact that video and audio
content generally consumes much more data than text and other types of data.
(Chatterjee, ¶116.)

Wren itself echoes these concerns.  While recognizing that "referencing movie
messages with a URI is not always the ideal end-user experience," Wren makes clear
that attaching "large message files" is simply "not practical for an end-user" with

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

even "dialup speeds" "given the resources consumed by the device to transport the large message. For example, the end-user will not have access to other Internet services or the quality of the active voice call will degrade as the device attempts to multitask as larger message transport and high-quality voice call over a long period of time." (Wren, ¶0006.)  One of ordinary skill would have appreciated that these concerns apply equally to sending and recipient mobile devices. (Chatterjee, ¶117.)

Hanna describes even more potential drawbacks to delivering an email with an attachment to the recipient:

> (1) Attachments can create a burden for an email system. If an email message with a large attachment is sent to a large number of people (for example a baby picture sent to all 30,000 people in a company), the process of sending the attachment will take up a large amount of network bandwidth. Also, storing the attachment in a large number of mailboxes will take up a large amount of storage space. Furthermore, messages containing attachments may persist in mailboxes for a large period of time because people are not always diligent about reading and deleting email messages. (2) A user may accidentally forward an attachment. This is particularly a problem if the attachment contains confidential information that was not intended to be forwarded. (3) It is hard to control access to an attached file because anyone who receives a copy of the file can do anything they want with it.

(Hanna, 1:29-44.)

Replacing the attached video file in Wren with a URL at the server, as

-60-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

disclosed in Hanna, would thus remedy the drawbacks discussed above. (Chatterjee, ¶119.)  Because a URL typically consumes only a handful of characters – whereas video and audio content can be quite large – the email message transmitted to the recipient could have consumed little network bandwidth.  These savings would have been further multiplied if the email message had to be passed through a number of computers on the Internet on its way to the recipient.  And once the email message was received, the underlying video and audio content would only have been transmitted to the recipient device on demand when the recipient needs it, *i.e.*, when the recipient chooses to play the movie message content through the URL.  (*Id.*)

These advantages would have been well-understood to a person of ordinary skill. (Chatterjee, ¶120.)  Network bandwidth is a valuable and often scarce resource in a networked computing system.  The URL delivery technique in Hanna would have enabled the system to conserve those resources, thus providing a compelling motivation to adapt it to Wren.  (*Id.*)

Accordingly, in light of the motivations discussed above, it would have been obvious to combine Wren with Berger and Hanna, resulting in a system in which **"the header information and the message content are received at the recipient user device via a network, wherein the header information and the message content are communicated over the network separately**."

-61-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

    **2.**    **Dependent Claim 10: "A computer-implemented method according to claim 1, wherein message content is received from a server computer and the method further comprises deleting the message content including the media component from the server computer."**

The combination of Wren, Berger, and Hanna satisfies the limitation "**wherein message content is received from a server computer**" for the same reasons previously discussed for claim 9. As explained, the movie message content in Wren (the "**message content including the media component**") is received by the recipient device from a server computer using a URL. (*E.g.*, Hanna, 5:57-59.) Wren, Berger, and Hanna thus disclose and render obvious that "**message content is received from a server computer**."

Claim 10 goes on to recite the step of "**deleting the message content including the media component from the server computer**," and this is also disclosed by Hanna. Hanna explains that the file attachment (which contains the "message content including the media component" under the combination with Wren) can be deleted from the server in a number of ways. For example:

> Eventually, the system deletes attachment **204** from file server **111**. This deletion process can take place in a number of different ways. It can take place automatically after an expiration of a time period. It can take place after sending a notification to recipients of the email message that the attachment will be deleted. It can take place after receiving a notification that all recipients of the email message have retrieved the attachment. It can take place after receiving a notification that all

-62-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

> recipients of the email message have deleted the email message. It can
> take place after receiving a command from a sender of the email
> message to delete the attachment (perhaps after some nagging).

(Hanna, 6:15-26.)  Hanna thus satisfies "**deleting the message content including
the media component from the server computer**."

This Petition provided a full explanation of the motivations to combine with
Hanna in the discussion of claim 9, which apply equally to claim 10.  As an
additional motivation, one of ordinary skill would have been motivated to adapt
Hanna's deletion teachings in order to conserve storage space on the server.  One of
ordinary skill would have understood that the content of movie messages in Wren
can consume a considerable amount of space on the server, and thus, that content
should be removed when appropriate in order to conserve storage space.  (Chatterjee,
¶125.)

3.    **Dependent Claim 11: "A computer-implemented method
according to claim 10, wherein said deleting the message
content including the media component from the server
computer occurs after said providing a second display."**

As explained for claim 10, Hanna discloses that the message content can be
deleted in a number of situations.  Under one scenario, the deletion "can take place
after receiving a notification that all recipients of the email message have retrieved
the attachment."  (Hanna, 6:20-22.)  As noted, Hanna discloses the ability to track
recipient access of the content stored at the server.  (Hanna, 6:1-5.)  Under the

-63-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

combination of Hanna with Wren and Berger, therefore, this form of deletion

satisfies deletion of the message content "**after said providing a second display**."

