# EXHIBIT 2

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

**SNAP INC**.,
Petitioner

v.

**VAPORSTREAM, INC.**,
Patent Owner

U.S. Patent No. 9,338,111 B2
Issue Date: May 10, 2016

Title: Electronic Message Recipient Handling System and Method with Media
Component and Header Information Separation

————————————

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 9,338,111 B2**

# Table of Contents

**Page**

I.    Mandatory Notices Under 37 C.F.R. § 42.8(A)(1) ........................................1

    A.    Real Party-In-Interest under 37 C.F.R. § 42.8(b)(1) ...........................1

    B.    Related Matters under 37 C.F.R. § 42.8(b)(2) ....................................1

    C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) .................2

    D.    Service Information..................................................................................3

    E.    Power of Attorney ...................................................................................3

II.    Fee Payment - 37 C.F.R. § 42.103 ....................................................................4

III.    Requirements for *Inter Partes* Review under 37 C.F.R. §§ 42.104 and
42.108 ...............................................................................................................4

    A.    Grounds for Standing under 37 C.F.R. § 42.104(a)............................4

    B.    Identification of Challenge under 37 C.F.R. § 42.104(b) and
Statement of Precise Relief Requested ................................................4

    C.    Considerations Under 35 U.S.C. § 325(d) ...........................................5

IV.    Overview of The '111 Patent...............................................................................5

    A.    Level of Ordinary Skill in the Art ........................................................5

    B.    Overview of the Specification................................................................5

    C.    The Challenged Claims ..........................................................................9

V.    Claim Construction Under 37 C.F.R. § 42.104(B)(3) ....................................9

VI.    Claims 1, 4, 5, and 9-11 Are Unpatentable ....................................................10

    A.    Brief Summary and Date Qualification of the Prior Art...................10

        1.    Prior Art for Ground 1 [Wren + Berger]...................................10

            (a)    Overview of Wren [Ex. 1003] ........................................10

            (b)    Overview of Berger [Ex. 1004] .....................................13

        2.    Prior Art for Ground 2 [Wren + Berger + Hanna]...................16

            (a)    Hanna [Ex. 1005]............................................................16

    B.    Ground 1: Obviousness Over Wren and Berger ...............................18

        1.    Claim 1 ............................................................................................18

# Table of Contents
## (continued)

<div align="right">**Page**</div>

(a)   "A computer-implemented method of handling an electronic message at a recipient user mobile device in a networked environment, the electronic message including a message content and a header information that corresponds to the message content, the recipient user mobile device having access to electronic instructions, the electronic instructions being stored at the recipient user mobile device and/or at a server, the method comprising:" (Preamble)..............................................18

(b)   "providing a plurality of reduced traceability displays via the recipient user mobile device using a display generator that acts upon a display element of the recipient user mobile device to provide the plurality of reduced traceability displays, the display generator including the electronic instructions, the plurality of reduced traceability displays including a first display presenting a header information of an electronic message received at the recipient user mobile device and a second display presenting a message content of the electronic message, the message content including a media component," (Claim 1[a])............................................................24

(c)   "the first display being generated by the display generator such that the first display does not include a display of the media component via the first display such that a single screen capture of both the header information and the media component is prevented, the first and second displays not being displayed to the user at the same time;" (Claim 1[b]) ......................................................31

# Table of Contents
## (continued)

Page

          (d)     "receiving a selection by the recipient user via the first display, the selection directed to a portion of a message list corresponding to the header information; and" (Claim 1[c]) ...................................... 34

          (e)     "in response to the selection, providing a second display via the recipient user device, the second display displaying the message content including the media component." (Claim 1[d]) ............................ 43

     2.     Dependent Claim 4: "A computer-implemented method according to claim 1, wherein the display generator acts with the display element to generate the second display such that the second display displays the message content including the media component without displaying the header information." ................................................. 44

     3.     Dependent Claim 5: "A computer-implemented method according to claim 1, wherein the media component includes information selected from the group consisting of an image, video, audio, and any combinations thereof." .................................................................... 45

C.     Ground 2: Obviousness Over Wren, Berger, and Hanna .................. 45

     1.     Dependent Claim 9: "A computer-implemented method according to claim 1, wherein the header information and the message content are received at the recipient user device via a network, wherein the header information and the message content are communicated over the network separately." ............................................................. 45

     2.     Dependent Claim 10: "A computer-implemented method according to claim 1, wherein the message content is received from a server computer and the method further comprises deleting the message content including the media component from the server computer." ........................ 56

**Table of Contents**
(continued)

                                                                              **Page**


3.    Dependent Claim 11: "A computer-implemented method
      according to claim 10, wherein said deleting the message
      content including the media component from the server
      computer occurs after said providing a second display." ........58

VII.   Conclusion .................................................................................................60

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

## List of Exhibits

| Exhibit No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 9,338,111 B2 to Joseph Collins and Amit Jindas Shah |
| 1002 | Declaration of Sandeep Chatterjee, Ph.D. |
| 1003 | U.S. Patent Application Publication No. 2005/0021803 A1 to Paul I. Wren III (filed on June 9, 2003) ("Wren") |
| 1004 | U.S. Patent Application Publication No. 2003/0152203 A1 to Adam L. Berger (published on August 14, 2003) ("Berger") |
| 1005 | U.S. Patent No. 7,054,905 B1 to Stephen R. Hanna et al. (filed on March 30, 2000) ("Hanna") |
| 1006 | *Reserved* |
| 1007 | Excerpts from Eric A. Meyer, *Cascading Style Sheets: The Definitive Guide* (2d ed. 2004) ("Meyer") |
| 1008 | *Reserved* |
| 1009 | *Reserved* |
| 1010 | *Reserved* |
| 1011 | *Reserved* |
| 1012 | Excerpts from *Microsoft Computer Dictionary* (5th ed. 2002) |
| 1013 | U.S. Patent No. 7,409,425 to Indran Naick and Jefferey Kenneth Wilson (filed on November 13, 2003) |
| 1014 | Exhibit H to Vaporstream's Infringement Contentions in the concurrent litigation, *Vaporstream, Inc. v. Snap Inc.*, Case No. 2:17-cv-00220-MLH-KS (C.D. Cal.) |

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

This is a petition for *Inter Partes* Review of claims 1, 4, 5, and 9-11 of U.S.

Patent No. 9,338,111 (Ex. 1001) ("'111 patent").

## I.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.    Real Party-In-Interest under 37 C.F.R. § 42.8(b)(1)

Snap Inc. ("Petitioner") is the real party-in-interest.

### B.    Related Matters under 37 C.F.R. § 42.8(b)(2)

The '111 patent is the subject of pending litigation involving Petitioner:

*Vaporstream, Inc. v. Snap Inc.*, Case No. 2:17-cv-00220-MLH-KS (C.D. Cal.), filed

in the U.S. District Court for the Central District of California on January 10, 2017.

The Complaint was served on Petitioner on January 11, 2017.

On November 16, 2017, Petitioner filed a petition for *inter partes* review of

U.S. Patent No. 8,886,739, a continuation of the same application to which the '111

patent claims priority.  *See Snap Inc. v. Vaporstream, Inc.*, IPR2018-00200.  No

institution decision has issued.

On December 14, 2017, Petitioner filed petition for *inter partes* review of U.S.

Patent No. 9,306,885, a continuation of the same application to which the '111 patent

claims priority.  *See Snap Inc. v. Vaporstream, Inc.*, IPR2018-00312. No institution

decision has issued.

On December 21, 2017, Petitioner filed petition for *inter partes* review of U.S.

Patent No. 9,313,155, a continuation of the same application to which the '111 patent

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

claims priority.  *See Snap Inc. v. Vaporstream, Inc.*, IPR2018-00369.  No institution decision has issued.

On December 26, 2017, Petitioner filed petition for *inter partes* review of U.S. Patent No. 9,306,886, a continuation of the same application to which the '111 claims priority.  *See Snap Inc. v. Vaporstream, Inc.*, IPR2018-00397.  No institution decision has issued.

On December 27, 2017, Petitioner filed petition for *inter partes* review of U.S. Patent No. 8,935,351, a continuation of the same application to which the '111 claims priority.  *See Snap Inc. v. Vaporstream, Inc.*, IPR2018-00404.  No institution decision has issued.

### C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

Petitioner provides the following designation of counsel.

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| Heidi L. Keefe (Reg. No. 40,673)<br>hkeefe@cooley.com<br>zSnapVaporstream@cooley.com<br><br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC 20004<br>Tel: (650) 843-5001<br>Fax: (650) 849-7400 | Andrew C. Mace (Reg. No. 63,342)<br>amace@cooley.com<br>zSnapVaporstream@cooley.com<br><br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave., NW, Suite 700<br>Washington D.C. 20004<br>Tel: (650) 843-5808<br>Fax: (650) 849-7400 |
|  | Mark R. Weinstein (Admission *pro hac vice* pending)<br>mweinstein@cooley.com |

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| | COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave. NW, Suite 700<br>Washington, DC 20004<br>Tel: (650) 843-5007<br>Fax: (650) 849-7400 |
| | Reuben Chen (Admission *pro hac vice* pending)<br>rchen@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave. NW, Suite 700<br>Washington, DC 20004<br>Tel: (650) 843-5480<br>Fax: (650) 849-7400 |
| | Yuan Liang (Admission *pro hac vice* pending)<br>yliang@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave. NW, Suite 700<br>Washington, DC 20004<br>Tel: (730) 456-8656<br>Fax: (240) 503-3291 |

**D.     Service Information**

This Petition is being served to the current correspondence address for the

'111 patent, BIRCH TREE IP LAW & STRATEGY PLLC, 370 Farrell St., Suite 423,

South Burlington, VT 05403.   Petitioner consents to electronic service at the

addresses provided above for lead and back-up counsel.

