# EXHIBIT 5

Trials@uspto.gov                              Paper 10
571-272-7822                                  Entered: July 10, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SNAP INC.,
Petitioner,

v.

VAPORSTREAM, INC.,
Patent Owner.
_____

Case IPR2018-00397
Patent 9,306,886 B2
_____

Before JUSTIN T. ARBES, STACEY G. WHITE, and
JENNIFER MEYER CHAGNON, *Administrative Patent Judges*.

ARBES, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*35 U.S.C. § 314(a)*

IPR2018-00397
Patent 9,306,886 B2

# I. INTRODUCTION

Petitioner Snap Inc. filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1, 4, 5, 9–11, and 13 of U.S. Patent No. 9,306,886 B2 (Ex. 1001, "the '886 patent") pursuant to 35 U.S.C. § 311(a). Patent Owner Vaporstream, Inc. filed a Preliminary Response (Paper 6, "Prelim. Resp.") pursuant to 35 U.S.C. § 313. Pursuant to 35 U.S.C. § 314(a), the Director may not authorize an *inter partes* review unless the information in the petition and preliminary response "shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." For the reasons that follow, we have decided to institute an *inter partes* review as to claims 1, 4, 5, 9–11, and 13 on all grounds of unpatentability asserted in the Petition.

# II. BACKGROUND

## A. The '886 Patent

The '886 patent discloses "[a]n electronic messaging system and method with reduced traceability." Ex. 1001, Abstract. The '886 patent notes that "[t]ypically, an electronic message between two people is not private." *Id.* at col. 2, ll. 7–8. For example, messages may be intercepted by third parties; logged and archived; or copied, cut, pasted, or printed. *Id.* at col. 2, ll. 8–13. "This may give a message a 'shelf-life' that is often uncontrollable by the sender or even the recipient." *Id.* at col. 2, ll. 13–14. As such, according to the '886 patent, there was "a demand for a system and method for reducing the traceability of electronic messages." *Id.* at col. 2, ll. 27–29.

2

IPR2018-00397
Patent 9,306,886 B2

Figure 3 of the '886 patent is reproduced below.



FIG. 3

Figure 3 above depicts system 300 for communicating electronic message 330 from user computer 315 to user computer 320 over network 325 using server 310. *Id.* at col. 10, ll. 62–67. "An electronic message may be any electronic file, data, and/or other information transmitted between one or more user computers." *Id.* at col. 7, ll. 50–52. The electronic message may include text, image, video, audio, or other types of data. *Id.* at col. 7, ll. 52–60.

IPR2018-00397
Patent 9,306,886 B2

Figure 5 of the '886 patent is reproduced below.



**FIG. 5**

Figure 5 depicts the process by which the electronic message is sent from the first user computer and received by the second user computer. *Id.* at col. 11, ll. 10–12. At steps 510–520, the user inputs a recipient address (e.g., a unique identifier, such as an e-mail address) and message content, using separate screens provided by the server computer, and the message is

IPR2018-00397
Patent 9,306,886 B2

communicated from the user computer to the server.  *Id.* at col. 11, l. 37–col.
12, l. 26, Figs. 8–9.  The server then performs various actions to process the
message at steps 525–545.  *Id.* at col. 12, l. 27–col. 14, l. 26.  For example,
the server identifies header information (e.g., information that "identifies the
sending user, recipient user, location of the electronic message, [or] timing
of [the] electronic message") separate from the content of the message itself
and generates a message ID associated with the header information and
message content.  *Id.* at col. 12, ll. 37–49, col. 13, ll. 30–32 ("A message ID
[is] used to maintain a correspondence between the separated components of
electronic message 330.").  The '886 patent describes an example in which
the message ID is included both in an Extensible Markup Language (XML)
file storing the header information and in an XML file storing the message
content.  *Id.* at col. 13, l. 38–col. 14, l. 26.

  To retrieve the message, the recipient first logs in to the system at
step 550.  *Id.* at col. 14, ll. 27–29.  At step 555, the server communicates to
the recipient user computer a display image showing header information for
multiple messages.  *Id.* at col. 14, ll. 33–49, Fig. 10.  For example, the
display image may show a display name and date/time for each message, but
not show the content itself for any of the messages.  *Id.*  In one embodiment,
the header information may include "a sequence number (ex: 1, 2, 3, etc.)
assigned to each electronic message," where each sequence number is
associated with a corresponding message ID for the respective message.  *Id.*
at col. 14, ll. 54–65.  At step 560, the user selects one of the electronic
messages to be displayed by, for example, selecting a "read" link displayed
with the respective header information.  *Id.* at col. 14, l. 66–col. 15, l. 2.
At step 565, the server communicates to the recipient user computer a

5

IPR2018-00397
Patent 9,306,886 B2

display image with the content of the chosen message (but not header information for the message).  *Id.* at col. 15, ll. 21–30, Fig. 11.  At step 570, the message is automatically and permanently deleted from the server at a predetermined time.  *Id.* at col. 15, ll. 47–49.  At step 575, the user closes the display image, returns to the message listing, or chooses to respond to the message.  *Id.* at col. 16, ll. 36–39.  At step 585, the message content is automatically deleted from the recipient user computer after viewing.  *Id.* at col. 16, ll. 45–53.  According to the '886 patent, displaying header information and message content separately, and automatically deleting message content, reduce the traceability of electronic messages.  *Id.* at col. 3, l. 58–col. 4, l. 13.

