# EXHIBIT 9

Trials@uspto.gov                                                    Paper 36
571-272-7822                                          Entered: June 28, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SNAP INC.,
Petitioner,

v.

VAPORSTREAM, INC.,
Patent Owner.
_____

Case IPR2018-00397
Patent 9,306,886 B2
_____

Before JUSTIN T. ARBES, STACEY G. WHITE, and
JENNIFER MEYER CHAGNON, *Administrative Patent Judges*.

ARBES, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)*

IPR2018-00397
Patent 9,306,886 B2

# I. BACKGROUND

Petitioner Snap Inc. filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1, 4, 5, 9–11, and 13 of U.S. Patent No. 9,306,886 B2 (Ex. 1001, "the '886 patent") pursuant to 35 U.S.C. § 311(a). On July 10, 2018, we instituted an *inter partes* review of all challenges raised in the Petition.  Paper 10 ("Dec. on Inst.").  Patent Owner Vaporstream, Inc. subsequently filed a Patent Owner Response (Paper 21, "PO Resp."), Petitioner filed a Reply (Paper 24, "Reply"), and Patent Owner filed a Sur-Reply (Paper 27, "Sur-Reply").  An oral hearing was held on March 27, 2019, and a transcript of the hearing is included in the record (Paper 34, "Tr.").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  For the reasons that follow, we determine that Petitioner has not shown by a preponderance of the evidence that claims 1, 4, 5, 9–11, and 13 are unpatentable.

## A. Related Proceedings

The parties indicate that the '886 patent is the subject of the following district court proceeding involving Petitioner and Patent Owner: *Vaporstream, Inc. v. Snap Inc.*, Case No. 2:17-cv-00220-MLH-KS (C.D. Cal.).  *See* Pet. 1; Paper 4, 1.  Petitioner filed nine additional petitions for *inter partes* review of various related patents owned by Patent Owner in Cases IPR2018-00200, IPR2018-00312, IPR2018-00369, IPR2018-00404, IPR2018-00408, IPR2018-00416, IPR2018-00439, IPR2018-00455, and IPR2018-00458.  *See* Pet. 1–2; Paper 4, 1–3.  *Inter partes* review was instituted in each of these proceedings.

IPR2018-00397
Patent 9,306,886 B2

*B. The '886 Patent*

The '886 patent discloses "[a]n electronic messaging system and method with reduced traceability."  Ex. 1001, Abstract.  The '886 patent notes that "[t]ypically, an electronic message between two people is not private."  *Id.* at col. 2, ll. 7–8.  For example, messages may be intercepted by third parties; logged and archived; or copied, cut, pasted, or printed.  *Id.* at col. 2, ll. 8–13.  "This may give a message a 'shelf-life' that is often uncontrollable by the sender or even the recipient."  *Id.* at col. 2, ll. 13–14.  As such, according to the '886 patent, there was "a demand for a system and method for reducing the traceability of electronic messages."  *Id.* at col. 2, ll. 27–29.  Figure 3 of the '886 patent is reproduced below.



**FIG. 3**

Figure 3 above depicts system 300 for communicating electronic message 330 from user computer 315 to user computer 320 over network 325 using server 310.  *Id.* at col. 10, ll. 62–67.  "An electronic message may be any

3

IPR2018-00397
Patent 9,306,886 B2

electronic file, data, and/or other information transmitted between one or
more user computers." *Id.* at col. 7, ll. 50–52.  The electronic message may
include text, image, video, audio, or other types of data.  *Id.* at col. 7,
ll. 52–60.

Figure 5 of the '886 patent is reproduced below.



**FIG. 5**

4

IPR2018-00397
Patent 9,306,886 B2

Figure 5 depicts the process by which the electronic message is sent from the first user computer and received by the second user computer. *Id.* at col. 11, ll. 10–12.  At steps 510–520, the user inputs a recipient address (e.g., a unique identifier, such as an email address) and message content, using separate screens provided by the server computer, and the message is communicated from the user computer to the server. *Id.* at col. 11, l. 37–col. 12, l. 26, Figs. 8, 9.  The server then performs various actions to process the message at steps 525–545. *Id.* at col. 12, l. 27–col. 14, l. 26.  For example, the server identifies header information (e.g., information that "identifies the sending user, recipient user, location of the electronic message, [or] timing of [the] electronic message") separate from the content of the message itself and generates a message ID associated with the header information and message content. *Id.* at col. 12, ll. 37–49, col. 13, ll. 30–32 ("A message ID [is] used to maintain a correspondence between the separated components of electronic message 330.").  The '886 patent describes an example in which the message ID is included both in an Extensible Markup Language (XML) file storing the header information and in an XML file storing the message content. *Id.* at col. 13, l. 38–col. 14, l. 26.

To retrieve the message, the recipient first logs in to the system at step 550. *Id.* at col. 14, ll. 27–29.  At step 555, the server communicates to the recipient user computer a display image showing header information for multiple messages. *Id.* at col. 14, ll. 33–49, Fig. 10.  For example, the display image may show a display name and date/time for each message, but not show the content itself for any of the messages. *Id.*  In one embodiment, the header information may include "a sequence number (ex: 1, 2, 3, etc.) assigned to each electronic message," where each sequence number is

IPR2018-00397
Patent 9,306,886 B2

associated with a corresponding message ID for the respective message. *Id.* at col. 14, ll. 54–65. At step 560, the user selects one of the electronic messages to be displayed by, for example, selecting a "read" link displayed with the respective header information. *Id.* at col. 14, l. 66–col. 15, l. 2. At step 565, the server communicates to the recipient user computer a display image with the content of the chosen message (but not header information for the message). *Id.* at col. 15, ll. 21–30, Fig. 11. At step 570, the message is automatically and permanently deleted from the server at a predetermined time. *Id.* at col. 15, ll. 47–49. At step 575, the user closes the display image, returns to the message listing, or chooses to respond to the message. *Id.* at col. 16, ll. 36–39. At step 585, the message content is automatically deleted from the recipient user computer after viewing. *Id.* at col. 16, ll. 45–53. According to the '886 patent, displaying header information and message content separately, and automatically deleting message content, reduce the traceability of electronic messages. *Id.* at col. 3, l. 58–col. 4, l. 13.