This is because the "**second display**" in Wren, shown in Figure 9B below,

displays the movie message content retrieved from the server:

 FIG 9A                FIG 9B        

(Wren, Figs. 9A, 9B.)  As noted previously, Figure 9B (the "**second display**") shows

the movie message being played in response to the recipient pressing the "**Play**"

button from Figure 9A.  (Wren, ¶0032.)  Under the straightforward combination of

Wren, Berger, and Hanna, pressing the "Play" button on Figure 9A would activate

the URL and retrieve the movie message content, resulting in the video and audio

data being presented through the "second display" of Figure 9B.

As noted, Hanna discloses that the deletion of the content at the server "can

take place <u>after receiving a notification that all recipients of the email message have</u>

<u>retrieved the attachment</u>."  (Hanna, 6:20-22.)  That notification would occur after

the recipient in Wren has retrieved the movie message content for display through

-64-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

the interface in Figure 9B (the "**second display**").  (Chatterjee, ¶128.)  Under the combination of Wren, Berger, and Hanna, therefore, the message content including the media component is deleted from the server computer "**after said providing a second display**."  The rationale and motivation to combine Wren, Berger and Hanna is provided in the discussion of claims 9 and 10 above, and applies here.

### D.    Ground 3: Obviousness Over Wren in view of Berger and Thorne

**1.    Dependent Claim 13: "A computer-implemented method according to claim 1, further comprising deleting the message content including the media component at a predetermined amount of time after being displayed such that after the second display is terminated from view, the message content including the media component is no longer available to the recipient user."**

As explained, claim 1 is rendered obvious by Wren and Berger.  The additional limitations of dependent claim 13 are obvious in further view of **Thorne**.

Thorne describes a number of techniques for restricting access to electronic messages.  For example, Thorne discloses two separate constraints that can be applied to an electronic message: **(1)** a "maximum display time" that limits how long the message can be viewed by the recipient before the message display is automatically closed, and **(2)** a maximum number of times the message can be viewed before it is automatically deleted from the system.  With respect to the maximum display time constraint, Thorne discloses:

At **546** the E-Mail message is opened and the text displayed. The

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

> opening of the display starts a timer count, and at **548** this is observed to determine whether the maximum display time has been exceeded. This feature is provided in order to insure that a user does not bring the message up and leave it displayed for hours. At the passage of the specified display time, the application displays a "Display Time Exceeded" message, and processing to close the message is initiated. These steps are shown at **550** and **552**. The message display is then closed as if the user had issued a close command.

(Thorne, 10:35-45.)

After the message display is closed, the system deletes the message if the maximum number of times it can be viewed has been reached:

> In due time the display is discontinued, either upon expiration of the maximum display time or pursuant to command of the user. At **560** the message read times counter is incremented. A determination as to whether or not the times read or displayed has exceeded the specified maximum is made at **562**. If this does occur the message is deleted and purged. Notification is sent to the user and the sender. These steps are shown at **564**.

(Thorne, 11:5-12.)  Thus, if the maximum number of read times was set as "one," the message would be deleted and purged after it was first viewed by the recipient. Thorne makes clear that deletion can occur at both the receiving client device and the server.  (Thorne, 8:62-63 ("If the servers are compatible, e.g., employ an automatic delete capability, then the message is transmitted."), 9:25-28 ("In the

-66-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

network described as exemplary of the preferred embodiment, <u>control may be</u>
<u>exercised over all access and elements, such as, the servers and all clients</u>."), 11:60-
62 ("[I]t may be desirable to limit time consuming <u>purge routines in servers</u> to a
greater extent than <u>in client computers</u>.").)

Thorne therefore discloses "**deleting the message content including the
media component at a predetermined amount of time after being displayed
such that after the second display is terminated from view**."   The system in
Thorne, as shown, can limit viewing of an electronic message based on a maximum
display time ("a predetermined amount of time after being displayed") before the
display automatically closes.  (Thorne, 10:35-45.)   The system then deletes and
purges the message if the system has reached the maximum number of reads for that
message.  (Thorne, 11:5-12.)  It would have been obvious that the maximum number
of reads could have been set to one.  (Chatterjee, ¶132.)   Setting the maximum
number of reads to "one" would have required no more than choosing from a finite
number of known and practical limits.  (*Id.*)  And after the message has been deleted
and purged, "**the message content including the media component is no longer
available to the recipient user**."