**E.     Power of Attorney**

Filed concurrently per 37 C.F.R. § 42.10(b).

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

## II.  FEE PAYMENT - 37 C.F.R. § 42.103

This Petition requests review of six claims.  A payment of $23,000 is submitted herewith, based on a $9,000 request fee, and a post-institution fee of $14,000.  This Petition meets the fee requirements of 35 U.S.C. § 312(a)(1).

## III.  REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108

### A.  Grounds for Standing under 37 C.F.R. § 42.104(a)

Petitioner certifies that the '111 patent is available for *inter partes* review and that Petitioner is not barred or otherwise estopped from requesting *inter partes* review on the grounds identified.

### B.  Identification of Challenge under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested

The Petitioner respectfully requests the Board initiate IPR of claims 1, 4, 5, and 9-11 based on the following:

| Ground | Claims | Basis for Challenge |
|---|---|---|
| 1 | 1, 4, 5 | Obvious over Wren (Ex. 1003) in view of Berger (Ex. 1004) |
| 2 | 9-11 | Obvious over Wren in view of Berger and Hanna (Ex. 1005) |

**Part VI** explains why the challenged claims are unpatentable.  Submitted with the present Petition is a Declaration of Sandeep Chatterjee, Ph.D. (Ex. 1002) ("Chatterjee"), a technical expert with decades of relevant technical experience. (Chatterjee, ¶¶1-9, Ex. A.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

### C.    Considerations Under 35 U.S.C. § 325(d)

The Wren, Berger, and Hanna references cited in Ground 1 and Ground 2 were
not cited during the prosecution of the '111 patent.  This Petition therefore relies on
prior art and grounds of unpatentability different from any presented during
prosecution.

## IV.    OVERVIEW OF THE '111 PATENT

### A.    Level of Ordinary Skill in the Art

The '111 patent, entitled "Electronic Message Recipient Handling System and
Method with Media Component and Header Information Separation," generally
relates to the field of "electronic messaging." ('111, 1:66-2:3.)  One of ordinary skill
in the art for purposes of the '111 patent would have possessed at least a bachelor's
degree in software engineering, computer science, or computer engineering with at
least two years of experience in the design and implementation of systems for
sending and receiving messages over a communications network, such as the
Internet (or equivalent degree or experience).  (Chatterjee, ¶¶13-15.)

### B.    Overview of the Specification

The '111 patent describes a series of techniques for sending an electronic
message from one user to another.  Figure 1 below shows "one embodiment of a
system **100** for electronic messaging depicting an electronic message **105** being sent
from one user to another." ('111, 4:17-19.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2



**FIG. 1**

('111, Fig. 1.)  "System **100** allows users of computers **110** and **115** to communicate with each other via one or more electronic messages, such as electronic message **105** over network **120**."  ('111, 4:29-32.) System **100** may also include one or more server computers.  ('111, 4:48-49.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

The '111 patent states that it discloses "[a]n electronic messaging system and method with reduced traceability." ('111, Abstract.) The challenged claims here focus on receive-side activities. For purposes of the challenged claims, therefore, the feature most pertinent to the "reduced traceability" method is providing a user interface for the recipient that has <u>separate</u> displays for the presentation of message "header information" and "message content." The specification explains that "header information for a particular electronic message, … may include, but is not limited to, a reply ID, a message ID, a date/time associated with the electronic message (*e.g.*, date/time of creation, date/time of delivery, etc.), a display name representing a sender of the electronic message, and any combinations thereof." ('111, 12:66-13:5.) The specification asserts that "separate display of header information and message content prevents a single screen capture at a user computer from creating a complete record of the electronic message." ('111, 18:6-9.)

Figures 10 and 11 below show examples of separate displays, the former showing only the header information (with no message content), and the latter showing only message content (with no header information):

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2



**FIG. 10**

('111, Fig. 10.)  As shown above, "Fig. 10 illustrates an example display image **1000** including a recipient address input portion **1005** and a message listing portion **1010**. Message listing portion **1010** includes a list of header information **1015**, **1020**, **1025** of three electronic messages.  Message listing portion **1010** includes a display name and a date/time received for each of header information **1015**, **1020**, **1025**."  ('111, 14:38-44.)  "[A] user may select one of the electronic messages indicated by header information **1015**, **1020**, **1025** …."  ('111, 14:66-15:2.)  Figure 11 shows an example display that could occur in response to such a selection:

-8-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2



**FIG. 11**

('111, Fig. 11.)  As explained in the '111 patent, Figure 11 above "illustrates one example display image **1100** presenting message content, independent of header information … upon the selection of header information **1015** in display image **1000** of FIG. 10."  ('111, 15:23-26.)

### C.    The Challenged Claims

This Petition challenges claims 1, 4, 5, and 9-11, with claim 1 being the sole independent claim.  This Petition will use bracketed notations (*e.g.*, **[a]**, **[b]**, etc.) to refer to individual limitations of claim 1.  All other challenged claims depend from claim 1.

## V.    CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3)

For purposes of the prior art cited herein, Petitioner does not at this time contend that any term requires explicit construction by the Board under the broadest

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

reasonable interpretation ("BRI") standard.   Petitioner notes that the claim

construction process in district court is currently ongoing, and reserves the right to

advocate for explicit constructions under the narrower *Philips* standard.  Petitioner

also reserves the right to raise indefiniteness issues in other proceedings where that

challenge is available.

## VI.   CLAIMS 1, 4, 5, AND 9-11 ARE UNPATENTABLE

### A.   Brief Summary and Date Qualification of the Prior Art

This Petition will provide an overview of each of the prior art references cited

in the grounds listed, and then discuss those grounds.

### 1.   Prior Art for Ground 1 [Wren + Berger]

#### (a)   Overview of Wren [Ex. 1003]

**Wren**, entitled "Messaging of Arbitrary-Length Video and Audio Content,"

purports to describe a method for easily recording a "movie message" and sending

it to another user on a network such as the Internet.  (Wren, ¶0008.)  "The method

can be enabled with a variety of devices such as a mobile phone … with an

embedded or attached camera and digital signal processing capabilities to capture

and encode an arbitrary length of video and audio into a format that can be streamed

or attached to an electronic message." (Wren, ¶0009.)  This Petition relies on Wren

as the primary reference for disclosing the majority of the elements for claim 1.

Wren qualifies as prior art under at least §§102(e) and 102(a) because it was a patent

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

application filed on June 9, 2003 and published on January 27, 2005, both dates

being before the earliest filing date for the '111 patent.

Wren describes a messaging system in which a sender can record video and

audio content and send it as a movie message to another user.  Wren calls this a "one-

touch" messaging procedure because the sender can transmit a movie message with

minimal user input.  "This one-touch procedure is invoked from a hard or soft button

while viewing an address-book entry, from a menu for initiating the recording and

sending of a movie message or from a voice or video call screen to record and send

a movie message simultaneously …."  (Wren, ¶0028, Fig. 5.)  Once the movie

message is recorded, the sender can choose to send the message via email.  (Wren,

¶0029.)  This embodiment does not require the sender to input an email address or

text for the subject or body of the message.  Instead, "[t]he Send option will auto-

compose the message based on parameters submitted to the method from the point

of initiation."  (*Id.*)

After the message is composed, Wren discloses two ways in which the video

and audio content can be provided with the message: **(1)** attaching the complete

video and audio message to the email message, or **(2)** inserting a URI into the

message identifying a network location where the video and audio data can be

-11-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

obtained for streaming delivery.  (Wren, ¶0029.)[1]  The message is then transmitted

via email.  (*Id.*)

On the recipient side, Figure 9 of Wren shows "an illustration of the end-user

experience receiving the one-touch message with a compatible mobile phone or PC

with a compatible e-mail client."  (Wren, ¶0022.)  In the case where the recipient

utilizes a mobile phone, Figures 9A and 9B show screen displays demonstrating how

the movie message is handled by the recipient device:

**FIG 9A**                **FIG 9B**        

---

[1] The term "URI" stands for Uniform Resource Identifier, which refers to a sequence

of characters that identifies a resource.  The most common type of URI is a Uniform

Resource Locator (URL), the familiar type of address used to identify resources on

the Internet and the Web (*e.g.*, <http://www.uspto.gov>).  The terms URL and URI

are often used interchangeably when the resources being identified are accessible

over the Internet, as is the case in Wren.  (*See* Chatterjee, ¶33 n.5.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

(Wren, Figs. 9A, 9B.)  Figure 9A on the left shows an exemplary notification of the receipt of a movie message, in this case a movie message from "Jane Doe" at "9:30AM."  Figure 9A also includes a "**Play**" button; pressing that button brings up Figure 9B to play back the movie message content on the recipient's device.  (Wren, ¶0032 ("FIG. 9A shows a notification of a new message. FIG. 9B shows a view of the Movie once the user selects play from a new message notification.").)  Further details are provided below.

### (b)     Overview of Berger [Ex. 1004]

<u>**Berger**</u>, entitled "Message Accessing," describes a technique for generating a list of messages for display at a recipient's mobile phone.  (Berger, Abstract, ¶0007.)  Berger qualifies as prior art under §102(b).