*B. Illustrative Claim*

Claim 1 of the '886 patent recites:

1. A computer-implemented method of handling an electronic message at a recipient user device in a networked environment, the electronic message including a message content and a header information that corresponds to the message content, the recipient user device having access to electronic instructions, the method comprising:

providing a plurality of reduced traceability displays via the recipient user device using a display generator that acts upon a display element of the recipient user device to provide the plurality of reduced traceability displays, the display generator including the electronic instructions, the plurality of reduced traceability displays including a first display presenting a header information of an electronic message received at the recipient user device and a second display presenting a message content of the electronic message, the message content including a media component, the message content and the header information having been related to each other using a

6

IPR2018-00397
Patent 9,306,886 B2

correlation previously assigned to each of the message content
and the header information;

receiving a selection by the recipient user via the first
display, the selection directed to a portion of a message list
corresponding to the header information; and

in response to the selection, providing the second display
via the recipient user device such that the second display does
not include a display of the header information via the second
display such that a single screen capture of both the header
information and the media component is prevented.

## C. The Prior Art

Petitioner relies on the following prior art:

U.S. Patent No. 7,054,905 B1, filed Mar. 30, 2000,
issued May 30, 2006 (Ex. 1005, "Hanna");

U.S. Patent No. 5,958,005, issued Sept. 28, 1999
(Ex. 1006, "Thorne");

U.S. Patent Application Publication No. 2005/0021803
A1, published Jan. 27, 2005 (Ex. 1003, "Wren"); and

U.S. Patent Application Publication No. 2003/0152203
A1, published Aug. 14, 2003 (Ex. 1004, "Berger").

## D. The Asserted Grounds

Petitioner challenges claims 1, 4, 5, 9–11, and 13 of the '886 patent on
the following grounds:

| References | Basis | Claim(s) Challenged |
|---|---|---|
| Wren and Berger | 35 U.S.C. § 103(a)[1] | 1, 4, and 5 |

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284
(2011) ("AIA"), amended 35 U.S.C. § 103.  Because the challenged claims
of the '886 patent have an effective filing date before the effective date of

IPR2018-00397
Patent 9,306,886 B2

| References | Basis | Claim(s) Challenged |
|---|---|---|
| Wren, Berger, and Hanna | 35 U.S.C. § 103(a) | 9–11 |
| Wren, Berger, and Thorne | 35 U.S.C. § 103(a) | 13 |

## III. ANALYSIS

### A. *Claim Interpretation*

The Board interprets claims in an unexpired patent using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b). Petitioner argues that no claim terms require interpretation. Pet. 9–10. Patent Owner asserts that "no special approach to construction of the claims is required," and notes that the district court in the related litigation between the parties interpreted various terms of the '886 patent claims. Prelim. Resp. 3 (citing Ex. 2002). After reviewing the preliminary record, we conclude that, for the purposes of this Decision, only two terms require express interpretation, agree with the analysis of the district court, and adopt the district court's interpretations as the broadest reasonable interpretation in light of the Specification of the '886 patent for those terms. First, we interpret "correlation" in claim 1 to mean "data corresponding to a message used to associate two components of a message." Ex. 2002, 9. The parties agreed to this interpretation in the related litigation. *Id.* Second, we interpret "reduced traceability displays" in claim 1 to mean "an arrangement of displays that enables reduced

---

the applicable AIA amendment, we refer to the pre-AIA version of 35 U.S.C. § 103.

IPR2018-00397
Patent 9,306,886 B2

traceability of electronic messages (e.g., by separately displaying identifying information and message content)." *Id.* at 15–17. Patent Owner proposed this interpretation in the related litigation, and Petitioner applies it in the Petition. *See id.*; Pet. 28–29.

### B. Principles of Law

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). The question of obviousness is resolved on the basis of underlying factual determinations, including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art."[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled

---

[2] Additionally, secondary considerations, such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Graham*, 383 U.S. at 17–18. Patent Owner, however, has not presented any such evidence at this stage of the proceeding.

IPR2018-00397
Patent 9,306,886 B2

artisan would have had a reasonable expectation of success in doing so.'"
*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359,
1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418
(for an obviousness analysis, "it can be important to identify a reason that
would have prompted a person of ordinary skill in the relevant field to
combine the elements in the way the claimed new invention does").

A motivation to combine the teachings of two references can be "found
explicitly or implicitly in market forces; design incentives; the 'interrelated
teachings of multiple patents'; 'any need or problem known in the field of
endeavor at the time of invention and addressed by the patent'; and the
background knowledge, creativity, and common sense of the person of
ordinary skill." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed.
Cir. 2013) (citation omitted). Further, an assertion of obviousness "cannot
be sustained by mere conclusory statements; instead, there must be some
articulated reasoning with some rational underpinning to support the legal
conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441
F.3d 977, 988 (Fed. Cir. 2006)); *In re NuVasive, Inc.*, 842 F.3d 1376, 1383
(Fed. Cir. 2016) (a finding of a motivation to combine "must be supported
by a 'reasoned explanation'" (citation omitted)).

### C. Level of Ordinary Skill in the Art

> Section 103(a) forbids issuance of a patent when "the
> differences between the subject matter sought to be patented
> and the prior art are such that the subject matter as a whole
> would have been obvious at the time the invention was made to
> a person having ordinary skill in the art to which said subject
> matter pertains."