### C. Illustrative Claim

Claim 1 of the '886 patent recites:

1. A computer-implemented method of handling an electronic message at a recipient user device in a networked environment, the electronic message including a message content and a header information that corresponds to the message content, the recipient user device having access to electronic instructions, the method comprising:

providing a plurality of reduced traceability displays via the recipient user device using a display generator that acts upon a display element of the recipient user device to provide the plurality of reduced traceability displays, the display

6

IPR2018-00397
Patent 9,306,886 B2

generator including the electronic instructions, the plurality of
reduced traceability displays including a first display presenting
a header information of an electronic message received at the
recipient user device and a second display presenting a message
content of the electronic message, the message content
including a media component, the message content and the
header information having been related to each other using a
correlation previously assigned to each of the message content
and the header information;

receiving a selection by the recipient user via the first
display, the selection directed to a portion of a message list
corresponding to the header information; and

in response to the selection, providing the second display
via the recipient user device such that the second display does
not include a display of the header information via the second
display such that a single screen capture of both the header
information and the media component is prevented.

### D. Prior Art

The pending grounds of unpatentability in the instant *inter partes*

review are based on the following prior art:

U.S. Patent No. 7,054,905 B1, filed Mar. 30, 2000, issued
May 30, 2006 (Ex. 1005, "Hanna");

U.S. Patent No. 5,958,005, issued Sept. 28, 1999
(Ex. 1006, "Thorne");

U.S. Patent Application Publication No. 2005/0021803
A1, published Jan. 27, 2005 (Ex. 1003, "Wren"); and

U.S. Patent Application Publication No. 2003/0152203
A1, published Aug. 14, 2003 (Ex. 1004, "Berger").

IPR2018-00397
Patent 9,306,886 B2

*E. Pending Grounds of Unpatentability*

The instant *inter partes* review involves the following grounds of unpatentability:

| References | Basis | Claim(s) Challenged |
|---|---|---|
| Wren and Berger | 35 U.S.C. § 103(a)[1] | 1, 4, and 5 |
| Wren, Berger, and Hanna | 35 U.S.C. § 103(a) | 9–11 |
| Wren, Berger, and Thorne | 35 U.S.C. § 103(a) | 13 |

## II. ANALYSIS

*A. Claim Interpretation*

According to the rules applicable to this proceeding, we interpret claims in an unexpired patent using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]."  37 C.F.R. § 42.100(b) (2017).[2]  In the Decision on Institution, based on the record at the time, we preliminarily interpreted "reduced traceability displays"

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103.  Because the challenged claims of the '886 patent have an effective filing date before the effective date of the applicable AIA amendment, we refer to the pre-AIA version of 35 U.S.C. § 103.

[2] The Petition in this proceeding was filed on December 26, 2017, prior to the effective date of the rule change that replaces the broadest reasonable interpretation standard with the federal court claim interpretation standard. *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340, 51,340 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018).

IPR2018-00397
Patent 9,306,886 B2

in claim 1 to mean "an arrangement of displays that enables reduced traceability of electronic messages (e.g., by separately displaying identifying information and message content)."  Dec. on Inst. 8–9.  Patent Owner proposed this interpretation in the related litigation, and Petitioner applies it in the Petition.  *See* Ex. 2002, 15–17; Pet. 28–29.  The parties do not dispute our preliminary interpretation of "reduced traceability displays," and we do not perceive any reason or evidence that compels any deviation from that interpretation.  *See* PO Resp. 7.  We adopt the previous analysis for purposes of this Decision.

In addition, we preliminarily interpreted "correlation" in the Decision on Institution, and Patent Owner in its Response proposes an interpretation for the phrase "message content including a media component."  *See* Dec. on Inst. 8–9; PO Resp. 7–11.  Because we are not persuaded by Petitioner's arguments with respect to the "reduced traceability displays" limitation recited in claim 1, though, we need not interpret any other terms to resolve the parties' disputes over the asserted grounds of unpatentability in this proceeding.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("Because we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy,' we need not construe [a particular claim limitation] where the construction is not 'material to the . . . dispute.'" (citations omitted)).

## B. Principles of Law

To prevail in challenging claims 1, 4, 5, 9–11, and 13 of the '886 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

IPR2018-00397
Patent 9,306,886 B2

A claim is unpatentable for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). The question of obviousness is resolved on the basis of underlying factual determinations, including "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art."[3] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does").

---

[3] Additionally, secondary considerations, such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Graham*, 383 U.S. at 17–18. Patent Owner, however, has not presented any such evidence.

IPR2018-00397
Patent 9,306,886 B2

A petitioner's assertion of obviousness "cannot employ mere conclusory
statements.  The petitioner must instead articulate specific reasoning, based
on evidence of record, to support the legal conclusion of obviousness."  *In re
Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) (citing
*KSR*, 550 U.S. at 418).

### *C. Level of Ordinary Skill in the Art*

Petitioner argues that a person of ordinary skill in the art at the time of
the '886 patent "would have possessed at least a bachelor's degree in
software engineering, computer science, or computer engineering with at
least two years of experience in the design and implementation of systems
for sending and receiving messages over a communications network, such as
the Internet (or equivalent degree or experience)," relying on testimony from
its declarant, Sandeep Chatterjee, Ph.D.  Pet. 5–6 (citing Ex. 1002
¶¶ 13–15).  Patent Owner does not propose a different level of ordinary skill
in the art in its Response.  Patent Owner's declarant, Kevin C. Almeroth,
Ph.D., "generally agree[s]" with Petitioner's characterization of the person
of ordinary skill in the art, with the caveat that "such a person of ordinary
skill would also have a working knowledge of design principles for software
user interfaces.  Such knowledge often would be learned in an undergraduate
course in Human Computer Interaction (HCI)."  Ex. 2009 ¶ 21.  We agree,
as the '886 patent describes the design of a software user interface that
purportedly provides for reduced traceability of electronic messages.  *See,
e.g.*, Ex. 1001, Abstract, col. 1, l. 64–col. 3, l. 19.  Based on the record
developed during trial, including our review of the '886 patent and the types
of problems and solutions described in the '886 patent and cited prior art,

11

IPR2018-00397
Patent 9,306,886 B2

we agree with and adopt Petitioner's assessment of the level of ordinary skill in the art, with the caveat that such an individual would have had a working knowledge of design principles for software user interfaces, which may be achieved via study of human-computer interaction (HCI).