***Rationale and Motivation to Combine***:   It would have been obvious to
combine Wren and Berger with Thorne, with no change in their respective functions,
predictably resulting in the movie messaging system of Wren that displays the

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

received movie message content for only a predetermined amount of time, and thereafter, closes the message display and deletes the message, as described in Thorne. (Thorne, 10:35-45, 11:5-12.) A person of ordinary skill would have been motivated to make this combination. (Chatterjee, ¶¶133-136)

One of ordinary skill would have been motivated to adapt the techniques of Thorne to improve the confidentiality of movie messages received using the system of Wren. Thorne itself recognizes existing needs for managing and protecting the confidentiality of email communications. (Thorne, 2:45-47.) "Those needs include capabilities to control not only the circulation of messages or electronic documents by the originator, but also the usage of the documents by the recipient for further dissemination and storage." (Thorne, 2:47-51.) One of ordinary skill would have been motivated to adapt the teachings of Thorne to regulate the display of the movie message by the recipient, thus improving the security and confidentiality of the received movie message. (*See* Thorne, 1:4-8 ("This invention relates in general to methods and systems for managing the security of electronic documents stored in an interactive information handling system, and more particularly relates to the controlling of the confidentiality of electronic mail communications over networks.").)

With respect to the maximum display time feature, Thorne provides an express motivation to combine by explaining that the feature "insure[s] that a user

-68-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

does not bring the message up and leave it displayed for hours." (Thorne, 10:38-

40.) This reduces the possibility that the content of a message can be seen or

intercepted by an eavesdropper, and overall, would have improved the security of

the movie message displayed in Wren. (Chatterjee, ¶135.)

One of ordinary skill would have perceived no technological obstacle to this

combination. (Chatterjee, ¶136.) Although one embodiment in Thorne uses

computers connected over a Local Area Network (LAN) in a business environment,

this Petition cites Thorne for its more basic security techniques that are applicable

to any electronic messaging context. Thorne itself explains that the maximum

display time and maximum number of reads can be provided through any type of

client or server system. (Thorne, 6:33-45 ("All processor agents, including all

servers and client computers, are provided with and run an E-Mail application which

provides the following functions … 7. Specification of number of readings

enabled… 9. Specification of display time."); *see also id.*, 9:25-28 ("In the network

described as exemplary of the preferred embodiment, control may be exercised over

all access and elements, such as, the servers and all clients.").) A person of ordinary

skill would have recognized that the mobile device in Wren is one example of a

"processor agent" or "client computer" to which the message security techniques of

Thorne could be applied. (Chatterjee, ¶136.) One of ordinary skill would have

further appreciated that Thorne's security restrictions relied upon in this Petition are

-69-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,306,886 B2

agnostic to the underlying system architecture, and thus, could have been deployed

on any messaging client (including mobile devices) and/or server.  (*Id.*)

## VII.   CONCLUSION

Petitioner respectfully requests institution on claims 1, 4, 5, 9-11, and 13.

Dated: December 26, 2017                          Respectfully submitted,

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Avenue NW      By:      /Heidi L. Keefe/
Suite 700                                          Heidi L. Keefe
Washington, DC 20004                       Reg. No. 40,673
Tel: (650) 843-5001                            Counsel for Petitioner
Fax: (650) 849-7400

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT</u>

Pursuant to 37 C.F.R. § 42.24(d), I certify that this petition complies with the type-volume limits of 37 C.F.R. § 42.24(a)(1)(i) because it contains 13,961 words, according to the word-processing system used to prepare this petition, excluding the parts of this petition that are exempted by 37 C.F.R. § 42.24(a) (including the table of contents, a table of authorities, mandatory notices, a certificate of service or this certificate word count, appendix of exhibits, and claim listings).

DATED:  December 26, 2017

COOLEY LLP                                    / Heidi L. Keefe /
ATTN: Patent Docketing                   Heidi L. Keefe
1299 Pennsylvania Avenue NW        Reg. No. 40,673
Suite 700
Washington, D.C. 20004
Tel: (650) 843-5001
Fax: (650) 849-7400

-71-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify, pursuant to 37 C.F.R. Sections 42.6 and 42.105, that a complete copy of the attached **PETITION FOR INTER PARTES REVIEW OF U.S. PATENT NO. 9,306,886,** including all exhibits (**Nos. 1001-1014**) and related documents, are being served via Federal Express on the 26th day of December, 2017, the same day as the filing of the above-identified document in the United States Patent and Trademark Office/Patent Trial and Appeal Board, upon the Patent Owner by serving the correspondence address of record with the USPTO as follows:

> Birch Tree IP Law & Strategy PLLC
> 370 Farrell Street, Suite 423
> South Burlington, VT 05403

and upon counsel of record for the Patent Owner in the litigation pending before the U.S. District Court for the Central District of California entitled *Vaporstream, Inc. v. Snap Inc. d/b/a Snapchat, Inc.*, Case No. 2:17-cv-00220-MLH-KS (C.D. Cal.) as follows:

> Davida Brook
> Meng Xi
> Susman Godfrey LLP
> 1901 Avenue of the Stars, Suite 950
> Los Angeles, CA 90067

> Robert Rivera, Jr.
> Joseph S. Grinstein
> Susman Godfrey LLP
> 1000 Louisiana, Suite 5100
> Houston, TX 77002-5096

DATED: December 26, 2017                    / Heidi L. Keefe /
                                            Heidi L. Keefe
                                            Reg. No. 40,673

COOLEY LLP
ATTN: Patent Docketing
1299 Pennsylvania Ave. NW, Suite 700
Washington, D.C. 20004
Tel: (650) 843-5001; Fax: (650) 849-7400

-72-