The discussion of Wren in Figure 9A and Figure 9B shows an embodiment in which a recipient device can select and play back a *single* received movie message, but that embodiment does not appear to involve *multiple* received messages.  Wren thus does not appear to expressly show receiving a selection "**directed to a portion of a <u>message list</u> corresponding to the header information**," as recited in claim 1**[c]**.  This Petition has thus cited Berger for this claim limitation.

Berger discloses a mobile phone messaging system similar in many respects to Wren.  Figure 4 of Berger shows an exemplary mobile phone display containing a message list **120** showing five received messages:

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2



(Berger, Fig. 4 (partial figure; yellow highlighting added).)  "FIG. 4 shows the list of available messages **120** displayed (**86**) to the user."  (Berger, ¶0041.)  "In FIG. 4, each entry occupies a single line of the display.  The line begins with an index **126** identifying the number of the message in the list."  (*Id*.)

For example, the first message ("1") in the message list **120** of Figure 4, which is shown highlighted above, shows a message from "**George Smith**" sent at "**11:00A**."  (Berger, ¶0041.)  "The user may then select (**88**) any of the messages for review by moving a cursor **132** up and down to reach the message of interest and then pressing the SEND button **134**."  (Berger, ¶0042.)  The "cursor" is shown as the triangle (▶) pointing to the message from "George Smith" in Figure 4.

-14-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

Figure 5 discloses a page of markup language code used to generate the

message list in Figure 5:

```
<?xml version="1.0"?>
<!DOCTYPE wml PUBLIC "-//WAPFORUM//DTD WML 1.1//EN"
"http://www.wapforum.org/DTD/wml_1.1.xml">
<wml>
<card>
<p align="left" mode="nowrap">
<b>Messages</b>
<select>
<option onpick="http://www.x.com/email.jsp?x=97236482342">George Smith
11:00AM </option>
<option onpick="http://www.x.com/email.jsp?x=19874534">Sally Stewart
9:49AM</option>
<option onpick="wtai://wp/mc;+18005551212,91873487632">Voice message
Fri 11:41PM</option>
<option onpick="http://www.x.com/email.jsp?x=92873374923">Sally Stewart
Fri 11:33PM</option>
<option onpick="wtai://wp/mc;+18005551212,929384672112">Voice message
Fri 9:10PM</option>
</select>
</p>
</card>
</wml>
```

FIGURE 5

(Berger, Fig. 5 (highlighting added).)  The information in Figure 5 is written in

Wireless Markup Language (WML), a well-known markup language that was used

to present pages of information to mobile devices.   (Chatterjee, ¶38.)    The

highlighted line of Figure 5 above shows the corresponding WML for the message

sent by "**George Smith**" at "**11:00AM**," which was displayed on the mobile phone

from Figure 4 above.  (*Id.* (citing Berger, ¶0050).)  That line includes not just the

information displayed to the user (*i.e.*, "George Smith," "11:00AM"), but includes

an embedded Uniform Resource Locator (URL) for retrieving the message content

from the Internet in response to user selection.  (Berger, ¶0050.)  In that example,

-15-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

the "**x=97236482342**" potion of the URL corresponds to a hash value that identifies

the user ID and the message number, and is used to specifically identify the desired

message content at the time of retrieval from the server where the content is stored.

(Berger, ¶¶0065-71.)

### 2.    Prior Art for Ground 2 [Wren + Berger + Hanna]

Ground 2 cites Wren and Berger from Ground 1 and adds the Hanna reference,

summarized below, to address limitations of dependent claims 9-11.

### (a)    Hanna [Ex. 1005]

The title of **<u>Hanna</u>** succinctly summarizes what the reference discloses—

"Replacing an Email Attachment With an Address Specifying Where the

Attachment Is Stored."  (Hanna, Cover Page.)  Hanna qualifies as prior art under

§102(e).

Hanna describes a technique for using Uniform Resource Locators (URLs) to

transmit and retrieve documents over the Internet.  Hanna explains that email

messages "commonly include attachments, which are typically files containing

documents, or other types of data, that accompany the email message."  (Hanna,

1:25-27.)  An email attachment "can include any type of file or other data that can

be attached to an email message," such as "a document, a graphical image or a data

file."  (Hanna, 4:25-28.)  Hanna purports to solve a series of problems that email

attachments can create.  For example, Hanna explains that email attachments "can

-16-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

give rise to a number of problems," such as (among others) imposing storage and bandwidth burdens on the system, and failing to provide adequate means to control access to the attachment.  (Hanna, 1:27-49.)

Hanna purports to address such problems through a system in which an email server receives an email message containing a file attachment, modifies the message to replace the attachment with a URL, and then sends the modified message to the recipient.  (Hanna, 1:50-55, 2:3-5, 2:55-57, 5:1-12, 5:26-28; *see also id.,* Fig. 3.) The email message recipient can then use the URL in the message to retrieve the original attachment from the server.  (Hanna, 4:37-47.)  Additionally, the email attachment can be automatically deleted from the server after expiration of a time period, after all recipients have retrieved the attachment, or other criteria.  (Hanna, 6:15-22.)

This Petition cites Hanna in combination with Wren and Berger for the limitation of claim 9 reciting that "**the header information and the message content are communicated over the network separately**."  This Petition also cites Hanna in connection with the requirement in claim 10 of "**deleting the message content including the media component from the server computer**," and the requirement in claim 11 that the deletion occurs "**after said providing a second display**."  Further details are provided in the analysis below.

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

**B.    Ground 1: Obviousness Over Wren and Berger**

**1.    Claim 1**

**(a)    "A computer-implemented method of handling an electronic message at a recipient user mobile device in a networked environment, the electronic message including a message content and a header information that corresponds to the message content, the recipient user mobile device having access to electronic instructions, the electronic instructions being stored at the recipient user mobile device and/or at a server, the method comprising:" (Preamble)**

The preamble of claim 1 is disclosed by **Wren**, which discloses a method of sending video messages to recipients.  As Wren explains: "The primary object of the invention is to provide an end-user with a one-touch messaging capability to send movie messages containing video and audio of arbitrary length to recipients independent of the recipient's device capabilities over a network such as the Internet."  (Wren, ¶0008.)

Wren discloses "[a] **computer-implemented method of handling an electronic message at a recipient user mobile device in a networked environment**."  The "**recipient user mobile device**" takes the form of a message recipient's mobile device such as a mobile phone.  (Wren, ¶¶0008, 0009 ("The method can be enabled with a variety of devices such as a mobile phone ...."), 0004 ("The exchange of movie messages that contain video and audio between devices such as a PC or mobile phone is a frequent and convenient means of

-18-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

communication."), 0022 ("FIG. 9 is an illustration of the end-user experience

receiving the one-touch message with a compatible mobile phone ….").)   The

recipient user mobile device resides "**in a networked environment**" because the

device can obtain the video message over a network such as the Internet.  (Wren,

¶0008 ("The primary object of the invention is to provide an end-user with a one-

touch messaging capability <u>to send movie messages</u> containing video and audio of

arbitrary length <u>to recipients</u> independent of the recipient's device capabilities <u>over

a network such as the Internet</u>.").)

The claimed "**electronic message**" in Wren takes the form of a movie

message containing video and audio as shown in Figures 9A and 9B, discussed

further below.  (*See also* Wren, ¶0008.)  This is consistent with the '111 patent,

which explains that "[a]n electronic message may be any electronic file, data, and/or

other information transmitted between one or more user computers."  ('111, 7:50-

52.)  The '111 patent further explains that "[a]n electronic message may include

(e.g., as part of a message content) any of a wide variety of information including,

but not limited to, text, an image, <u>video</u>[,] … <u>audio</u>[,] … other types of data, and any

combinations thereof."  ('111, 7:52-60.)

Wren further discloses that "**the electronic message includ[es] a message

content and a header information that corresponds to the message content**," as

-19-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

recited.  The "message content" and "header information" are clearly illustrated by

Figures 9A and 9B of Wren shown below:

**FIG 9A**


**FIG 9B**


(Wren, Figs. 9A, 9B.)  Figure 9A shows a screen display on the recipient device

showing a notification of receipt of a movie message from "Jane Doe" at "9:30AM."

Figure 9B shows the movie message being played in response to the recipient

pressing the "Play" button.  (Wren, ¶0032 ("FIG. 9A shows a notification of a new

message.  FIG. 9B shows a view of the Movie once the user selects play from a new

message notification.").)  The claimed "**message content**" in Wren thus corresponds

to the movie message content that is shown being played in Figure 9B.  This is

consistent with the '111 specification, which explains that "[a]n electronic message

may include (e.g., as part of a message content) any of a wide variety of information

including, but not limited to, text, an image, video … other types of data, and any

combinations thereof."  ('111, 7:52-60.)

The claimed "**header information that corresponds to the message**

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

**content**" is the sender identification ("Jane Doe") and time ("9:30AM") shown in

Figure 9A.  The '111 patent itself confirms that the information shown in Figure 9A

clearly qualifies as "header information."  The patent states that header information

"may include, but is not limited to, a reply ID, a message ID, <u>a date/time associated</u>

<u>with the electronic message</u> (e.g., date/time of creation, date/time of delivery, etc.),

a <u>display name representing a sender of the electronic message</u>, and <u>any</u>

<u>combinations thereof</u>."  ('111, 12:66-13:5.)  Figure 10 of the '111 patent, in fact,

shows header information (**1015**, **1020**, **1025**) containing the name of the sender

("Mary Smith") and the date and time associated with the message—similar to

Wren.  ('111, Fig. 10, 14:40-42 ("Message listing portion **1010** includes a list of

header information **1015**, **1020**, **1025** of three electronic messages.").)