IPR2018-00397
Patent 9,306,886 B2

*KSR*, 550 U.S. at 406 (quoting 35 U.S.C. § 103(a)).  Petitioner argues that a
person of ordinary skill in the art at the time of the '886 patent "would have
possessed at least a bachelor's degree in software engineering, computer
science, or computer engineering with at least two years of experience in the
design and implementation of systems for sending and receiving messages
over a communications network, such as the Internet (or equivalent degree
or experience)."  Pet. 5–6 (citing Ex. 1002 ¶¶ 13–15).  Patent Owner's
declarant, Michael Shamos, Ph.D., "generally agree[s]" with Petitioner's
characterization of the person of ordinary skill.  Ex. 2001 ¶ 14.  Based on the
current record, including our review of the '886 patent and the types of
problems and solutions described in the '886 patent and cited prior art, we
agree with Petitioner's assessment of the level of ordinary skill in the art and
apply it for purposes of this Decision.

### D. Obviousness Ground Based on Wren and Berger

Petitioner contends that claims 1, 4, and 5 are unpatentable over Wren
and Berger[3] under 35 U.S.C. § 103(a), citing the testimony of Sandeep
Chatterjee, Ph.D., as support.  Pet. 20–50 (citing Ex. 1002).  Patent Owner
makes various arguments in response, citing the testimony of Dr. Shamos as
support.  Prelim. Resp. 13–42, 45–62 (citing Ex. 2001).  We are persuaded
that Petitioner has established a reasonable likelihood of prevailing on its
asserted ground for the reasons explained below.

---

[3] Wren and Berger were not of record during prosecution of the '886 patent.
*See* Ex. 1001, (56); Pet. 4–5.

11

IPR2018-00397
Patent 9,306,886 B2

*1. Wren*

Wren describes "a multimedia video messaging system that provides
an end-user with the ability to record and send arbitrary-length audio and
video content" as "audiovisual messages that are automatically addressed to
recipients based on one-touch activation."  Ex. 1003, Abstract, ¶ 2.  The user
"initiate[s] the method from a menu, address-book or an active voice or
audio call screen" on the user's mobile phone.  *Id.* ¶ 10.  For example, the
device may provide the user with a "Send" option, which "will
auto-compose the message [to the desired recipient(s)] based on parameters
submitted to the method from the point of initiation" or "may prompt the
user for the to: address that will typically be a phone number or e-mail
address, subject text and body text."  *Id.* ¶ 29.  The device then sends the
movie message in one of two ways.  *Id.* ¶¶ 11, 29.  If the video is less than a
certain size, it is sent as an attachment to the message.  *Id.* ¶ 11.  If the video
is above that size, however, "the video and audio streams to a remote disk
that is available on the world-wide web and a message is created and sent
with a [Uniform Resource Identifier (URI)[4]] to the streamed media
embedded in the body of the message."  *Id.*  "When the message is received,
an end-user can click on the attachment or the URI to play the video and
audio."  *Id.*

---

[4] Dr. Chatterjee explains that a URI is a "sequence of characters that
identifies a resource," the most common example of which is a Uniform
Resource Locator (URL), and "[t]he terms URL and URI are often used
interchangeably when the resource being identified is accessible over the
Internet, as is the case in Wren."  Ex. 1002 ¶ 33 n.5.

IPR2018-00397
Patent 9,306,886 B2

Figures 9A–9C of Wren are "an illustration of the end-user experience receiving the one-touch message with a compatible mobile phone or [personal computer (PC)] with a compatible e-mail client." *Id.* ¶ 22. Figures 9A and 9B of Wren are reproduced below.



Figure 9A depicts "a notification of a new message," and Figure 9B depicts "a view of the Movie once the user selects play from a new message notification." *Id.* ¶ 32.  Wren also includes Figure 9C, which is reproduced below.



Figure 9C depicts "an e-mail message containing the Movie." *Id.*

13

IPR2018-00397
Patent 9,306,886 B2

### 2. Berger

Berger describes a unified messaging (UM) system where a user can access different types of messages (e.g., voicemail, e-mail, facsimile, video) from a remote UM messaging server with a "seamless user interface" presented on a mobile phone.  Ex. 1004 ¶¶ 1, 28.  The messaging server converts data as necessary (e.g., text to speech, and vice versa) so that it can be accessed and provided to the user.  *Id.* ¶¶ 1–4, 28–30.  Figure 4 of Berger is reproduced below.



FIGURE 4

IPR2018-00397
Patent 9,306,886 B2

Figure 4 depicts list of available messages 120 displayed on the user's
mobile phone, including e-mail messages 122 and voice messages 124.  *Id.*
¶ 41.  The list is provided to the user's phone as "a web page, in a markup
language compatible with the requesting device," and displayed as
"hyperlinked messages."  *Id.*  The user selects a particular message by
moving cursor 132 up and down and pressing SEND button 134.  *Id.* ¶ 42.
Upon doing so, the phone's browser sends a Hypertext Transfer Protocol
(HTTP) request to the messaging server, and the messaging server performs
any necessary conversion of the message and returns the content of the
message as a web page for display on the phone.  *Id.* ¶¶ 43–44.  Berger
discloses that each message has an associated message number (displayed as
1–5 in Figure 4 above), which is included in each hyperlink of the displayed
list and the HTTP request from the phone.  *Id.* ¶¶ 45–57.