### D. Obviousness Ground Based on Wren and Berger
### (Claims 1, 4, and 5)

#### 1. Wren

Wren describes "a multimedia video messaging system that provides an end-user with the ability to record and send arbitrary-length audio and video content" as "audiovisual messages that are automatically addressed to recipients based on one-touch activation."  Ex. 1003, Abstract, ¶ 2.  The sending user (referred to in Wren as the "end-user") "initiate[s] the method from a menu, address-book or an active voice or audio call screen" on the user's device (e.g., a mobile phone).  *Id.* ¶¶ 10, 23.  For example, the device may provide the end-user with a "Send" option, which "will auto-compose the message [to the desired recipient(s)] based on parameters submitted to the method from the point of initiation" or "may prompt the user for the to: address that will typically be a phone number or e-mail address, subject text and body text."  *Id.* ¶ 29.  The device then sends the movie message in one of two ways.  *Id.* ¶¶ 11, 29.  If the video is less than a certain size, it is sent as an attachment to the message.  *Id.* ¶ 11.  If the video is above that size, however, "the video and audio streams to a remote disk that is available on the world-wide web and a message is created and sent with a [Uniform

IPR2018-00397
Patent 9,306,886 B2

Resource Identifier (URI)[4]] to the streamed media embedded in the body of the message." *Id.* "When the message is received, an end-user can click on the attachment or the URI to play the video and audio." *Id.*

Figures 9A–9C of Wren are "an illustration of the end-user experience receiving the one-touch message with a compatible mobile phone or [personal computer (PC)] with a compatible e-mail client." *Id.* ¶ 22. Figures 9A and 9B of Wren are reproduced below.



Figure 9A depicts "a notification of a new message," and Figure 9B depicts "a view of the Movie once the user selects play from a new message notification." *Id.* ¶ 32.

---

[4] Dr. Chatterjee explains that a URI is a "sequence of characters that identifies a resource," the most common example of which is a Uniform Resource Locator (URL), and "[t]he terms URL and URI are often used interchangeably when the resource being identified is accessible over the Internet, as is the case in Wren." Ex. 1002 ¶ 33 n.5.

IPR2018-00397
Patent 9,306,886 B2

Wren also includes Figure 9C, which is reproduced below.



Figure 9C depicts "an e-mail message containing the Movie."  *Id.*

### 2. Berger

Berger describes a unified messaging (UM) system where a user can access different types of messages (e.g., voicemail, email, facsimile, video) from a remote UM messaging server with a "seamless user interface" presented on a mobile phone.  Ex. 1004 ¶¶ 1, 28.  The messaging server converts data as necessary (e.g., text to speech, and vice versa) so that it can be accessed and provided to the user.  *Id.* ¶¶ 1–4, 28–30.

IPR2018-00397
Patent 9,306,886 B2

Figure 4 of Berger is reproduced below.



Figure 4 depicts list of available messages 120 displayed on the user's
mobile phone, including email messages 122 and voice messages 124.  *Id.*
¶ 41.  The list is provided to the user's phone as "a web page, in a markup
language compatible with the requesting device," and displayed as
"hyperlinked messages."  *Id.*  The user selects a particular message by
moving cursor 132 up and down and pressing SEND button 134.  *Id.* ¶ 42.
Upon doing so, the phone's browser sends a Hypertext Transfer Protocol
(HTTP) request to the messaging server, and the messaging server performs

15

IPR2018-00397
Patent 9,306,886 B2

any necessary conversion of the message and "deliver[s] . . . the message (in the form of a web page, using HTTP) to the phone" for display to the user. *Id.* ¶¶ 43–44. Berger discloses that each message has an associated message number (displayed as 1–5 in Figure 4 above), which is included in each hyperlink of the displayed list and the HTTP request from the phone. *Id.* ¶¶ 45–57.

### 3. Claim 1

#### a. Petitioner's Contentions

In its Petition, Petitioner relies on Wren for the majority of the limitations of claim 1. Petitioner argues that Wren teaches a "recipient user device" (i.e., the recipient's mobile phone) that handles an "electronic message" (i.e., movie message) having both "header information" and "message content" including a "media component," as recited in the preamble of claim 1. Pet. 20–25. Claim 1 further recites the following limitation:

> providing a plurality of reduced traceability displays via the recipient user device using a display generator that acts upon a display element of the recipient user device to provide the plurality of reduced traceability displays, the display generator including the electronic instructions, the plurality of reduced traceability displays including a first display presenting a header information of an electronic message received at the recipient user device and a second display presenting a message content of the electronic message, the message content including a media component . . . .

16

IPR2018-00397
Patent 9,306,886 B2

Petitioner argues that "[t]his limitation is also disclosed by Wren," including the following chart showing how Petitioner maps Wren's disclosure to the limitation:

| Limitation of Claim 1[a] | Corresponding Disclosure from Wren |
|---|---|
| "recipient user device" | Receiver's mobile phone |
| "display generator" | Hardware, software, or firmware on receiver's mobile phone for generating the screen displays (*e.g.*, Figs. 9A, 9B) |
| "display element of the recipient user device" | The screen display on the recipient user's mobile phone |
| "plurality of reduced traceability displays" | The "first display" and the "second display," specified below. |
| "a first display presenting a header information of an electronic message received at the recipient user device" | The screen display in Figure 9A presenting the message header information including the sender name ("Jane Doe") |
| "a second display presenting a message content of the electronic message, the message content including a media component" | The screen display in Figure 9B presenting the movie message content |

*Id.* at 25.  Petitioner contends that Figure 9A is a "first display" presenting "header information" (i.e., sender name ("Jane Doe") and time ("9:30AM")), Figure 9B is a "second display" presenting "message content" including a "media component" (i.e., video), and the two displays are "reduced traceability displays" because they "display header information and message content separately."  *Id.* at 25–27.  According to Petitioner, the text "New Movie" in Figure 9A does *not* constitute message content.  *Id.* at 27–28.  Petitioner does not discuss Berger in its analysis of how Wren allegedly teaches the limitation of claim 1 above.  *Id.* at 25–31.

IPR2018-00397
Patent 9,306,886 B2

With respect to the remaining limitations of claim 1, Petitioner argues that Wren teaches "receiving a selection by the recipient user via the first display" (i.e., the user selecting "Play" on the screen display shown in Figure 9A) and "in response to the selection, providing the second display" that "does not include a display of the header information" such that "a single screen capture of both the header information and the media component is prevented" (i.e., providing the screen display shown in Figure 9B that includes only message content). *Id*. at 44–45, 47–49 (emphases omitted).