The header information in Wren also "**corresponds to the message content**"

because it accompanies and is associated with the video content.  (Chatterjee, ¶52.)

As shown above, in fact, the user can click "Play" from Figure 9A (which shows the

"**header information**") to access the movie message content ("**message content**")

in Figure 9B.  (Wren, ¶0032, Figs. 9A & 9B.)

With respect to the requirement of "[**a**] **computer-implemented method of**

**handling**" the electronic video message, the '111 patent explains that the "handling"

includes any of a number possible actions such as, for example, storing or displaying

an electronic message.  (*See* '111, 8:16-20 ("[S]ystem **100** may <u>handle</u> (<u>e.g., store,</u>

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

deliver, <u>display</u>, etc.) a header information and a message content of a particular

electronic message ....").)  As shown above, Wren discloses a technique in which the

recipient mobile phone may receive a notification of a new movie message, and then

view the movie message content on the phone display.  (Wren, ¶0032, Figs. 9A-9B.)

This clearly discloses a computer-implemented method of "handling" an electronic

message.

Finally, Wren satisfies "**the recipient user mobile device having access to**
**electronic instructions, the electronic instructions being stored at the recipient**
**user mobile device and/or at a server**."  A person of ordinary skill would have

understood that "**electronic instructions**" as recited in the preamble simply refers

to executable instructions that cause a computing device to perform a particular

function.  (Chatterjee, ¶54; '111, *e.g.*, 2:50-54, 4:64-67, 5:39-44.)  As discussed,

Wren discloses a recipient user mobile device that can receive a new video message

and display it to the user.  (Wren, ¶¶0031-32, Figs. 9A-9B.)  One of ordinary skill

would have understood that the recipient device could not perform these functions

as described in Wren without access to electronic instructions (*e.g.*, software) for

performing these functions.  (Chatterjee, ¶54.)

Moreover, the recitation of "electronic instructions being stored at the

recipient user mobile device *and/or* at a server," to the extent it is limiting, is satisfied

by electronic instructions stored at *either* the "recipient user mobile device" *or* the

-22-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

"server."  *See Ex Parte Gross*, Appeal No. 2011-004811, Decision on Appeal, at 4

(P.T.A.B. Jan. 3, 2014).  As noted, Wren discloses a recipient mobile phone that can

receive a new video message and display it to the user.  (Wren, ¶¶0031-32, Figs. 9A-

9B.)  One of ordinary skill would have thus understood and found it obvious that

there would be at least electronic instructions stored at the mobile phone (*e.g.*, in

phone memory) that that phone can access to enable it to perform these functions.

(Chatterjee, ¶55.)[2]

---

[2] The '111 patent itself confirms that the preparation and storage of electronic

instructions is readily apparent to persons of ordinary skill in the art.  (*See* '111,

18:38-50 ("Appropriate software coding can readily be prepared by skilled

programmers based on the teachings of the present disclosure, as will be apparent to

those skilled in the software art. Such software can be a computer program product

that employs a storage medium including stored computer code which is used to

program a computer to perform the disclosed function and process of the present

invention. The storage medium may include, but is not limited to, any type of

conventional floppy disks, optical disks, CD-ROMs, magneto-optical disks, ROMs,

RAMs, EPROMs, EEPROMs, magnetic or optical cards, or any other suitable media

for storing electronic instructions.").)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

> (b)     **"providing a plurality of reduced traceability displays
> via the recipient user mobile device using a display
> generator that acts upon a display element of the
> recipient user mobile device to provide the plurality of
> reduced traceability displays, the display generator
> including the electronic instructions, the plurality of
> reduced traceability displays including a first display
> presenting a header information of an electronic
> message received at the recipient user mobile device
> and a second display presenting a message content of
> the electronic message, the message content including
> a media component," (Claim 1[a])**

This limitation is also disclosed by Wren.  The following table provides an

explanation of how the Petition maps Wren's disclosures to claim 1**[a]**:

| Limitation of Claim 1[a] | Corresponding Disclosure from Wren |
|---|---|
| "recipient user mobile device" | Receiver's mobile phone |
| "display generator" | Hardware, software, or firmware on receiver's mobile phone for generating the screen displays (*e.g.*, Figs. 9A, 9B) |
| "display element of the recipient user mobile device" | The screen display on the recipient user's mobile phone |
| "plurality of reduced traceability displays" | The "first display" and the "second display," specified below. |
| "a first display presenting a header information of an electronic message received at the recipient user mobile device" | The screen display in Figure 9A presenting the message header information including the sender name ("Jane Doe") |
| "a second display presenting a message content of the electronic | The screen display in Figure 9B presenting the movie message content |

-24-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

| Limitation of Claim 1[a] | Corresponding Disclosure from Wren |
|---|---|
| message, the message content including a media component" | |

Although claim 1**[a]** appears verbose, the key limitations pertain to the two reduced traceability displays—the "**first display**" and the "**second display**," which are disclosed by Figures 9A and 9B in Wren, respectively:

 FIG 9A



FIG 9B



(Wren, Figs. 9A, 9B, ¶0032.)  "FIG. 9 is an illustration of the end-user experience receiving the one-touch message with a compatible mobile phone …."  (Wren, ¶0022.)  "FIG. 9A shows a notification of a new message.  FIG. 9B shows a view of the Movie once the user selects play from a new message notification."  (Wren, ¶0032.)

Figure 9A discloses "**a first display presenting a header information of an electronic message received at the recipient user mobile device**," because it shows the message sender's name ("Jane Doe") and time ("9:30AM") associated with the message.  As explained with respect to the preamble, these two pieces of

-25-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

information qualify as "header information" of an electronic message.

Figure 9B shows "**a second display presenting a message content of the electronic message, the message content including a media component**," because it presents the actual movie message content to the user.  (Wren, ¶0032.)

The display in Figure 9A ("first display") and the display in Figure 9B ("second display") together qualify as "**a plurality of <u>reduced traceability displays</u>**."[3]   This is because the displays in Figures 9A and 9B display header information and message content separately, which as explained by the '111 specification, enables reduced traceability.  (Chatterjee, ¶60 (citing '111, 9:18-22, 3:59-66).)

_____

[3] Petitioner's arguments about the term "reduced traceability display" in the text are based on the meaning of the term under its broadest reasonable interpretation.  Petitioner reserves its right to advance a different position in district court litigation not governed by the BRI standard.

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

As shown, Figure 9A displays only header information and not any of the movie message content. Petitioner notes that Figure 9A shows the text "New Movie," but nothing in Wren suggests that this text was part of the message sent from Jane Doe. (Chatterjee, ¶61.) In fact, as noted, Wren refers to the movie message as a "one-touch" message in which the sender can send messages to a recipient without further user input. (Wren, ¶¶0032, 0006-08.) In one embodiment, for example, the sender can simply select a recipient from an address book to have a movie message recorded and sent, without further input. (Wren, Claim 2 ("[T]he content is recorded, processed, and sent following a one-touch button press in the context of an address book entry, active audio or video call, or other menu without further user input.").) Accordingly, nothing in Wren suggests that the sending user provided the "New Movie" text.



And the display in Figure 9B shows the movie message content, but clearly does not include any header information (*e.g.*, "Jane Doe" or "9:30AM"). To the extent the Patent Owner would speculate that the movie message content itself could contain identifying information about the sender and/or recipient, it would have been obvious that a video could be recorded without any such indication. (Chatterjee, ¶62.)



-27-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

Petitioner's mapping of "**a plurality of reduced traceability displays**" is
consistent with the Patent Owner's infringement read in the underlying litigation.
(*See* Infringement Contentions (Exhibit H), Ex. 1014, p.5.)  Petitioner's mapping is
further supported by the Patent Owner's current proposed construction of "reduced
traceability displays" in the underlying litigation as "an arrangement of displays that
enables reduced traceability of electronic messages (e.g. by separately displaying
identifying information and message content)."  Because the Patent Owner's
interpretation of this limitation should be no narrower under BRI, this limitation is
thus satisfied by the separate display of identifying information and message content
as disclosed in Figures 9A and 9B of Wren.

Moreover, as noted, the claimed "**recipient user mobile device**" is the
receiving mobile phone in Wren.  The claim requires that the reduced traceability
displays be provided via the recipient user mobile device "**using a display
generator that acts upon a display element of the recipient user mobile device
to provide the plurality of reduced traceability displays, the display generator
including the electronic instructions**."  But these limitations do not add anything
that is not already disclosed by, or trivially obvious in view of, Wren.