### 3. Analysis

Petitioner relies on Wren for the majority of the limitations of claim 1.
For example, Petitioner argues that Wren teaches a "recipient user device"
(i.e., the recipient's mobile phone) that handles an "electronic message"
(i.e., movie message) having both "header information" (i.e., sender
identification ("Jane Doe") and time ("9:30AM")) and "message content"
including a "media component" (i.e., video).  Pet. 20–25.  Petitioner further
argues that Wren teaches (1) providing a "first display" with the header
information (i.e., the screen display shown in Figure 9A) and a "second
display" with the message content (i.e., the screen display in Figure 9B),
which are "reduced traceability displays" because they display the header
information and message content separately; (2) receiving a selection by the

IPR2018-00397
Patent 9,306,886 B2

recipient via the first display (i.e., the user selecting "Play" on the screen
display shown in Figure 9A); and (3) in response, providing the screen
display shown in Figure 9B, such that a single screen capture of the header
information and media component is prevented. *Id*. at 25–31, 44–45, 47–49.

Petitioner relies on Berger for two limitations of claim 1. First, claim
1 recites a "selection directed to a portion of a message list corresponding to
the header information." Because Wren displays only a single message at
a time, Petitioner relies on Berger for this limitation, citing the list of
messages shown in Figure 4 of Berger, which displays "header information"
for individual messages and allows the user to select a particular message by
moving the cursor. *Id.* at 44–47. Petitioner explains that in the asserted
combination,

> Figure 9A of Wren ("first display") would be further adapted to
> display a message list containing multiple messages, each item
> in the list listing header information as disclosed in Berger.
> The selection in Wren, under this combination, would thus be
> "directed to a portion of a message list corresponding to the
> header information" because the user would select the message
> by placing the cursor on the header information corresponding
> to that message (e.g., "George Smith," "11:00A"), as disclosed
> in Berger . . . .

*Id.* at 47 (emphases omitted).

Second, claim 1 recites "the message content and the header
information having been related to each other using a correlation previously
assigned to each of the message content and the header information."
As explained above, we interpret "correlation" to mean data corresponding
to a message used to associate two components of a message. *See supra*
Section III.A. According to Petitioner and Dr. Chatterjee, a person of
ordinary skill in the art would have understood that Wren must have a

16

IPR2018-00397
Patent 9,306,886 B2

previously assigned correlation between the header information and message
content because, when the user selects "Play" on the screen with the header
information shown in Figure 9A, Wren plays the video corresponding to that
information, as shown in Figure 9B. Pet. 31–33 (citing Ex. 1002 ¶¶ 69–70).
Petitioner acknowledges, though, that "Wren does not disclose the details of
how the correlation between the header information and the message content
was assigned," and thus also relies on Berger. *Id.* at 34–38. Specifically,
Petitioner contends that in Berger, a message number is "previously assigned
by the server . . . to each row of displayed header information" and included
in the URL that is "used to retrieve the corresponding message content." *Id.*
at 34–36. Petitioner also points to Berger's alternative embodiment, which
combines the message number and user ID into a single cryptographic hash
value that is similarly included in the URL. *Id.* at 36–37.

Petitioner provides an explanation as to why a person of ordinary skill
in the art would have been able and motivated to modify Wren's system
based on the teachings of Berger. *Id.* at 38–44. For example, Petitioner
argues that both references teach similar techniques for delivering message
content and presenting that content on a mobile phone with a small screen,
and an ordinarily skilled artisan would have viewed "the ability to display
and allow selection from among a multiplicity of received messages," rather
than displaying one message at a time, as a "distinct improvement" to the
system of Wren. *Id.* at 39–41. Petitioner's contentions are supported by the
testimony of Dr. Chatterjee. *See* Ex. 1002 ¶¶ 78–87, 93.

Patent Owner makes seven arguments in its Preliminary Response.
First, Patent Owner argues that Wren is not analogous art to the '886 patent.
Prelim. Resp. 45–57 (citing Ex. 2001 ¶¶ 27, 28, 30, 31, 33). To be

17

IPR2018-00397
Patent 9,306,886 B2

considered for obviousness, a reference must be analogous art. *See In re
Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004) ("References within the
statutory terms of 35 U.S.C. § 102 qualify as prior art for an obviousness
determination only when analogous to the claimed invention."). A prior art
reference qualifies as analogous art (1) if it is from the same field of
endeavor as the claimed invention, regardless of the problem addressed, or
(2) if the reference is not within the field of the inventor's endeavor, it is
nonetheless reasonably pertinent to the particular problem with which the
inventor is involved. *Id.*

Patent Owner contends that the '886 patent's field of endeavor is a
"reduced-traceability electronic messaging system and method." Prelim.
Resp. 48. According to Patent Owner, "every one of [the '886 patent's]
parts, *i.e.*, Abstract, Field of Invention, Background, Summary of the
Disclosure, Drawings, Detailed Description, and Claims, is specifically
targeted at reducing traceability of electronic messages." *Id.* at 47.