Petitioner relies on Berger for two limitations of claim 1. First, claim 1 recites a "selection directed to a portion of a message list corresponding to the header information." Because Wren displays only a single message at a time, Petitioner relies on Berger for this limitation, citing the list of messages shown in Figure 4 of Berger, which displays "header information" for individual messages and allows the user to select a particular message by moving the cursor. *Id*. at 44–47. Petitioner explains that in the asserted combination,

> Figure 9A of Wren ("first display") would be further adapted to display a message list containing multiple messages, each item in the list listing header information as disclosed in Berger. The selection in Wren, under this combination, would thus be "directed to a portion of a message list corresponding to the header information" because the user would select the message by placing the cursor on the header information corresponding to that message (e.g., "George Smith," "11:00A"), as disclosed in Berger . . . .

*Id.* at 47 (emphases omitted).

Second, claim 1 recites "the message content and the header information having been related to each other using a correlation previously

18

IPR2018-00397
Patent 9,306,886 B2

assigned to each of the message content and the header information."
According to Petitioner, a person of ordinary skill in the art would have
understood that Wren must have a previously assigned correlation between
the header information and message content because, when the user selects
"Play" on the screen with the header information shown in Figure 9A, Wren
plays the video corresponding to that information, as shown in Figure 9B.
*Id.* at 31–33.  Petitioner acknowledges, though, that "Wren does not disclose
the details of how the correlation between the header information and the
message content was assigned," and thus also relies on Berger.  *Id.* at 34–38.
Specifically, Petitioner contends that in Berger, a message number is
"previously assigned by the server . . . to each row of displayed header
information" and included in the URL that is "used to retrieve the
corresponding message content."  *Id.* at 34–36.  Petitioner also points to
Berger's alternative embodiment, which combines the message number and
user ID into a single cryptographic hash value that is similarly included in
the URL.  *Id.* at 36–37.

### b. *Petitioner Has Not Shown That Wren Teaches "Providing a Plurality of Reduced Traceability Displays Via the Recipient User Device"*

Claim 1 recites "providing a plurality of reduced traceability displays
via the recipient user device."  As explained above, we interpret "reduced
traceability displays" in claim 1 to mean an arrangement of displays that
enables reduced traceability of electronic messages (e.g., by separately
displaying identifying information and message content).  *See supra*
Section II.A.  Petitioner's position, as argued in the Petition, is that the
screen displays shown in Figures 9A and 9B of Wren are "reduced
traceability displays" because they "display header information and message

19

IPR2018-00397
Patent 9,306,886 B2

content separately." Pet. 27, 29 (arguing that the limitation is "satisfied by
the separate display of identifying information and message content as
disclosed in Figures 9A and 9B of Wren"). In particular, Petitioner asserts
that "Figure 9A displays only header information and not any of the movie
message content." *Id.* at 27. Certain text in Figure 9A is undisputedly
"header information," namely the sender name ("Jane Doe") and time of the
message ("9:30AM"). *See id.* at 25–26; Ex. 1001, col. 12, l. 42–col. 13, l. 5
(describing "a display name representing a sender of the electronic message"
and "a date/time associated with the electronic message" as "header
information"); Tr. 42:16–20 (Patent Owner acknowledging that "Jane Doe"
and "9:30AM" are "header information"). Figure 9A, however, also
includes the text "New Movie." Petitioner argues that "New Movie" is not
"message content." Pet. 27–28; Reply 16–23. Patent Owner argues that
Petitioner fails to provide sufficient proof that "New Movie" is not "message
content," and thus, has not shown that Wren teaches providing "reduced
traceability displays." PO Resp. 36–46; Sur-Reply 14–19. For the reasons
explained below, we agree with Patent Owner.

Initially, we note that Petitioner does not point to—and we do not
find—any express disclosure in Wren of the concept of separating header
information and message content for display to a message recipient. Indeed,
the vast majority of the reference is directed to functionality at the
sender-side, such as how the messaging functionality is initiated, how a
message is created, and how video content is sent as a message. *See*
Ex. 1003 ¶¶ 2, 8–12, 23–31, Figs. 1–8. Only one paragraph of Wren's
written description pertains to what happens at the receiver-side:

20

IPR2018-00397
Patent 9,306,886 B2

> FIG. 9 is an illustration of a recipient receiving the
> one-touch arbitrary length movie message with video and audio.
> FIG. 9A shows a notification of a new message.  FIG. 9B shows
> a view of the Movie once the user selects play from a new
> message notification.   FIG. 9C shows an e-mail message
> containing the Movie.  This illustration is of an image that is
> automatically played inline with the e-mail reader.

*Id.* ¶ 32.  Paragraph 32 includes little detail about what is shown in the
figures, and does not reference the "New Movie" text in particular.  Also,
as both parties and their declarants agree, Wren is silent as to where
"New Movie" originated—whether from the sending device, the recipient
mobile phone, or something else.  *See* PO Resp. 37; Reply 22; Ex. 2009
¶¶ 66–67; Ex. 2012, 43:2–45:16; Tr. 38:6–11.  Thus, what we must
determine is how a person of ordinary skill in the art, reading paragraph 32
and the cited figures in context with the rest of Wren, would have
understood "New Movie" in Figure 9A.  *See Life Techs., Inc. v. Clontech
Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000) (obviousness is "assessed
from the perspective of the hypothetical person of ordinary skill in the art").
According to Petitioner, the "most reasonable inference" is that "New
Movie" is generated and displayed by the recipient device.  Reply 20.  Patent
Owner responds that nothing in Wren supports Petitioner's reading, and in
fact the reference suggests the opposite, i.e., that the text is part of the
message sent by the sending device.  PO Resp. 37; Sur-Reply 16.  We
address each of Petitioner's contentions, and Patent Owner's responses,
in turn.

First, Petitioner argues that "nothing in Wren suggests that [the 'New
Movie'] text was part of the message sent from Jane Doe."  Pet. 27–28.
As explained above, however, neither does Wren disclose the opposite.