In the underlying litigation, the Patent Owner has taken the position that
"display generator" is not a means-plus-function limitation and should be construed
as "software or hardware configured to provide information representing a display

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

image for display on a user computer."  For purposes of this proceeding, and to streamline the Board's consideration of this Petition, Petitioner accepts this formulation as the "broadest reasonable interpretation.  Petitioner observes that the "software or hardware" formulation proposed by the Patent Owner is generally consistent with the functional way in which specification describes the claimed display generator.  ('111, 9:29-35.)[4]

---

[4] For purposes this proceeding, Petitioner does not contend that "display generator" under its broadest reasonable interpretation is a means-plus-function limitation.  Petitioner acknowledges that it has advanced a means-plus-function argument in district court litigation, but the Board has recognized that there is nothing improper about agreeing with a patent owner's position to streamline an IPR proceeding while preserving an alternative position in separate litigation not governed by the BRI standard.  *See Kingston Tech. Co. v. Polaris Innovations Ltd.*, IPR2016-01621, Paper 8 at 7, 16 (P.T.A.B. Feb. 15, 2017) (rejecting patent owner's arguments based on "Petitioner's prior allegation of indefiniteness … in the district court" because "neither party argues in this proceeding that the term … is a means-plus function term or that it is indefinite"); *Telit Wireless Sols. Inc. v. M2M Sols. LLC,* IPR2016-00055, Paper 9 at 9 (P.T.A.B. Apr. 22, 2016) ("Patent Owner also

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

It would have been obvious to a person of ordinary skill that the recipient mobile device in Wren would have included a "display generator" (as described above) in order to generate the screen displays of Figures 9A and 9B. (Chatterjee, ¶65.) In order to present the displays in Wren on the recipient device, the recipient device would have included at least hardware or software to provide representations of images ("**display generator**") for the mobile phone display (the "**display element**"). (*Id.*) Indeed, generating displayable images on a display device for presentation to a user is one of the most fundamental functions of any computer system dating back to the earliest days of computing; in fact, the recipient mobile device in Wren could not generate and present displayable images without a "display generator" as defined above. (*Id.*) It thus would have been obvious to implement the screens in Figures 9A and 9B using a display generator.

Moreover, as explained in connection with the preamble, it would have been obvious that the mobile phone would have included "electronic instructions" for performing the functions of that device as disclosed in Wren. (Chatterjee, ¶¶54-55, 66.) In particular, one of ordinary skill would have understood that the display

---

argues that Petitioner's proposed construction in this proceeding is in conflict with positions Petitioner has taken in district court litigation .... However, we are not bound by positions taken by an accused infringer in district court litigation.").

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

generator that provided the screen displays in Figures 9A and 9B of Wren would

have included instructions (*e.g.*, software) for generating the displayable images and

providing them to the mobile phone's display.  (Chatterjee, ¶66.)

> **(c)    "the first display being generated by the display generator such that the first display does not include a display of the media component via the first display such that a single screen capture of both the header information and the media component is prevented, the first and second displays not being displayed to the user at the same time;" (Claim 1[b])**

As explained above for claim 1[a], Figure 9A in Wren

discloses the claimed "**first display**."  And as further shown

above, Figure 9A (the "**first display**"; at right) shows only

header information and does not present any component of

the video content of the movie message.    Wren thus



discloses that "**the first display does not include a display of the media**

**component via the first display**."  Moreover, as previously explained, one of

ordinary skill would have understood and found it obvious that Figure 9A (the "**first**

**display**") would be generated by a "**display generator**" as claimed.  (*See also*

Chatterjee, ¶¶58, 65-67.)

Wren also makes clear that Figure 9A (the "**first display**") and Figure 9B (the

"**second display**") are "**not being displayed to the user at the same time**":

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

FIG 9A



FIG 9B



(Wren, Figs. 9A, 9B; *see also id.*, ¶0022.)  As Wren explains, "FIG. 9A shows a notification of a new message.  FIG. 9B shows a view of the Movie <u>once the user selects play from a new message notification</u>."  (Wren, ¶0032.) Figure 9B is thus displayed <u>after</u> Figure 9A, and not "at the same time."  (Chatterjee, ¶68.)  Nothing in Wren suggests any scenario in which Figure 9A and Figure 9B are ever displayed at the same time.  (Chatterjee, ¶69.)

Moreover, because the header information and media component are presented on separate screens of Figure 9A and Figure 9B, respectively, "**a single screen capture of both the header information and the media component is prevented**," as claimed.  A screen capture of the "first display" disclosed in Figure 9A of Wren

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

would capture header information, but none of the media component.[5]  Conversely, a screen capture of the "second display" of Figure 9B of Wren may capture some of the media component (*e.g.*, a frame of the movie message), but would not capture any of the header information.  Thus, a "single screen capture" of both the header and media component is prevented.  (Chatterjee, ¶¶70-71.)  The '111 specification confirms that not displaying header information with the message content prevents a single screen capture of both pieces of information.  ('111, 9:18-22 ("Separate display of header information and message content for an electronic message reduces traceability of the electronic message. In one aspect, screenshot logging at a computer, such as computer 115, may not capture both header information and message content simultaneously."), 18:6-9 ("[S]eparate display of header information and message content prevents a single screen capture at a user computer from creating a complete record of the electronic message.").)  Petitioner's mapping of this limitation is further consistent with the Patent Owner's infringement read in the underlying litigation.  (*See* Infringement Contentions (Exhibit H), Ex. 1014, pp.7-8.)

---

[5] As explained for claim 1[**c**] below, Figure 9A adapted to include a "message list" (according to the teachings of the Berger reference) would still only capture header information, and none of the media component.

-33-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

For all of the foregoing reasons, Wren discloses "**the first display being generated by the display generator such that the first display does not include a display of the media component via the first display such that a single screen capture of both the header information and the media component is prevented, the first and second displays not being displayed to the user at the same time**," as recited in claim 1.

       **(d)**    "**receiving a selection by the recipient user via the first display, the selection directed to a portion of a message list corresponding to the header information; and**" **(Claim 1[c])**

Figure 9A of Wren (the "**first display**") shows that the recipient user can select a message by pressing the "Play" option to present the movie content:

**FIG 9A**



**FIG 9B**



(Wren, Figs. 9A, 9B, ¶0032.)  As discussed, "FIG. 9A shows a notification of a new message. FIG. 9B shows a view of the Movie <u>once the user selects play from a new message notification</u>."  (Wren, ¶0032.)  Wren thus discloses "**receiving a selection**

-34-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

**by the recipient user via the first display**," the selection directed to the header

information shown in Figure 9A.

Figure 9A of Wren displays only a single message, and as such, does not appear

to expressly disclose a "**selection directed to <u>a portion of a message list</u>**

**corresponding to the header information**." But this additional feature would have

been obvious in further view of Berger.

Berger discloses a mobile phone that can display a message list that displays

header information—the same header information in Wren (sender name and

date)—and allows a user to select a message from that list. Figure 4 of Berger shows

an example of such a list as displayed in a mobile phone:



Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

(Berger, Fig. 4 (highlighting added; partial figure); *see also id.*, ¶0041.)  "In FIG. 4,

each entry occupies a single line of the display. The line begins with an index **126**

identifying the number of the message in the list."  (Berger, ¶0041.)

For example, the first message in the message list **120**, highlighted in yellow,

shows header information for a message sent by "**George Smith**" at "**11:00A**," the

same two categories of header information shown in Figure 9A of Wren ("**Jane Doe**"

and "**9:30AM**").  (*Compare,* Wren, Fig. 9A, *with* Berger, ¶0041 ("For text messages,

the title is the name of the sender of the message. After the title, the time **130** when

the message was sent appears.").)  Berger explains that "[t]he user may then select

(**88**) any of the messages for review by moving a cursor **132** up and down to reach

the message of interest and then pressing the SEND button **134**.  A variety of other

techniques could be used to enable the user to select a message, including a

touchscreen or pointing device, available on some mobile devices."  (Berger, ¶0042.)

The combination of Wren and Berger thus renders obvious the step of

"**receiving a selection by the recipient user via the first display, the selection

directed to a portion of a message list corresponding to the header

information**."  (Chatterjee, ¶77.)  Under the combination of Wren and Berger,

Figure 9A of Wren ("first display") would be further adapted to display a message

list containing multiple messages, each item in the list listing header information as

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

disclosed in Berger.[6]  The selection in Wren, under this combination, would thus be "**directed to a portion of a message list corresponding to the header information**" because the user would select the message by placing the cursor on the header information corresponding to that message (*e.g.*, "George Smith," "11:00A"), as disclosed in Berger and explained above.  (Berger, ¶0042.)

*Rationale and Motivation to Combine*:  It would have been obvious to combine Wren and Berger, with no change in their respective functions.  The combination would have predictably resulted in the mobile phone user interface of Wren (as shown in Figure 9A and Figure 9B) in which Figure 9A of Wren (the "first display") would be further adapted to display a message list containing multiple messages, each item in the list listing header information as disclosed in Berger.

---

[6] As noted in the analysis of claim 1[**b**], above, Figure 9A of Wren (the "first display") adapted to include the message list of Berger would still capture only header information, and none of the media component.  (*See* Berger, Fig. 4 (showing a display that includes only header information and none of the corresponding message content).)  Berger itself confirms that the message content would be displayed on a separate screen from the message list.  (*E.g.*, Berger, ¶0048 ("In the case of an email message that has been displayed, when the user indicates that he is finished reviewing the email message, the message list is again displayed.").)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

(Chatterjee, ¶78.)

A person of ordinary skill would have found this to be a straightforward combination for a number of reasons. (Chatterjee, ¶79.) To begin with, the teachings of Berger would have provided a distinct improvement to the mobile device display of Wren—the ability to display and allow selection from among a multiplicity of received messages. (Chatterjee, ¶79.)

Although the exemplary screen displays in Figure 9A and Figure 9B of Wren show a single received message, it was well-known to persons of ordinary skill, and just about anyone who had used email or other forms of electronic messaging, that a user could receive multiple messages through her device. (Chatterjee, ¶79.) This has been known since the earliest days of electronic messaging, and as Berger confirms, was also known to occur in the context of messages received by mobile phones. (*Id.* (citing Berger, Fig. 4, ¶0041).) One of ordinary skill would have found the teachings of Berger instructive in improving the recipient mobile device in Wren to display a list of multiple messages and allow a recipient to select a message from the list. (Chatterjee, ¶79.) As Berger expressly confirms, its techniques provide a "simple seamless user interface." (Berger, ¶0028.)