Based on the current record, we find that the '886 patent teaches
systems and methods for handling electronic messages more generally, such
that its field of endeavor is not limited to the reduction of message
traceability. The "Field of the Invention" section of the '886 patent states
that "[t]he present invention generally relates to the *field* of electronic
messaging." Ex. 1001, col. 1, ll. 64–67 (emphasis added). This definition is
reflected in all of the claims, which recite either a method, system, or
machine readable hardware storage medium with instructions for
implementing a method of "handling an electronic message." The
'886 patent describes the disclosed invention as "an electronic message
recipient handling system and method with separated display of message

18

IPR2018-00397
Patent 9,306,886 B2

content and header information," and indicates that "several aspects of
system 100 reduce traceability of electronic messages." *Id.* at col. 1,
l. 67–col. 2, l. 3, col. 4, ll. 32–34. On this record, however, we are not
persuaded that the '886 patent's discussion of one particular aspect of the
disclosed invention—"separated display of message content and header
information"—and one stated advantage of the invention—"reduce[d]
traceability"—limits the patent's field of endeavor, particularly when the
patent expressly defines the "field" as electronic messaging. Indeed, the
U.S. Court of Appeals for the Federal Circuit has indicated that the scope of
analogous art is to be construed broadly. *Wyers v. Master Lock Co.*,
616 F.3d 1231, 1238 (Fed. Cir. 2010) ("The Supreme Court's decision in
*KSR* . . . directs us to construe the scope of analogous art broadly . . . ."); *see
also Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001 (Fed. Cir.
2016) ("The field of endeavor of a patent is not limited to the specific point
of novelty, the narrowest possible conception of the field, or the particular
focus within a given field."). On this record, we are persuaded that the
'886 patent's field of endeavor is handling electronic messages.[5]

---

[5] In two previous decisions involving patents related to the '886 patent,
we preliminarily defined the field of endeavor for the respective patents as
"handling electronic mail messages." *See* IPR2018-00200, Paper 13, 14;
IPR2018-00312, Paper 13, 19. Upon further consideration, and based on the
record now before us in this proceeding, we find that the field of endeavor of
the '886 patent is handling electronic messages, consistent with the "Field of
the Invention" section and claims of the '886 patent, which describe
"electronic messages" generally and are not limited to "electronic mail
messages." The parties are encouraged to address the field of endeavor of
the '886 patent in their papers during trial.

19

IPR2018-00397
Patent 9,306,886 B2

Wren discloses a "multimedia video messaging system," where a multimedia device sends a movie message to a recipient device and the recipient device receives and displays the message. *See* Ex. 1003 ¶¶ 2, 31–32; Pet. 10–13. Wren, therefore, is directed to the handling of electronic messages. We are persuaded, based on the current record, that Wren is within the field of endeavor of the '886 patent and thus, is analogous art to the '886 patent, and need not determine whether Wren is reasonably pertinent to the particular problem the inventors of the '886 patent were trying to solve.

Second, Patent Owner argues that the references do not teach a "correlation previously assigned to each of the message content and the header information," as recited in claim 1. Prelim. Resp. 18–24 (citing Ex. 2001 ¶¶ 78–81). Patent Owner asserts that Wren has very little disclosure regarding the relationship between the screens shown in Figures 9A and 9B, and does not disclose any particular data used to associate the header information and message content. *Id.* at 18–22 (citing Ex. 1003 ¶ 32). Further, Berger only discloses "a list of links to entire messages, not correlations between headers and corresponding contents of messages," according to Patent Owner. *Id.* at 22–24. Patent Owner argues that Berger does not disclose "separating" message content from the rest of the message and, therefore, has no need for any correlation between header information and message content. *Id.*

We are not persuaded based on the current record. Petitioner relies on separate items of data in both Wren and Berger for the claimed header information (i.e., sender identification and time) and message content (i.e., video or text of the message). Although claim 1 requires that the header

20

IPR2018-00397
Patent 9,306,886 B2

information and message content be "related to each other" using a
previously assigned correlation, we do not see—and Patent Owner does not
point to—any language in claim 1 requiring them to be separately stored or
communicated.[6]  Moreover, we agree with Petitioner on this record that the
alleged "correlation" in Berger is very similar to the exemplary embodiment
described in the Specification of the '886 patent.  *See* Pet. 38.  In Berger, the
message number for a particular message is displayed in the web page
message list along with the header information for the message (e.g.,
"1 George Smith 11:00A" in Figure 4), and is part of the URL linked from
the displayed header information and used to retrieve the corresponding
message content.  *See* Ex. 1004 ¶¶ 49–50, 54–57, Fig. 5 (showing the
Wireless Markup Language (WML) code for the message list, with the URL
link for each message).  The message ID described in the Specification of
the '886 patent, which may be associated with a "sequence number (e.g.,
1, 2, 3, 4, etc.)" included in the header information, similarly identifies a
particular message, is sent to the server when the recipient selects that
message from the list, and is used by the server to retrieve the message
content and send it to the recipient.  *See* Ex. 1001, col. 6, l. 67–col. 7, l. 2;
col. 8, ll. 16–26, col. 14, ll. 54–65, col. 15, ll. 9–20.  Thus, the message
number in Berger associates the header information and message content,
similar to how the message ID associates the two components in the
Specification of the '886 patent.  Petitioner has made a sufficient showing on
this record that the cited references teach the "correlation" limitation of

---

[6] Indeed, dependent claim 9, challenged by Petitioner in a different ground,
recites that the header information and message content are communicated
over the network "separately."

IPR2018-00397
Patent 9,306,886 B2

claim 1.  The parties are encouraged to address this issue in their papers
during trial.

Third, Patent Owner argues that the references do not teach a first
"reduced traceability display" that shows header information but not
message content.  Prelim. Resp. 25–28.  As explained above, we interpret
"reduced traceability displays" to mean an arrangement of displays that
enables reduced traceability of electronic messages (e.g., by separately
displaying identifying information and message content).  *See supra* Section
III.A.  Patent Owner contends that the screen shown in Figure 9A of Wren is
not a reduced traceability display because it includes the text "New Movie,"
and Petitioner has not shown sufficiently that the text is *not* part of the
content of the message.  Prelim. Resp. 25–28.