IPR2018-00397
Patent 9,306,886 B2

Wren is completely silent as to whether "New Movie" came from the
sending device as part of the message or whether it was generated by the
recipient device on its own.  In such circumstances, the fact that Wren does
not contain an express disclosure of the former is not automatically proof of
the latter.  Petitioner bears the burden to prove unpatentability by a
preponderance of the evidence, 35 U.S.C. § 316(e), including the articulation
of "specific reasoning, based on evidence of record, to support the legal
conclusion of obviousness," *Magnum Oil*, 829 F.3d at 1380.  Petitioner's
reliance on Wren's lack of disclosure of where "New Movie" originated and
argument that "*Patent Owner* points to nothing in Wren to suggest that 'New
Movie' is message content originating from the sender," therefore, are not
persuasive.  *See* Reply 16 (emphasis added); Pet. 27–28.  It is Petitioner's
burden to show that a person of ordinary skill in the art would have
understood Figure 9A in Wren to include no message content, not Patent
Owner's burden to prove the opposite.  *See* PO Resp. 42–43; Sur-Reply 15.

Petitioner relies on the testimony of Dr. Chatterjee, who opines that
"[a] person of ordinary skill in the art would have recognized that the
recipient mobile phone generates and displays [the 'New Movie'] text as
part of a 'notification of a new message.'"  Ex. 1002 ¶ 63 (quoting Ex. 1003
¶ 32).  According to Dr. Chatterjee, "the 'New Movie' descriptor is
generally applicable to all 'movie messages'" in Wren, and a person of
ordinary skill in the art "would have appreciated that generating this element
at the recipient mobile phone is preferable to requiring that [the] sending
device transmit it as part of each outgoing message, as this allows for the
communication of smaller messages and hence decreased burdens on
network bandwidth and device memory."  *Id.* ¶ 63 n.6.

IPR2018-00397
Patent 9,306,886 B2

We do not find these points persuasive because they are not supported sufficiently by the disclosure of Wren (or any other evidence in the record). Dr. Chatterjee cites only paragraphs 8, 22, and 32 of Wren in support of his opinions. *See id.* ¶ 63. Paragraph 8 states that "[t]he primary object of the invention is to provide an end-user with a one-touch messaging capability to send movie messages containing video and audio of arbitrary length to recipients independent of the recipient's device capabilities over a network such as the Internet," paragraph 22 states that "FIG. 9 is an illustration of the end-user experience receiving the one-touch message with a compatible mobile phone or PC with a compatible e-mail client," and paragraph 32 states that "FIG. 9A shows a notification of a new message." Ex. 1003 ¶¶ 8, 22, 32.

There are multiple lines of text and images in Figure 9A, but these paragraphs of Wren say nothing about the recipient device generating any portion of that content or that doing so would be preferable over other alternatives. Nor do they differentiate between content clearly received by the recipient device in connection with the message (e.g., an identification of the sender "Jane Doe") and any content that might be generated by the recipient device on its own, as would be the case in Dr. Chatterjee's opinion. We also do not read the single reference to "new message" in paragraph 32 of Wren as supporting Dr. Chatterjee's view, given that the relevant text in Figure 9A ("New Movie") is not the same. Further, Dr. Chatterjee's opinion that "New Movie" would apply to "all" movie messages in Wren is contradicted by the fact that Figure 9C (discussed further below) also depicts a movie message, but does not include that language. *See id.* ¶¶ 22 (referring to Figures 9A–C together as illustrating "the end-user experience

23

IPR2018-00397
Patent 9,306,886 B2

receiving the one-touch message"), 32 (referring to Figures 9A–C together
as illustrating "a recipient receiving the one-touch arbitrary length movie
message"); Ex. 2012, 57:24–58:4 (Dr. Chatterjee acknowledging that
Figure 9C depicts a movie message).

Second, Petitioner argues that the fact that "Wren refers to the movie
message as a 'one-touch' message in which the sender can send messages to
a recipient without further user input" supports its position that "New
Movie" is generated by the recipient device.  Pet. 27–28 (citing Ex. 1002
¶ 63; Ex. 1003 ¶¶ 6–8, 32, claim 2); Reply 20–22.  Again, we are not
persuaded that the disclosure of Wren supports Petitioner's contention.

Wren discloses the procedures by which the end-user can create and
send a message.  The end-user initiates the disclosed method using "a menu,
address-book or an active voice or audio call screen."  Ex. 1003 ¶ 10.  When
an address-book is used, the end-user "populate[s] the address-book via add
prompts pre and post voice and video calls or sync[s] with an address-book
residing on a network such as the Internet."  *Id.* ¶ 23.  The sending device
displays "a selection of entries" in the address-book and the end-user selects
"a highlighted entry" as the recipient of the message.  *Id.* ¶ 23, Fig. 1A.
Once the end-user has recorded a video, the device presents "send,"
"cancel," and "save" options.  *Id.* ¶ 29, Fig. 6.  Wren describes the "send"
option as follows:

> The Send option will auto-compose the message based on
> parameters submitted to the method from the point of initiation.
> In an alternative implementation, the method may prompt the
> user for the to: address that will typically be a phone number or
> e-mail address, subject text and body text.  Once composition is
> complete, the method will attach the complete video and audio
> message or insert a URI that refers to the originating network

24

IPR2018-00397
Patent 9,306,886 B2

> location source for the video and audio stream, assemble and
> send a message using an interoperable protocol such as the
> [Internet Engineering Task Force (IETF)] e-mail protocols of the
> receiving server, and prompt the user to save or simply exit the
> message.

*Id.* ¶ 29.  Figure 8 of Wren is reproduced below.



IPR2018-00397
Patent 9,306,886 B2

Figure 8 "illustrates the compose and send function." *Id.* ¶ 31.  Wren
describes the functionality shown in Figure 8 as follows:

> Once the movie message is recorded, the method invokes the
> process to compose and the send the message.  The compose will
> automatically construct the message To:, CC:, Subject: and
> Body:.  An alternative implementation will allow an end-user to
> specify these fields or override the method's defaults.  The steps
> will then attach the full audio and video or a URI pointing to the
> audio and video residing on the originating network depending
> on the network threshold.  When completed, the process will
> transport the message using a standard Internet message
> transport protocol such as [Simple Mail Transfer Protocol
> (SMTP)].

*Id.*

Petitioner argues that the above language discloses two different
embodiments, namely a "primary one-touch implementation [where] the
user is provided no opportunity to enter 'New Movie' or any other text" and
"an 'alternative implementation' in which the user can input header fields
such as [a] subject."  Reply 21 (citing Ex. 1049 ¶ 30; Ex. 1052, 6, 18).
According to Petitioner and Dr. Chatterjee, a person of ordinary skill in the
art would have understood that Figures 9A and 9B show the "one-touch"
implementation, and it also would have been obvious to send the message of
Figures 9A and 9B using that implementation.  *Id.* at 21–22 (citing Ex. 1049
¶¶ 31–32).