One of ordinary skill would have further recognized that the message list techniques in Berger are a particularly good technological fit with the mobile device of Wren. (Chatterjee, ¶80.) Wren and Berger are analogous references in the same

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

field of mobile communications, and both references confront common issues relating to presenting received messages on mobile devices with smaller screens. (*See id.*; Berger, ¶¶0006, 0032; Wren, ¶¶0022, 0032, Figs 9A-9B (using multiple screens on a mobile phone), 9C (using single screen on a PC with a larger display).)

Both references also use similar techniques for delivering message content to the recipient device. (Chatterjee, ¶81.) Berger discloses that message content can be retrieved from a storage location on the Internet by activating a URL embedded in the header information. (Berger, ¶¶0053-57, 0081 ("Various platforms for embedding of the locators can be used.").) And Wren discloses that its movie message content can be retrieved by activating an embedded URI. (Wren, ¶0011 ("[T]he video and audio streams to a remote disk that is available on the world-wide web and a message is created and sent with a URI to the streamed media embedded in the body of the message…. When the message is received, an end-user can click on … the URI to play the video and audio."); *see also id.*, Abstract, ¶0025.) As noted, the "URI" in Wren and the "URL" in Berger are interchangeable in this context. (Chatterjee, ¶¶33 n.5, 81.) Because the recipient mobile phone in Wren already has the ability to retrieve message content using a URI/URL, incorporating the teachings of Berger would have been technologically straightforward, and a person of ordinary skill would have had every expectation of success. Indeed, the synergistic and complementary nature of the systems disclosed in Wren and Berger

-39-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

would have provided a further motivation to combine.  (Chatterjee, ¶81.)

Berger provides additional express motivations.  Berger explains that its URL

delivery technique allows the message content to be optimized for delivery based on

the capabilities of the recipient device:

> To deliver the message to the phone may require that the UM server
> transform the content of the original message-which may be in a format
> not compatible with the target device or which may contain attachments
> in a format not compatible with the target device-so they are compatible
> with the target device. Delivering the message to the phone also
> requires that the UM server honors the constraints of the target device,
> including memory limitations which impose an upper limit on the file
> size of a document delivered to the device.

(Berger, ¶0044.)  It was well-known that target device limitations could be identified

to the server along with the URL request – such functionality (known as "User-

Agent") was built-into the design of HTTP.  (Chatterjee, ¶82; *see also* Berger, ¶0043

(explaining that message delivery occurs in response to an HTTP request from the

target phone).)  One of ordinary skill would have recognized that this benefit would

have been particularly significant in the context of video, which typically takes up

significantly more data and processing than other types of information, and thus,

creates a greater likelihood that a sender's video in its original form may exceed the

constraints of the target device.  (Chatterjee, ¶82.)  This benefit is also particularly

compelling for recipient mobile phones, which as Berger recognized, "typically have

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

limited memory capability, limited bandwidth, and cannot render some common

types of files in their native formats, for example, HTML, GIF, JPEG, MPEG, WAV,

PDF, MSWord, PowerPoint, and Excel." (Berger, ¶0006.) Wren similarly

recognizes these limitations, adding further express support for the motivation

provided in Berger. (Wren, ¶0004 ("[T]he size of the movie message is

predetermined by the designers of the mobile phone based on the networking

capabilities of the device. In current art of mobile data technology, the size of the

movie message is constrained to less than 20 or 30 kilobytes as limited at the time

of manufacturing.").)

Berger provides yet another express benefit in the form of security.

(Chatterjee, ¶83 (citing Berger, ¶¶0059-63).) Berger discloses an embodiment

where, "rather than encoding the userID and message number explicitly in the URL

that is included in the list sent to the phone, the message server instead applies the

hashing function to these two values." (Berger, ¶0065.) Berger explains that such

a technique prevents the potential scenario where a "malicious third party,"

"[e]quipped with the knowledge of another person's user ID, … could, even without

physical access to the user's phone, access that person's messages simply by visiting

(for example) the URL http://www.x.com/email jsp?u=123456m=4 to see the user's

fourth most recent message." (Berger, ¶0061.)

As noted, Wren uses email, a private form of person-to-person messaging, to

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

facilitate the delivery of message content.  (Wren, ¶¶0010, 0029.)  It was well-known to persons of ordinary skill in the art that privacy and security were important to just about any user of computer messaging products, including email.  (Chatterjee, ¶83.)  As of July 2005, entire industries existed that offered encryption and various other privacy and security solutions to protect the confidentiality of electronic messages.  (*Id.*)  One of ordinary skill would have understood that the security and privacy mechanisms in Berger, including encryption and access control features discussed above, would have made the video message communications system of Wren more desirable.  (*Id.*)

Finally, Berger makes clear that its teachings do not depend on the type of messages received—"[a]ny kind of message could be received."  (Berger, ¶0084.)  And Berger specifically identifies video as a type of message that can be received.  (Berger, ¶¶0001, 0079 ("Although we have used the words audio, voice, and video to describe certain kinds of messages received, other kinds of multimedia messages may also be handled in similar ways.").)  One of ordinary skill would have understood that the message list in Berger would have been suitable for organizing movie messages on the mobile device of Wren.  (Chatterjee, ¶84.)  Berger also uses industry standard technologies such as "typical" WAP browsers "installed on mobile phones."  (Berger, ¶0030.)  One of ordinary skill would have thus appreciated that using the message list techniques in Berger would have provided the additional

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

benefit of built-in compatibility with an installed base of mobile phones that had

used standard WAP browsers.  (Chatterjee, ¶85.)

> **(e)      "in response to the selection, providing a second
> display via the recipient user device, the second display
> displaying the message content including the media
> component." (Claim 1[d])**

Figure 9B of Wren (the "**second display**") shows that, in response to the

selection, the recipient user is presented with the movie message content ("**message**

**content including the media component**"):

**FIG 9A**                **FIG 9B**        

(Wren, Figs. 9A, 9B.)   As discussed, "FIG. 9A shows a notification of a new

message. FIG. 9B shows a view of the Movie <u>once the user selects play</u> from a new

message notification."   (Wren, ¶0032.)   Wren thus discloses "**in response to the**

**selection, providing a second display via the recipient user device, the second**

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

**display displaying the message content including the media component**."[7]

> **2.** **Dependent Claim 4: "A computer-implemented method
> according to claim 1, wherein the display generator acts with
> the display element to generate the second display such that
> the second display displays the message content including the
> media component without displaying the header
> information."**

As discussed above for independent claim 1, one of

ordinary skill would have understood and found it obvious

that the "**display generator**" of the recipient mobile phone

in Wren would "**act[] with the display element to**



**generate the second display**" as shown in Figure 9B.

(Chatterjee, ¶¶63, 65-66.)  And as explained at length for claim , Figure 9B displays

the movie message content ("**message content including the media component**"),

but does not display the "**header information**" (*i.e.*, "Jane Doe" and "9:30AM").

(Chatterjee, ¶¶59-61.)  Wren thus satisfies the additional requirements of dependent

---

[7] As explained for claim 1**[c]**, it would have been obvious that the claimed

"selection" was "directed to a portion of a message list corresponding to the header

information" as disclosed in Berger.  The selection in Berger activates a URL to

retrieve the message content, which as discussed, is a functionality the mobile phone

in Wren already has.  (Wren, ¶0011 ("When the message is received, an end-user

can click on … the URI to play the video and audio."), Abstract, Claim 7.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

claim 4.  (Chatterjee, ¶88.)

> **3.      Dependent Claim 5: "A computer-implemented method according to claim 1, wherein the media component includes information selected from the group consisting of an image, video, audio, and any combinations thereof."**

As explained for claim 1, Wren discloses that the media component includes at least video and audio information.  (Wren, ¶0008 ("[M]ovie messages containing video and audio …."); *see also id.*, Fig. 9B.)

> **C.      Ground 2: Obviousness Over Wren, Berger, and Hanna**

> **1.      Dependent Claim 9: "A computer-implemented method according to claim 1, wherein the header information and the message content are received at the recipient user device via a network, wherein the header information and the message content are communicated over the network separately."**

As explained for claim 1, the recipient device receives the header information (Figure 9A) and movie message content (Figure 9B) over a network.  (*E.g.*, Wren, ¶0031-32.)  Wren therefore discloses that "**header information and the message content are received at the recipient device via a network**," as claimed.  As noted in **Part VI.A.1(a)** above, in some instances the movie message in Wren is transmitted from the sending device as a file attachment to an email message.  (*E.g.*, Wren, ¶¶0002 ("[T]he invention relates to multimedia devices conditionally sending audiovisual messages that are automatically addressed to recipients based on one-touch activation and contain an attachment with the video and audio recording …."), 0025 ("Sending transmits the message to a recipient as either a fully contained

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

message with the movie attached …."), Abstract.)  The email containing the video

attachment is then received by a server.  (Wren, ¶0029 ("Once composition is

complete, the method will attach the complete video and audio message … assemble

and send a message using an interoperable protocol such as the IETF e-mail

protocols of the receiving server ….").)