Patent Owner's argument is not persuasive on this record.
Dr. Chatterjee explains that a person of ordinary skill in the art would have
understood Wren to teach that "the recipient mobile phone generates and
displays [the 'New Movie' text in Figure 9A] as part of a 'notification of a
new message,'" not that the sender entered the text.  Ex. 1002 ¶ 63; *see*
Pet. 27–28.  The basis for that opinion is that (1) Wren teaches a
"one-touch" activation where the user can send a message without any
further input, such as entering text, (2) there is nothing in Wren suggesting
that "New Movie" was entered by the sender, and (3) the "New Movie"
description would apply to all movie messages, not just the particular one
shown in Figures 9A and 9B.  Ex. 1002 ¶ 63 (citing Ex. 1003 ¶¶ 6–8, 22, 32,
claim 2).  Although Wren does not state expressly whether the "New Movie"
text is provided by the system or entered by the sender, we are persuaded
that Dr. Chatterjee's testimony is sufficient at this stage of the proceeding, as

IPR2018-00397
Patent 9,306,886 B2

it is supported by and consistent with the written description of Wren.  *See*
Ex. 1003 ¶ 32 (Figure 9A notifies the recipient of a "new" message, and that
message includes a "Movie" as shown in Figure 9B).  Patent Owner will
have the opportunity to cross-examine Dr. Chatterjee and explore the bases
for his opinions, and (as with all of Petitioner's contentions) our ultimate
assessment of Petitioner's asserted ground will be based on the complete
record at the end of trial.

Fourth, Patent Owner argues that the references do not teach "in
response to the selection, providing the second display via the recipient user
device such that the second display does not include a display of the header
information via the second display," as recited in claim 1.  Prelim. Resp.
13–17.  Patent Owner argues that

> [w]hen the Wren and Berger teachings are combined, in an
> attempt to provide a method of handling an electronic message,
> both of Wren's e-mail message types, *i.e.*, movie-as-an-
> attachment type and embedded-URI type, would be stored in an
> e-mail message repository for retrieval by Berger's UM server.
> Then, when a user has been authenticated by the Berger system,
> Berger's UM server composes a message list containing
> individual items corresponding to the messages stored in the
> e-mail repository for that user.  When the user selects an item
> from Berger's message list, the Berger server retrieves that
> e-mail message and displays it to the user on the user's device.
> In the combined method as hypothesized by Petitioner, in
> response to an item selection in the Berger list, Berger would
> first display Wren's FIG. 9A screen.  The recipient could then
> play the movie using the Play button on that screen.
> Consequently, and in Petitioner's hypothetical, when the user
> selected the Play button, it stands to reason that the Berger UM
> server would display Wren's FIG. 9B screen in accordance with
> the teachings of Wren.

23

IPR2018-00397
Patent 9,306,886 B2

*Id.* at 15–16 (citations omitted). Thus, according to Patent Owner, the screen of Figure 9A (showing the header information), not Figure 9B (showing the message content), would be displayed "in response to" the selection from the list in the asserted combination. *Id.* at 16–17.

We are not persuaded on this record that a person of ordinary skill in the art would have combined the references' teachings in the manner asserted by Patent Owner. Wren teaches a first screen (Figure 9A) showing header information for a single message, and the user selects that message for display by clicking "Play," after which a second screen (Figure 9B) showing the video is displayed. *See* Pet. 44–47. Berger similarly teaches a screen with header information from which the user may make a selection for display, but header information is shown for multiple messages, not a single message. *Id.* Petitioner's position is that a person of ordinary skill in the art would have been motivated to modify Wren's first screen, based on Berger, to display header information for multiple messages. *Id.* at 47. That modification is supported sufficiently at this stage by the disclosure of the references and the testimony of Dr. Chatterjee. *See id.* at 44–47; Ex. 1003 ¶ 32; Ex. 1004 ¶¶ 41–42; Ex. 1002 ¶¶ 78–87, 93.

Patent Owner's argument also is not persuasive because it is predicated on bodily incorporating certain aspects of Berger's UM server functionality into Wren's system. "It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements. . . . Rather, the test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art." *In re Mouttet*, 686 F.3d 1322, 1332–33 (Fed. Cir. 2012); *see also MCM Portfolio LLC v.*

24

IPR2018-00397
Patent 9,306,886 B2

*Hewlett-Packard Co.*, 812 F.3d 1284, 1294 (Fed. Cir. 2015) ("[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference" (citation omitted)), *cert. denied*, 137 S. Ct. 292 (2016).

Fifth, Patent Owner argues that the references do not teach providing a second display without header information "such that a single screen capture of both the header information and the media component is prevented," as recited in claim 1. Prelim. Resp. 28–32 (citing Ex. 2001 ¶¶ 29, 31). Patent Owner contends that "Wren does not mention screen capture, privacy, traceability, or security, and most telling, Wren teaches the simultaneous display of header information and message content in FIG. 9C," which "demonstrates that Wren is not concerned about reducing traceability when transmitting media content." *Id.* at 30–31 (emphasis omitted). We are not persuaded. Petitioner relies on Figures 9A and 9B of Wren as first and second displays separately displaying header information and message content on a mobile phone, not Figure 9C, which depicts a PC embodiment. *See* Pet. 22–23, 25–29, 44–45, 47–49; Ex. 2001 ¶ 32 ("Fig. 9C does not appear to depict a cellphone screen, but shows a PC"). Regardless of whether Wren discloses the purpose behind having separate screens, the reference teaches that Figures 9A and 9B are two different screens, with different displayed information and with the latter being displayed after the user selects "Play" in the former. *See* Ex. 1003 ¶ 32. Petitioner has made a sufficient showing based on Figures 9A and 9B in Wren.