We disagree, and find that the above disclosure actually supports
Patent Owner's position.  Figure 8 depicts the "*compose* and send function"
in which the sending device (in both alleged implementations) creates the
"To:, CC:, Subject: and Body:" fields of the message that are sent to the
recipient device.  Ex. 1003 ¶ 31 (emphasis added).  On the other hand, Wren
does not disclose the recipient device creating anything.  Thus, as Patent

IPR2018-00397
Patent 9,306,886 B2

Owner correctly points out, "the only disclosed methods for generating
'New Movie' come from the send side, not the receiving device."  *See*
Sur-Reply 16.

Moreover, for purposes of determining whether "New Movie" is
generated by the recipient device (as Petitioner contends) or by the sending
device (as Patent Owner contends), what matters is whether the text is sent
by the sending device to the recipient device, not whether (or when) the
end-user inputted the text.  *See* Tr. 45:21–46:4.  Wren discloses that the
sending device automatically creates the message including "To:, CC:,
Subject: and Body:" fields or allows the end-user to enter them and
"override" their "defaults."  Ex. 1003 ¶¶ 29, 31, claim 3 (reciting the step of
"automatically addressing recipients based on attributes in the address-book
or menu . . . and populating other message fields such as the body and
subject with pre-configured settings").  The fields plainly exist at the time
the message is sent, regardless of whether they are entered by the end-user
when prompted or populated by the sending device.  *See id.*  We agree with
Patent Owner and Dr. Almeroth that "Wren does not disclose that the
auto-compose feature uses [any] information that did not originate with the
sender."  *See* Sur-Reply 17–18; Ex. 2009 ¶¶ 73–74.  For example, the
recipient's address comes from the selected address-book entry populated
previously by the end-user or from end-user input at the time of sending the
message.  *See id.*; Ex. 1003 ¶¶ 23 ("An end-user can populate the
address-book via add prompts . . . ."), 29 (the sending device creates the
message "based on parameters submitted to the method from the point of
initiation" or "prompt[s] the user for the to: address that will typically be a
phone number or e-mail address, subject text and body text").

IPR2018-00397
Patent 9,306,886 B2

Figure 9C of Wren also contradicts Petitioner's arguments.
Figures 9A–C illustrate "the end-user experience receiving the *one-touch*
message."  Ex. 1003 ¶ 22 (emphasis added); *see also id.* ¶ 32 ("the
*one-touch* arbitrary length movie message" (emphasis added)).  Figures 9A
and 9B depict such a message received by a "compatible mobile phone" and
Figure 9C depicts such a message received by a "PC with a compatible
e-mail client," but all three figures are described in Wren as reception of a
"one-touch" message.  *Id.* ¶¶ 22, 32.  Thus, when drawing inferences as to
how a person of ordinary skill in the art would have understood Wren's
disclosed "one-touch" functionality, it is appropriate to look at all three
figures.  Figure 9C includes the text "Subject: Christmas morning… ."
Dr. Chatterjee acknowledges that Figure 9C depicts a "one-touch" message
and that the subject of "Christmas morning…" was provided by the sending
end-user.  Ex. 2012, 42:12–17, 59:15–60:7.  Thus, Petitioner's position that
Figures 9A and 9B depict a "one-touch" implementation where the end-user
would have had no opportunity to enter "New Movie" or other text is belied
by the fact that Figure 9C also depicts a "one-touch" message, yet the
end-user entered text.  *See* Reply 21.  Patent Owner's arguments, supported
by the testimony of Dr. Almeroth, are persuasive in that regard.  *See*
PO Resp. 43–44; Sur-Reply 18; Ex. 2009 ¶¶ 71, 75–76 (explaining that
"Dr. Chatterjee's assertion that 'New Movie' was not entered by the sender
when the only other embodiment shown in Figure 9C contains text that was
clearly generated by the sender is a significant logical leap not supported by
any evidence").

Figure 9C is relevant in another respect as well.  Petitioner asserts that
Wren's "one-touch" message display in Figures 9A and 9B teaches the

IPR2018-00397
Patent 9,306,886 B2

concept of separating header information and message content for display on different screens.  Pet. 27–28; Reply 20–22.  Yet the only other illustration of a "one-touch" message, Figure 9C, shows just the opposite—header information (e.g., sender name, date of the message) and message content (e.g., video) on the same screen.  This is another fact supporting Patent Owner's position concerning the "New Movie" text in Figure 9A.

Third, Petitioner makes various arguments it poses as applicable "to the extent the Patent Owner might speculate that the 'New Movie' text in Figure 9A corresponds to the 'Subject' of the incoming message."  Reply 16–18.  Patent Owner responds that it is not taking that position.  Sur-Reply 15–16.  We do not see any indication in Wren that "New Movie" is a subject line of the message.  Unlike Figure 9C, for example, which includes the text "Subject: Christmas morning…," Figure 9A does not include "Subject:" before "New Movie."  Thus, whatever "New Movie" is (i.e., message content or something else), we agree with the parties that the evidence does not establish that "New Movie" is a subject line.

Fourth, Petitioner argues that the layout of Figure 9A supports its view that "New Movie" is not message content.  Reply 19.  Petitioner contends that, as shown in Figure 9A, there is "not enough screen space . . . to present any reasonably long textual body that could be entered by the user" because "any message body with more than a few words would prevent the header information underneath from being displayed."  *Id.* (citing Ex. 1049 ¶ 27; Ex. 1050, 56:22–57:9, 58:2–7).  Further, according to Petitioner, displaying a message body above the sender name and time is "inconsistent with how conventional messaging systems present messages,

29

IPR2018-00397
Patent 9,306,886 B2

which typically present the message body below the header information."
*Id.* (citing Ex. 1049 ¶ 27; Ex. 1052, 42–44).

We view these facts as nominal support for Petitioner's position.
Again, the written description of Wren does not mention the "New Movie"
text at all. Wren does not include any disclosure about the size of the
various lines of text shown in Figure 9A or how much text might fit in each
line. Indeed, there appears to be blank space to the right of "New Movie"
where additional text could appear. Figure 9A also includes up and down
arrows on the bottom of the screen. As with "New Movie" though, Wren
does not describe at all what the arrows do. It could be the case, as
Dr. Chatterjee testifies, that the arrow icon permits the user to scroll to
"a different message," Ex. 1049 ¶ 28, but it is just as likely that the icon
allows the user to scroll up and down to see additional text beyond "New
Movie," as Dr. Almeroth points out, Ex. 1051, 250:3–17; *see* Ex. 1003,
Abstract, ¶¶ 11, 25, 29, 31, claim 3 (disclosing a message having a "body"
with text, in addition to the video or link to the video). Wren does not say
either way. Petitioner's arguments and Dr. Chatterjee's corresponding
testimony regarding the length and positioning of "New Movie" in Figure
9A are plausible, but as with Petitioner's other contentions, they do not find
support in the remaining disclosure in Wren.