But Wren does not disclose the detailed mechanics of how the movie message,

including the header information and video content, is transmitted from the server

to the recipient's mobile phone.  This Petition thus cites to **Berger** and **Hanna** to

show that "**the header information and the message content are communicated**

**over the network separately**."

As discussed in **Part VI.A.2(a)**, Hanna discloses a system in which a server

receives from a sending device an email message containing a file attachment, and

replaces the file attachment in the email with a URL.  (Hanna, 2:3-5 ("One

embodiment of the present invention provides a system that replaces an attachment

to an email message with a reference to a location where the attachment is stored."),

2:55-57 ("[T]he reference specifying the location of the attachment includes a

uniform resource locator (URL)."), 5:1-12, 5:26-28.)  The modified email message

is then transmitted to the recipients.  (Hanna, 5:39-40.)

Hanna explains how the message recipient can retrieve the original attachment

using the URL:

-46-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

>Upon receiving modified email message **202** including URL **206** (step
>**312**), recipient **114** uses URL **206** to retrieve attachment **204** from file
>server **111** (step **314**). This may involve allowing a user to explicitly
>request attachment **204** by clicking on URL **206**.

>In order to receive attachment **204**, recipient **114** may have to be
>authenticated to file server **111**. This can be accomplished using any of
>a number of authentication mechanisms, such as a password, a shared
>secret, public key cryptography and/or digital certificates.

(Hanna, 5:57-66.)

As mentioned previously, Berger teaches that a URL to the message content
can be embedded in the header information sent from the server to the recipient
device, such that upon user selection of the displayed header information, the URL
is activated to retrieve the corresponding message content.  (Berger, ¶¶0041-43,
0053-57, 0081 ("Various platforms for embedding of the locators can be used.").)
Berger makes clear that the URL itself need not be displayed.  (Berger, Fig. 4
(showing a message list with no displayed URL), Fig. 5 (showing the code
underlying the displayed text, which includes the embedded URL).)

The combination of Wren with Berger and Hanna thus fully discloses and
renders obvious the requirement that "**the header information and the message
content are communicated over the network separately**."  (Chatterjee, ¶95.)
Under this combination, the header information in Wren (such as the sender name
and date/time shown in Figure 9A) is sent separately from the message content (the

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

movie message shown in Figure 9B).  This is because a message is initially sent from the server to the recipient device that does <u>not</u> include an attachment containing the movie message content – that message instead includes only the header information and a URL as disclosed in Berger and Hanna, the URL identifying the location of the movie message content on a server.  The recipient's mobile phone can later retrieve the movie message content (as shown in Figure 9B of Wren) from the server using the URL in a separate transmission according to the techniques of Berger and Hanna.  Under this scenario, therefore, the header information is communicated separately from the movie message content.

Petitioner anticipates that the Patent Owner may attempt to argue that the communication of header information under this combination somehow also includes message content, but any such argument is easily refuted.  Because this Petition cites Figures 9A and 9B in Wren for the claimed "**electronic message**," the **"message content including a media component"** under the proposed combination contains only the video message content shown in Figure 9B, with no additional user-provided text or other content.  (Wren, Fig. 9B (showing only video content).)  As discussed, Wren refers to the movie message shown in Figure 9B as a "one-touch" message that the sender can send to a recipient without additional input such as text.  (Wren, ¶¶0022, 0032.)  For example, the sender can simply select a recipient from an address book to have a movie message recorded and sent, without any

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

further input.  (Wren, ¶¶0028, ("This one-touch procedure is invoked from a hard or

soft button while viewing an address-book entry, from a menu for initiating the

recording and sending of a movie message or from a voice or video call screen to

record and send a movie message simultaneously with the call."), 0029 ("The Send

option will auto-compose the message based on parameters submitted to the method

from the point of initiation."), Claim 2.)  As such, there can be no argument that the

initial message delivered from the server to the recipient user mobile device may

include some kind of non-video "**message content**."

The Patent Owner may alternatively attempt to argue that the URL contained

in the initial message to the recipient, under this combination, forms some part of

the "**message content**" as claimed.  Although this initial message does include a

URL inserted by the server (as taught by Hanna), the URL is merely a pointer to the

movie message content, and thus not part of the claimed "**message content**" itself.

That the URL is not part of the "message content," in the context of video messaging

of Wren, is confirmed by the fact that while Wren contemplates embedding a URI

into the email body as a way to deliver message content (Wren, *e.g.*, ¶0011), that

URI is nowhere to be found in the figures showing the display of movie messages

to the recipient.  (Wren, Figs. 9A, 9B, 9C.)  As noted, Berger teaches how URLs can

be associated with displayed elements (*e.g.*, the "Play" button in Figure 9A of Wren),

but not displayed themselves.  (Berger, Figs. 4, 5.)  Moreover, under the proposed

-49-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

combination with Hanna, the URL does not even exist at the time the movie message in Wren ("**electronic message**") is transmitted from the sending device.  Rather, the URL is generated (based on the movie message content) only *after* the claimed "**electronic message**" has been received by the server, thus further confirming that the URL should not be mapped as part of the claimed "**message content**."  (*E.g.*, Hanna, 2:3-5 ("One embodiment of the present invention provides a system that replaces an attachment to an email message with a reference to a location where the attachment is stored.").)

Finally, the mapping of the "**separate**" communication limitation using a URL sent with the header information is consistent with the '111 specification.  The '111 specification discloses an embodiment where a pointer to the message content (in the form of a "message ID" or "sequence number") is sent with the header information to the recipient device.  ('111, 15:9-20 ("[C]omputer **320** requests a message content for a selected electronic message (*e.g.*, electronic message **330** via header information **1015**) from server **310**.  In response to this action, server **310** may associate a message ID **from the selected header information** and communicate the message content having the corresponding message ID to computer **320**. Alternatively, where a sequence number is utilized for each electronic message, server **310** associates the sequence number of the selected electronic message with a corresponding message content and communicates the message

-50-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

content to computer **320**.").)  That pointer, like the URL in Petitioner's combination,

is then used to retrieve the message content in a separate communication.  (*Id.*)  The

'111 patent itself thus confirms that the claimed "**separate**" communication can be

implemented by sending a pointer (such as a URL) with the header information.

(Chatterjee, ¶98.)

*Rationale and Motivation to Combine*:  It would have been obvious to

combine Wren with Berger and Hanna in the manner described above, and one of

ordinary skill would have had many motivations to make such a combination.

(Chatterjee, ¶¶99-111.)  The rationale and motivation to combine Wren with Berger

has been discussed above, and applies equally here.

Moreover, as discussed previously, Wren already discloses an alternative to

the attachment technique in which a URI is embedded into an email message

identifying the network location of the movie message content (Wren, *e.g.*, ¶0029),

thus confirming that the recipient mobile phone has a built-in ability to retrieve video

message content using a URL, according to the teachings of Berger and Hanna.  As

further discussed, Berger similarly discloses accessing message content on the

recipient device using a URL.  (Berger, *e.g.*, ¶¶0050, 0056, 0057, 0071.)  And Hanna,

like Berger, discloses that the URL can include an identification of the file to be

retrieved.  (Hanna, 5:41-45.)  Accordingly, one of ordinary skill would have

regarded Wren, Berger, and Hanna as closely analogous references in the same field

-51-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

of electronic messaging that use similar techniques for delivering content. One of

ordinary skill would have thus found the incorporation of Hanna, which describes

delivery of content to the recipient via a URL in more detail, to be technologically

straightforward, and one of ordinary skill would have had every expectation of

success. Indeed, the synergistic and complementary nature of the systems disclosed

in Hanna, Wren, and Berger would have provided a motivation to combine.

(Chatterjee, ¶100.)

Moreover, as discussed above with respect to Berger, one of ordinary skill

would have recognized that a URL-based delivery technique would have provided

significant advantages to a movie messaging system such as Wren, including the

ability to optimize the delivery of message content based on the capabilities of the

recipient device. (Chatterjee, ¶101.) Those motivations apply equally to the further

combination with Hanna.

Hanna provides additional express motivations to combine. Hanna explains

that its technique of replacing an email attachment with a URL prior to delivery

provides superior message tracking because the system can log the recipient's

request to retrieve the message content stored on the server, thus providing proof of

receipt. (Hanna, 6:1-5 ("One of the advantages of the above-described embodiment

is that it can provide better proof of receipt of a file. Proof of receipt is rarely

provided for email messages. By forcing recipient **114** to log onto file server **111** to

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

receive attachment **204**, proof of receipt can be obtained.").)  The ability to track

recipient access to the message content, in turn, benefits the server's storage and

retention of those files. (Chatterjee, ¶102.)  For example, based on tracking intended

recipients' access of the file, the server could delete the file (and thus conserve

storage space) after all of the intended recipients have successfully retrieved it.

(Hanna, 6:15-22 ("Eventually, the system deletes attachment **204** from file server

**111**…. It can take place after receiving a notification that all recipients of the email

message have retrieved the attachment.").)

      Wren also explains that a URL technique such as Hanna's allows the video

message content to be streamed to the recipient device.  (Chatterjee, ¶¶103-104.)  It

was well-known to persons of ordinary skill that streaming video content to a

recipient had significant advantages over transmitting the complete video file to the

recipient for playback, such as through an email attachment.  (*Id.*)

      Thus, as explained at length, the URL delivery technique disclosed in Berger

and Hanna would have provided ample benefits in the form of optimized delivery

based on recipient device capabilities, superior tracking of message content retrieval,

and streaming for playback.  Moreover, as explained below, one of ordinary skill

would have appreciated that the URL-based delivery technique is further preferable

due to limitations associated with the delivery of emails with embedded attachments.

(Chatterjee, ¶¶105-110.)