Sixth, Patent Owner argues that the asserted combination of Wren with Berger would render Wren unsatisfactory for its intended purpose because "adding Berger's URL-based message list to Wren is contrary to

25

IPR2018-00397
Patent 9,306,886 B2

Wren's explicit teaching of sending movies directly to recipient devices to provide recipients with a better user-experience by making the movies available for immediate and offline viewing." Prelim. Resp. 32–39 (citing Ex. 2001 ¶¶ 29, 39). Patent Owner contends that one of Wren's key purposes is to "provide a recipient user with a good user-experience, which '[i]deally' involves transferring the movie message to the recipient at the time of sending, i.e., without using a URI," so that the recipient can view the message offline when the network is unavailable. *Id.* at 33 (quoting Ex. 1003 ¶ 6). Patent Owner argues that the asserted combination would frustrate that purpose because in the asserted combination,

> all of Wren's e-mail messages would be stored in the email message repository, including the Wren messages having the movies as attachments. So, when Wren sends a movie as an attachment, the message, including the attachment, does not go to the recipient's device, but rather Berger's UM server receives it and stores it in an e-mail message repository remote from the recipient device. Consequently, the movie attachment is *not* sent directly to the recipient device and is *not* available to the recipient for immediate or offline viewing.
>
> Indeed, to retrieve one of Wren's movie-as-an-attachment type e-mail messages, the user would first have to select the corresponding item in Berger's message list. Berger's UM server would then respond by retrieving the message via Berger's URL and then sending the message, including the attachment, to the recipient's device. Only after this additional step would Wren's movie be available to the recipient on her/his device. . . .

*Id.* at 36–37. For similar reasons, Patent Owner also contends that the asserted combination with Berger would change Wren's principle of operation because "the combination eliminates the direct delivery of a movie to a recipient's device contrary to Wren's express teachings that, when

26

IPR2018-00397
Patent 9,306,886 B2

network conditions allow, sending the movie directly to the recipient device
as an attachment improves the recipient's user-experience." *Id.* at 39–42
(citing Ex. 2001 ¶ 40).

Based on the current record, Patent Owner's arguments are not
persuasive. Wren teaches that the decision of how to send the movie
message is based on the file size of the video. Ex. 1003 ¶¶ 11, 29. If the
video is less than a certain size, it is sent as an attachment to the message.
*Id.* If the video is above that size, a URI to the video is included in the
message. *Id.* Patent Owner's argument appears to be directed to the
former—the recipient would not receive the movie directly as an attachment
because the asserted combination introduces an intermediate step of
providing a list of messages, from which the user selects a URL link to the
video. Prelim. Resp. 32–42. Regardless of whether doing so would be
contrary to Wren's intended purpose or principle of operation, however, the
latter procedure would still occur (for large video files), as contemplated by
Wren. In other words, Wren discloses two methods of operation, only one
of which allegedly would be frustrated according to Patent Owner.
Although Wren discloses that transferring a movie message "at the time of
send without a URI reference" provides the "ideal" type of user experience,
Ex. 1003 ¶ 6, we are not persuaded on this record that introducing a
URL-based selection from a message list would be inconsistent with Wren's
intended purpose or principle of operation, given that Wren's disclosed
system uses *both* methods of operation.

Seventh, Patent Owner argues that Petitioner's reasoning for
combining the teachings of the references is insufficient, as it "relies on
unsubstantiated supposition and speculation to support piecing together

27

IPR2018-00397
Patent 9,306,886 B2

disparate parts of references completely divorced from the problems
addressed by the '886 patent," repeating a number of its previous arguments
regarding the asserted combination.  Prelim. Resp. 57–62 (citing Ex. 2001
¶ 29).  Petitioner has made a sufficient showing at this stage of the
proceeding, with supporting testimony from Dr. Chatterjee, as to why a
person of ordinary skill in the art would have been motivated to modify
Wren to display a list of multiple messages, rather than one message at a
time, based on the teachings of Berger.  Further, we are not persuaded on
this record that doing so would have been contrary to Wren's intended
purpose or principle of operation, for the reasons explained above.

On this record, we are persuaded that Petitioner has shown a
reasonable likelihood of prevailing on its assertion that claim 1 is
unpatentable over Wren and Berger.  We also have reviewed Petitioner's
contentions regarding claims 4 and 5, which depend from claim 1, and are
persuaded that Petitioner has made a sufficient showing at this stage for
those claims as well.  *See* Pet. 50.

### E. Obviousness Ground Based on Wren, Berger, and Hanna

Petitioner contends that claims 9–11 are unpatentable over Wren,
Berger, and Hanna[7] under 35 U.S.C. § 103(a).  Pet. 50–65.  For example,
claim 9 recites that "the header information and the message content are
received at the recipient user device via a network, wherein the header
information and the message content are communicated over the network
separately."  Petitioner argues that the recipient device in Wren receives

---

[7] Hanna was not of record during prosecution of the '886 patent.  *See*
Ex. 1001, (56); Pet. 4–5.