Upon review of all of the evidence, we find that Patent Owner's
declarant, Dr. Almeroth, articulates the more compelling position with
respect to "New Movie." *See* Ex. 2009 ¶¶ 65–76. Dr. Almeroth points out
the speculative nature of Petitioner's arguments, explains the deficiencies in
Petitioner's reading of Wren's "one-touch" message disclosure, and explains
in detail why Petitioner's view that "New Movie" is not message content is

30

IPR2018-00397
Patent 9,306,886 B2

unfounded, in particular with reference to Figure 9C.  *See id.*  We credit

Dr. Almeroth's testimony on this issue and find it more persuasive than the

testimony of Dr. Chatterjee, for all of the reasons explained above.

The instant facts are similar to those of *International Business*

*Machines Corporation v. Iancu*, No. 2018-1065, 759 F. App'x 1002

(Fed. Cir. Apr. 1, 2019).  The claims at issue in that case required a

"single-sign-on operation," which was interpreted to mean "a process by

which a user is authenticated at a first entity and subsequently not required

to perform another authentication before accessing a protected resource at a

second entity."  *Id.* at 1008.  The Board found that a prior art reference

disclosed a single-sign-on operation, relying in part on the reference's

silence as to what information is included in a particular scenario described

in the reference.  *Id.* at 1010–11.  The Federal Circuit reversed the Board's

decision, concluding that the fact that the reference was silent on the matter

> would not alone support a finding that there was *no* user
> authentication action in this scenario if, as appears, the Board
> meant that it simply could not tell one way or the other whether
> the accessCard contains credentials.  Silence in that sense would
> not by itself suffice for the Petitioner to meet its burden to prove,
> by a preponderance of the evidence, that there was *no* user
> authentication action in this scenario.  Nor would that burden be
> met merely by adding a finding that [the patent owner] did not
> prove the opposite, *i.e.*, a finding of "the absence of sufficient
> evidence showing the provision or validation of a set credentials
> at the partner site" in this scenario.

*Id.* at 1011 (citations omitted).  The Federal Circuit also found that the Board

erred in its silence determination by "taking too narrow a view" of the

reference and not reading the scenario description in context with other

portions of the reference.  *Id.* at 1011–12.

31

IPR2018-00397
Patent 9,306,886 B2

Similarly, Petitioner's position in this proceeding is that Wren teaches the separation of header information and message content because there is *no* message content in Figure 9A. Wren's silence as to what the "New Movie" text represents and where it originated is insufficient for Petitioner to prove that it is not message content. Also, reading the limited disclosure of paragraph 32 and Figures 9A and 9B in context with the rest of Wren, in particular with Wren's description of "one-touch" messaging and Figure 9C, we agree with Patent Owner and Dr. Almeroth that Wren at least would have suggested to a person of ordinary skill in the art that the "New Movie" text is sent by the sending device to the recipient device as part of the message, not generated by the recipient device on its own as Petitioner contends.

Ultimately, it is Petitioner's burden to prove unpatentability by a preponderance of the evidence, which includes in this instance proving that a person of ordinary skill in the art would have understood Wren to teach "providing a plurality of reduced traceability displays via the recipient user device." *See* 35 U.S.C. § 316(e); *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) ("In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."). "In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' and that burden *never shifts* to the patentee." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (emphasis added; citation omitted); *see also Magnum Oil*, 829 F.3d at 1376 ("Where, as here, the only question presented is whether [claims would have been obvious], no burden shifts from the patent

IPR2018-00397
Patent 9,306,886 B2

challenger to the patentee," and "[t]his is especially true" when the issues are
"what the prior art discloses, whether there would have been a motivation to
combine the prior art, and whether that combination would render the
patented claims obvious."). "'Failure to prove the matter as required by the
applicable standard means that the party with the burden of persuasion loses
on that point—thus, if the fact trier of the issue is left uncertain, the party
with the burden loses.'" *Dynamic Drinkware*, 800 F.3d at 1378–79 (quoting
*Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed.
Cir. 2008)).

Petitioner argues that Figures 9A and 9B of Wren constitute "reduced
traceability displays" because "New Movie" in Figure 9A is not message
content and Wren thus displays header information and message content
separately, citing the very limited disclosure of Wren regarding those
displays and the testimony of Dr. Chatterjee as to what a person of ordinary
skill in the art allegedly would have inferred from that disclosure.  In
response, Patent Owner provides persuasive evidence to the contrary that a
person of ordinary skill in the art would have understood "New Movie" to be
sent by the sending device to the recipient device as part of the message, or
at the very least, that Wren is ambiguous on the point such that there is no
basis to draw the inference advocated by Petitioner.  Based on the record
presented, we agree with Patent Owner and are not persuaded that there is
sufficient evidence to establish that Wren teaches "providing a plurality of
reduced traceability displays via the recipient user device."

33

IPR2018-00397
Patent 9,306,886 B2

### c. Petitioner's Argument in its Reply Regarding the Combination of Wren and Berger is Not Persuasive

Petitioner makes the additional argument in its Reply that "the question of whether 'New Movie' shown in Figure 9A of Wren is message content is somewhat academic in light of the combination of Wren with Berger."  Reply 15–16 (emphasis omitted).  Petitioner contends that "[i]ncorporating Berger's message list into Figure 9A would result in a 'first display' that does not even contain the 'New Movie' text," *id.* at 15 (emphasis omitted), providing the following figure.