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

Without a URL-based delivery technique, the entire video and audio content
in Wren would be attached to the email message itself. (Wren, ¶¶0029 ("Once
composition is complete, the method <u>will attach the complete video and audio
message</u> or insert a URI that refers to the originating network location source for the
video and audio stream …."), 0031.) That content would then be transmitted over
the network to the recipient's device when the message is delivered—regardless of
whether the recipient has any interest in viewing the video and audio content. This
consumption of network bandwidth is exacerbated by the fact that video and audio
content generally consumes much more data than text and other types of data.
(Chatterjee, ¶106.)

Wren itself echoes these concerns. While recognizing that "referencing movie
messages with a URI is not always the ideal end-user experience," Wren makes clear
that attaching "large message files" is simply "not practical for an end-user" with
even "dialup speeds" "given the resources consumed by the device to transport the
large message. For example, the end-user will not have access to other Internet
services or the quality of the active voice call will degrade as the device attempts to
multitask as larger message transport and high-quality voice call over a long period
of time." (Wren, ¶0006.) One of ordinary skill would have appreciated that these
concerns apply equally to sending and recipient mobile devices. (Chatterjee, ¶107.)

Hanna describes even more potential drawbacks to delivering an email with

-54-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

an attachment to the recipient:

> (1) Attachments can create a burden for an email system. If an email
> message with a large attachment is sent to a large number of people (for
> example a baby picture sent to all 30,000 people in a company), the
> process of sending the attachment will take up a large amount of
> network bandwidth. Also, storing the attachment in a large number of
> mailboxes will take up a large amount of storage space. Furthermore,
> messages containing attachments may persist in mailboxes for a large
> period of time because people are not always diligent about reading and
> deleting email messages. (2) A user may accidentally forward an
> attachment. This is particularly a problem if the attachment contains
> confidential information that was not intended to be forwarded. (3) It is
> hard to control access to an attached file because anyone who receives
> a copy of the file can do anything they want with it.

(Hanna, 1:29-44.)

Replacing the attached video file in Wren with a URL at the server, as
disclosed in Hanna, would thus remedy the drawbacks discussed above. (Chatterjee,
¶109.) Because a URL typically consumes only a handful of characters – whereas
video and audio content can be quite large – the email message transmitted to the
recipient could have consumed little network bandwidth. These savings would have
been further multiplied if the email message had to be passed through a number of
computers on the Internet on its way to the recipient. And once the email message
was received, the underlying video and audio content would only have been

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

transmitted to the recipient device on demand when the recipient needs it, *i.e.*, when the recipient chooses to play the movie message content through the URL. (*Id.*)

These advantages would have been well-understood to a person of ordinary skill. (Chatterjee, ¶110.) Network bandwidth is a valuable and often scarce resource in a networked computing system. The URL delivery technique in Hanna would have enabled the system to conserve those resources, thus providing a compelling motivation to adapt it to Wren. (*Id.*)

Accordingly, in light of the motivations discussed above, it would have been obvious to combine Wren with Berger and Hanna, resulting in a system in which "**the header information and the message content are received at the recipient user device via a network, wherein the header information and the message content are communicated over the network separately**."

> 2. **Dependent Claim 10: "A computer-implemented method according to claim 1, wherein the message content is received from a server computer and the method further comprises deleting the message content including the media component from the server computer."**

The combination of Wren, Berger, and Hanna satisfies the limitation "**wherein message content is received from a server computer**" for the same reasons previously discussed for claim 9. As explained, the movie message content in Wren (the "**message content including the media component**") is received by the recipient device from a server computer using a URL. (*E.g.*, Hanna, 5:57-59.)

-56-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

Wren, Berger, and Hanna thus disclose and render obvious that "**message content is received from a server computer**."

Claim 10 goes on to recite the step of "**deleting the message content including the media component from the server computer**," and this is also disclosed by Hanna.  Hanna explains that the file attachment (which contains the "message content including the media component" under the combination with Wren) can be deleted from the server in a number of ways.  For example:

> Eventually, the system deletes attachment **204** from file server **111**. This deletion process can take place in a number of different ways. It can take place automatically after an expiration of a time period. It can take place after sending a notification to recipients of the email message that the attachment will be deleted. It can take place after receiving a notification that all recipients of the email message have retrieved the attachment. It can take place after receiving a notification that all recipients of the email message have deleted the email message. It can take place after receiving a command from a sender of the email message to delete the attachment (perhaps after some nagging).

(Hanna, 6:15-26.)  Hanna thus satisfies "**deleting the message content including the media component from the server computer**."

This Petition provided a full explanation of the motivations to combine with Hanna in the discussion of claim 9, which apply equally to claim 10.  As an additional motivation, one of ordinary skill would have been motivated to adapt

-57-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

Hanna's deletion teachings in order to conserve storage space on the server. One of

ordinary skill would have understood that the content of movie messages in Wren

can consume a considerable amount of space on the server, and thus, that content

should be removed when appropriate in order to conserve storage space. (Chatterjee,

¶115.)

> **3.     Dependent Claim 11: "A computer-implemented method according to claim 10, wherein said deleting the message content including the media component from the server computer occurs after said providing a second display."**

As explained for claim 10, Hanna discloses that the message content can be

deleted in a number of situations. Under one scenario, the deletion "can take place

<u>after receiving a notification that all recipients of the email message have retrieved</u>

<u>the attachment</u>." (Hanna, 6:20-22.) As noted, Hanna discloses the ability to track

recipient access of the content stored at the server. (Hanna, 6:1-5.) Under the

combination of Hanna with Wren and Berger, therefore, this form of deletion

satisfies deletion of the message content "**after said providing a second display**."

This is because the "**second display**" in Wren, shown in Figure 9B below,

displays the movie message content retrieved from the server:

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

FIG 9A



FIG 9B



(Wren, Figs. 9A, 9B.)  As noted previously, Figure 9B (the "**second display**") shows the movie message being played in response to the recipient pressing the "**Play**" button from Figure 9A.  (Wren, ¶0032.)  Under the straightforward combination of Wren, Berger, and Hanna, pressing the "Play" button on Figure 9A would activate the URL and retrieve the movie message content, resulting in the video and audio data being presented through the "second display" of Figure 9B.

As noted, Hanna discloses that the deletion of the content at the server "can take place <u>after receiving a notification that all recipients of the email message have retrieved the attachment</u>."  (Hanna, 6:20-22.)  That notification would occur after the recipient in Wren has retrieved the movie message content for display through the interface in Figure 9B (the "**second display**").  (Chatterjee, ¶118.)  Under the combination of Wren, Berger, and Hanna, therefore, the message content including the media component is deleted from the server computer "**after said providing a second display**."  The rationale and motivation to combine Wren, Berger and Hanna

-59-

Petition for *Inter Partes* Review of
U.S. Patent No. 9,338,111 B2

is provided in the discussion of claims 9 and 10 above, and applies here.

## VII.  CONCLUSION

Petitioner respectfully requests institution on claims 1, 4, 5, and 9-11.

Dated: December 28, 2017                                  Respectfully submitted,

COOLEY LLP
ATTN: Patent Group                         By:    /Heidi L. Keefe/
1299 Pennsylvania Avenue NW                        Heidi L. Keefe
Suite 700                                          Reg. No. 40,673
Washington, DC 20004                               Counsel for Petitioner
Tel: (650) 843-5001
Fax: (650) 849-7400

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT</u>

Pursuant to 37 C.F.R. § 42.24(d), I certify that this petition complies with the type-volume limits of 37 C.F.R. § 42.24(a)(1)(i) because it contains 11,581 words, according to the word-processing system used to prepare this petition, excluding the parts of this petition that are exempted by 37 C.F.R. § 42.24(a) (including the table of contents, a table of authorities, mandatory notices, a certificate of service or this certificate word count, appendix of exhibits, and claim listings).


DATED:  December 28, 2017

COOLEY LLP                                  / Heidi L. Keefe /
ATTN: Patent Docketing                      Heidi L. Keefe
1299 Pennsylvania Avenue NW                 Reg. No. 40,673
Suite 700
Washington, D.C. 20004
Tel: (650) 843-5001
Fax: (650) 849-7400

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to 37 C.F.R. Sections 42.6 and 42.105, that a complete copy of the attached **PETITION FOR INTER PARTES REVIEW OF U.S. PATENT NO. 9,338,111**, including all exhibits (**Nos. 1001-1014**) and related documents, are being served via Federal Express on the 29th day of December, 2017, the same day as the filing of the above-identified document in the United States Patent and Trademark Office/Patent Trial and Appeal Board, upon the Patent Owner by serving the correspondence address of record with the USPTO as follows:

Birch Tree IP Law & Strategy PLLC
370 Farrell Street, Suite 423
South Burlington, VT 05403

and upon counsel of record for the Patent Owner in the litigation pending before the U.S. District Court for the Central District of California entitled *Vaporstream, Inc. v. Snap Inc. d/b/a Snapchat, Inc.*, Case No. 2:17-cv-00220 JAK as follows:

Davida Brook
Meng Xi
Susman Godfrey LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

Robert Rivera, Jr.
Joseph  S. Grinstein
Susman Godfrey LLP
1000 Louisiana, Suite 5100
Houston, TX 77002-5096

DATED: December 29, 2017                    / Heidi L. Keefe /
                                                              Heidi L. Keefe
                                                              Reg. No. 40,673

COOLEY LLP
ATTN:  Patent Docketing
1299 Pennsylvania Ave. NW, Suite 700
Washington, D.C. 20004
Tel:  (650) 843-5001
Fax: (650) 849-7400