IPR2018-00397
Patent 9,306,886 B2

header information and message content via a network and displays them as
shown in Figures 9A and 9B, but acknowledges that "Wren does not
disclose the detailed mechanics of how the movie message . . . is transmitted
from the server to the recipient's mobile phone." *Id.* at 50–51.  Petitioner
thus relies on Berger and Hanna as disclosing the recited separate
communication.  *Id.* at 51.  Specifically, Hanna teaches a system that
replaces the file attachment in an e-mail message with a URL to the file on a
server, where the recipient then uses the URL to retrieve the file.  *Id.* at
51–52 (citing Ex. 1005, col. 2, ll. 3–5, 55–57, col. 5, ll. 1–12, 26–28, 39–40,
57–66).  Similarly, Berger's message list web page includes, for a particular
message, a URL to the message content, which the recipient uses to retrieve
the message content.  *Id.* at 52–53 (citing Ex. 1004 ¶¶ 53–57, 81).  Petitioner
contends that, based on the combined teachings of the references,

> the header information in Wren (such as the sender name and
> date/time shown in Figure 9A) [would be] sent separately from
> the message content (the movie message shown in Figure 9B).
> This is because a message is initially sent from the server to the
> recipient device that does not include an attachment containing
> the movie message content – that message instead includes only
> the header information and a URL as disclosed in Berger and
> Hanna, the URL identifying the location of the movie message
> content on a server.  The recipient's mobile phone can later
> retrieve the movie message content (as shown in Figure 9B of
> Wren) from the server using the URL in a separate transmission
> according to the techniques of Berger and Hanna.  Under this
> scenario, therefore, the header information is communicated
> separately from the movie message content.

*Id*. at 53 (emphases omitted).  Petitioner further provides reasons as to why a
person of ordinary skill in the art would have been motivated to make such a
combination, including, for example, that doing so would have provided "the
ability to optimize the delivery of message content based on the capabilities

29

IPR2018-00397
Patent 9,306,886 B2

of the recipient device" as well as "superior message tracking." *Id.* at 56–61 (citing Ex. 1002 ¶¶ 109–120).

Similar to its arguments regarding the combination of Wren with Berger, Patent Owner argues that modifying Wren to replace an attachment with a URL, as taught by Hanna, would render Wren unsatisfactory for its intended purpose and change Wren's principle of operation because it "eliminates Wren's teaching of sending movies directly to recipient devices to provide recipients with good user-experiences by making the movies available for immediate and offline viewing." Prelim. Resp. 42–45. Based on the current record, we are not persuaded by these arguments, for reasons similar to those explained above. *See supra* Section III.D.3. Patent Owner does not argue separately that the combination of references does not teach or suggest the limitations of each of claims 9–11.

Further, the Supreme Court has held that a decision to institute under 35 U.S.C. § 314 may not institute on fewer than all claims challenged in the petition. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018). Given our determination above that Petitioner has demonstrated a reasonable likelihood of prevailing as to claim 1, we also determine that it is appropriate to institute a trial on Petitioner's asserted ground that claims 9–11 are unpatentable over Wren, Berger, and Hanna.

### F. Obviousness Ground Based on Wren, Berger, and Thorne

Petitioner contends that claim 13 is unpatentable over Wren, Berger, and Thorne under 35 U.S.C. § 103(a). Pet. 65–70. Claim 13 recites "deleting the message content including the media component at a predetermined amount of time after being displayed such that after the

IPR2018-00397
Patent 9,306,886 B2

second display is terminated from view, the message content including the
media component is no longer available to the recipient user." Petitioner
relies on Thorne's teaching of starting a timer when an e-mail message is
displayed, and deleting the message upon expiration of a "maximum display
time." *Id.* at 65–66 (citing Ex. 1006, col. 10, ll. 35–45, col. 11, ll. 5–12).
Petitioner argues that a person of ordinary skill in the art would have been
motivated to further modify the combined system of Wren and Berger to
perform this functionality, for example, to "improv[e] the security and
confidentiality of the received movie message," noting that Thorne expressly
states that its deletion functionality "[e]nsure[s] that a user does not bring the
message up and leave it displayed for hours." *Id.* at 67–70 (quoting
Ex. 1006, col. 10, ll. 38–40). Patent Owner in its Preliminary Response
disputes the asserted combination of Wren and Berger as explained above,
*see supra* Section III.D.3, but does not separately argue the additional
combination with Thorne. We institute a trial on Petitioner's asserted
ground that claim 13 is unpatentable over Wren, Berger, and Thorne.

## IV. CONCLUSION

We conclude that Petitioner has demonstrated a reasonable likelihood
of prevailing with respect to at least one claim of the '886 patent challenged
in the Petition. The Board, however, has not made a final determination
under 35 U.S.C. § 318(a) with respect to the patentability of the challenged
claims.

IPR2018-00397
Patent 9,306,886 B2

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes*
review of claims 1, 4, 5, 9–11, and 13 of the '886 patent is instituted with
respect to all grounds set forth in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and
37 C.F.R. § 42.4(b), *inter partes* review of the '886 patent shall commence
on the entry date of this Decision, and notice is hereby given of the
institution of a trial.

IPR2018-00397
Patent 9,306,886 B2

PETITIONER:

Heidi L. Keefe
Andrew C. Mace
COOLEY LLP
hkeefe@cooley.com
amace@cooley.com


PATENT OWNER:

Douglas R. Wilson
Michael F. Heim
Blaine A. Larson
HEIM PAYNE & CHORUSH, LLP
dwilson@hpcllp.com
mheim@hpcllp.com
blarson@hpcllp.com

Jamie T. Gallagher
BIRCH TREE IP LAW & STRATEGY PLLC
jamie@birchtreeip.com