According to Petitioner, the figure above is a modified version of Figure 9A of Wren depicting the "combination of Berger's message list with Figure 9A" and omitting the "New Movie" text.  *Id.*

We agree with Patent Owner that presentation of this theory in the Reply is improper because it was not raised adequately in the Petition.  *See* Sur-Reply 19–21.  Pursuant to 37 C.F.R. § 42.23(b), a reply "may only respond to arguments raised in the corresponding . . . patent owner response."  *See also Intelligent Bio-Sys.*, 821 F.3d at 1369–70 (concluding

34

IPR2018-00397
Patent 9,306,886 B2

that the Board did not abuse its discretion in refusing to consider reply brief
arguments advocating a "new theory" of unpatentability under 37 C.F.R.
§ 42.23(b)); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767
(Aug. 14, 2012) ("While replies can help crystalize issues for decision,
a reply that raises a new issue or belatedly presents evidence will not be
considered and may be returned. . . .  Examples of indications that a new
issue has been raised in a reply include new evidence necessary to make out
a *prima facie* case for the patentability or unpatentability of an original or
proposed substitute claim, and new evidence that could have been presented
in a prior filing."); Trial Practice Guide Update (Aug. 2018), 14–15,
*available at* https://www.uspto.gov/sites/default/files/documents/
2018_Revised_Trial_Practice_Guide.pdf ("'[R]espond,' in the context of
§ 42.23(b), does not mean embark in a new direction with a new approach as
compared to positions taken in a prior filing.  While replies and sur-replies
can help crystalize issues for decision, a reply or sur-reply that raises a new
issue or belatedly presents evidence may not be considered.").

Petitioner in its Petition relies solely on Wren as allegedly teaching
the "providing a plurality of reduced traceability displays via the recipient
user device" limitation of claim 1.  *See supra* Section III.D.3.a; Pet. 25
(arguing that the limitation is "disclosed by Wren").  Petitioner clearly
explained its position as follows:

> The display in Figure 9A ("first display") and the display
> in Figure 9B ("second display") together qualify as "a plurality
> of reduced traceability displays."  This is because the displays in
> Figures 9A and 9B display header information and message
> content separately, which as explained by the '886 [patent]
> specification, enables reduced traceability.

35

IPR2018-00397
Patent 9,306,886 B2

Pet. 27 (emphases and footnote omitted).  Petitioner never mentions Berger
when addressing the limitation at pages 25–31 of the Petition.  Only later in
the Petition at pages 31–49, when addressing the "message list" and
"correlation" limitations of claim 1, does Petitioner rely on the combined
teachings of Wren and Berger.  Indeed, the only portions of the Petition cited
by Petitioner in the Reply for the argument are pages 46 and 47, which
pertain to the later "message list" limitation of claim 1.  *See* Reply 15–16.
Dr. Chatterjee's original declaration also mirrors the arguments in the
Petition.  *Compare* Ex. 1002 ¶¶ 58–68, *with* Pet. 25–31.

      Moreover, even if Petitioner could now rely on a combination of
Wren and Berger for the "providing a plurality of reduced traceability
displays via the recipient user device" limitation, Petitioner never argued in
the Petition that a person of ordinary skill in the art would have removed the
"New Movie" text in making such a combination.  *See* Sur-Reply 19–21;
Tr. 99:1–100:21 (Petitioner acknowledging that "for the reduced traceability
displays, . . . the display 9a and the display 9b are the displays . . . [b]ut then
display 9a has to include information from figure 4 of Berger" and "you
could have at least that embodiment that took new movie out completely").
Petitioner did not include the modified version of Figure 9A above in its
Petition, Dr. Chatterjee did not include it in his original declaration, and
neither described a combined display omitting "New Movie."  Further, it is
unclear what basis there would be for a person of ordinary skill in the art,
when combining Wren with Berger to show multiple messages in a
"message list," to keep some individual components of Figure 9A (e.g.,
sender name and message time) but remove others (e.g., "New Movie" and

IPR2018-00397
Patent 9,306,886 B2

video length), preventing the recipient from ever seeing the removed components, as Petitioner now proposes.

For the reasons explained above, we find that Petitioner has not proven that "New Movie" is not message content and also did not present a theory in the Petition that a person of ordinary skill in the art would have removed "New Movie" when combining the teachings of Wren and Berger. Based on the record presented, we are not persuaded by Petitioner's new argument that the combination of Wren and Berger teaches "providing a plurality of reduced traceability displays via the recipient user device."

### d. Conclusion

We are not persuaded that the combination of Wren and Berger teaches "providing a plurality of reduced traceability displays via the recipient user device," as recited in claim 1. Petitioner has not shown, by a preponderance of the evidence, that claim 1 is unpatentable over Wren and Berger under 35 U.S.C. § 103(a).

### 4. Claims 4 and 5

Claims 4 and 5 depend from claim 1. Petitioner does not make any additional arguments as to the "reduced traceability displays" limitation discussed above. *See* Pet. 50. Accordingly, Petitioner has not shown, by a preponderance of the evidence, that claims 4 and 5 are unpatentable over Wren and Berger under 35 U.S.C. § 103(a).

IPR2018-00397
Patent 9,306,886 B2

### E. Other Obviousness Grounds

Petitioner contends that claims 9–11 are unpatentable over Wren, Berger, and Hanna, and claim 13 is unpatentable over Wren, Berger, and Thorne, under 35 U.S.C. § 103(a).  Pet. 50–70.  Claims 9–11 and 13 depend, directly or indirectly, from claim 1.  Petitioner does not argue that Hanna or Thorne teaches "reduced traceability displays" as recited in claim 1.  Accordingly, Petitioner has not proven, by a preponderance of the evidence, that claims 9–11 and 13 are unpatentable based on the asserted grounds.

### III. ORDER

Petitioner has not demonstrated, by a preponderance of the evidence, that claims 1, 4, and 5 are unpatentable over Wren and Berger, that claims 9–11 are unpatentable over Wren, Berger, and Hanna, or that claim 13 is unpatentable over Wren, Berger, and Thorne, under 35 U.S.C. § 103(a).

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 4, 5, 9–11, and 13 of the '886 patent have not been shown to be unpatentable.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2018-00397
Patent 9,306,886 B2

PETITIONER:

Heidi L. Keefe
Andrew C. Mace
Mark R. Weinstein
Reuben Chen
Yuan Liang
COOLEY LLP
hkeefe@cooley.com
amace@cooley.com
mweinstein@cooley.com
rchen@cooley.com
yliang@cooley.com


PATENT OWNER:

Douglas R. Wilson
ARMOND WILSON LLP
doug.wilson@armondwilson.com

Michael F. Heim
Blaine A. Larson
HEIM PAYNE & CHORUSH, LLP
mheim@hpcllp.com
blarson@hpcllp.com

Jamie T. Gallagher
BIRCH TREE IP LAW & STRATEGY PLLC
jamie@birchtreeip.com