# EXHIBIT B

# REDACTED PUBLIC VERSION

```
 1              UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4
    VAPORSTREAM INC.,            )
 5                               )
                    Plaintiff,   ) No. 2:17-CV-00220-
 6                               ) MLH (KSx)
                                 )
 7           vs.                 )
                                 )
 8  SNAP, INC., dba SNAPCHAT     )
    INC.,                        )
 9                               )
                    Defendant.   )
10  -----------------------------)

11

12

13

14     VIDEOTAPED DEPOSITION OF PHILIP JOHNSON

15

16             * * * CONFIDENTIAL * * *

17

18               Seattle, Washington

19           Friday, November 15, 2019

20

21

22

23  Reported by:

24  Connie Recob, CCR 2631, RMR, CRR

25  JOB NO. 171685
```

```
 1   to be input to the process of designing and
 2   creating these videos?
 3         A.    I don't think so.
 4         Q.    How would you describe the target
 5   population for this survey?
 6         A.    They were current and potential
 7   users of Snap.
 8         Q.    And "current users of Snap" are
 9   users of Snap for the last six months?
10         A.    Well, the current users were people
11   who have it installed currently on their phone
12   and -- and use it.  In other words, some people
13   install it and never use it, which they would
14   not qualify for the survey but there's no time
15   frame in its current use.
16         Q.    And is there a time frame that you
17   applied to your definition of potential users
18   of Snap?
19         A.    Yes.  Use in the coming year.
20         Q.    Anticipated use in the coming year?
21         A.    Chances you will install Snapchat on
22   your phone in the coming year.
23         Q.    And what is -- what is that chance?
24         A.    Definitely, probably or maybe
25   install it.
```

1    Q.    Can you just point me to the portion
2  of your report where you identify this as the
3  target population for your survey?
4    A.    Paragraph 7 in the methodology
5  outlines generally the target population, and
6  then it becomes more specific as the discussion
7  of methodology continues and we talk about the
8  screening.
9    Q.    Okay. And given this target
10 population, how did you determine the
11 appropriate demographic information?
12   A.    I was provided the age and gender
13 breakdown from Snap.
14   Q.    And is that the -- one of the Excel
15 spreadsheets that you provided along with your
16 report?
17   A.    I think it's in there.
18   Q.    Do you know what -- the actual quota
19 percentages that you used in your quotas?
20   A.    Well, the quotas were set based on
21 the -- on the demographics, and then they're
22 adjusted after the survey by using weighting to
23 bring them back to those levels.
24   Q.    And is that -- is that answer --
25 does that answer apply to quotas that you used

1   technical experts?

2            MR. NGUYEN:  Objection.  Asked and

3       answered.

4            THE WITNESS:  I don't think so.

5   BY MS. XI:

6       Q.   Do you have any belief as to whether

7   the ephemerality or reduced traceability of

8   messages is an important feature of Snapchat?

9            MR. NGUYEN:  Objection.  Vague.

10      Lacks foundation.  Calls for a legal

11      conclusion.

12           THE WITNESS:  I don't know.

13  BY MS. XI:

14      Q.   You don't have an opinion either

15  way?

16      A.   I don't.

17      Q.   There were two categories of videos

18  or vignettes that you used in connection with

19  your survey, correct?

20      A.   Well, there were a number of

21  different categories.  Which two are you

22  referring to?

23      Q.   Okay.  I'm referring to the ones

24  that you called or described as status quo

25  versus the ones that you described as an

1   alternate.

2        A.    Okay.  Those are two things, yeah.

3        Q.    Okay.  How would you describe -- how

4   would you describe the status quo vignettes?

5              MR. NGUYEN:  Objection.  Vague.

6              THE WITNESS:  Well, my understanding

7        of the status quo alternative -- the --

8        we'll call it the user experience or

9        vignette is that it reflected the existing

10       experience at the time of the survey based

11       on either the new user interface or the old

12       user interface depending on which the

13       Snapchat user had on their phone.

14  BY MS. XI:

15       Q.    And are you referring to what the

16  Snapchat user had on their personal phones?

17       A.    On the phone they were using to take

18  the survey, yes.

19       Q.    And what were the alternate

20  vignettes testing?

21       A.    Those were vignettes that showed the

22  same general functionality or process, but

23  executed it differently in a way that was

24  believed to be noninfringing.

25       Q.    You had four different status quo

1        where five is the best and one is the

2        worst, how would you rate this Snapchat

3        user experience in terms of, and then they

4        were asked about ease of use, speed and

5        efficiency, clarity and readability,

6        informational content and fun and

7        entertaining.

8   BY MS. XI:

9        Q.   So were you testing those five

10  features and how -- what the user's perception

11  would be of those five features?

12       A.   For this user experience that they

13  had just seen.

14       Q.   Why did you choose to test these

15  five features?  And by "five features," I mean

16  ease of use, speed and efficiency, clarity and

17  reliability, informational content and fun and

18  entertaining.

19            MR. NGUYEN:  Objection.  Vague.

20       Misstates the document and previous

21       testimony.

22            THE WITNESS:  These are fairly

23       standard metrics for reading a mobile

24       application.

25  BY MS. XI:

Case 2:17-cv-00220-MLH-KS Document 208-3 Filed 12/06/19 Page 8 of 17 Page ID #:9181
Confidential

Page 68

```
 1      Q.   How did you come about selecting
 2  these metrics to be rated in the survey study?
 3      A.   Well, these are metrics I've used
 4  before in studying mobile applications.
 5  They're also widely used in the industry.
 6      Q.   Do you agree that these metrics have
 7  nothing to do with the ephemerality of messages
 8  in a messaging or mobile application?
 9           MR. NGUYEN:  Objection.  Vague.
10      Lacks foundation.
11           THE WITNESS:  I don't think I would
12      agree, no.
13  BY MS. XI:
14      Q.   In what way is ease of use related
15  to the ephemeral nature of the Snapchat
16  application?
17           MR. NGUYEN:  Objection.  Vague.
18      Assumes facts.
19           THE WITNESS:  The ephemeral nature
20      is something that's subsumed in how easy it
21      is, how efficient it is, how clear it is,
22      how informational it is, how fun it is.
23      It's part of the experience.
24  BY MS. XI:
25      Q.   Would you say that ephemerality is
```

1   subsumed in other features that you're not
2   testing here?
3       A.    I would assume so.
4       Q.    Do you have on -- do you have an
5   opinion as to whether any of these five
6   features that you're testing actually read on
7   the patents in suit?
8       A.    I don't.
9       Q.    Now, would it be fair to say that by
10  testing the five features that we've been
11  discussing, you're also testing the
12  ephemerality of the Snapchat app and users'
13  perceptions of the ephemerality?
14            MR. NGUYEN:  Objection.  Vague.
15       It's compound.  Misstates previous
16       testimony.
17            THE WITNESS:  It's part of the
18       overall experience they're rating, yes.
19  BY MS. XI:
20      Q.    Is there any reason why you did not
21  test features that are specific to maintaining
22  the privacy or security of a Snap being
23  transmitted on the Snapchat app?
24            MR. NGUYEN:  Objection.  Vague.
25       Lacks foundation.

1                THE WITNESS:  I'm not sure what the

2        question is when you said, did not test it.

3    BY MS. XI:

4        Q.    Yeah.  So privacy and security is

5    not one of the five features that you tested;

6    is that right?

7        A.    Well, it's not one of the five

8    attributes that they're rated on.  It's

9    included in their overall experience with the

10   app and it's included in the key question of,

11   If your Snapchat session were like the one you

12   just saw, would that make you use Snapchat more

13   often, less often or about the same as you do

14   now, to the extent it matters to people.

15   Excuse me.

16       Q.    Is it your opinion that the five

17   metrics that you chose to test each read upon

18   privacy and securities of a Snap being

19   transmitted on the Snapchat app?

20               MR. NGUYEN:  Objection.  Vague.

21       Lacks foundation.

22               THE WITNESS:  Well, to some extent,

23       they would be included certainly in things

24       like informational content, perhaps clarity

25       and readability, but they're not directly

1        tested.  They're not one of the major
2        attributes that you would expect to rate on
3        an app.
4   BY MS. XI:
5        Q.   So would it be fair to say that
6   privacy and security of the message is not one
7   of the metrics directly being tested in your
8   survey study?
9             MR. NGUYEN:  Objection.  Vague.
10            THE WITNESS:  No.
11            MR. NGUYEN:  Misstates his prior
12       testimony.
13  BY MS. XI:
14       Q.   In what way would you reform my
15  question or statement?
16       A.   Well, it's not that they're --
17  they're not one of the metrics that's included
18  in the ratings.  As I said, they're certainly
19  included in informational content.  They're not
20  an independent attribute that's added to the
21  list if that's what you're asking me.
22       Q.   And that is.  Thank you.
23            Let's turn to your question 4B.  Did
24  you analyze any of the open responses that
25  respondents provided?

Case 2:17-cv-00220-MLH-KS Document 208-3 Filed 12/06/19 Page 12 of 17 Page ID #:9185
Confidential

Page 98

1   more after seeing the video?

2       A.   I thought it was about a third of

3   the current users who were exposed to the

4   status quo video said they would use it more

5   after seeing the exhibit, while two thirds

6   said, No, it's no different than what I do now.

7   I wouldn't use it more.

8       Q.   Got it.  Thank you for that.

9            For those one third, you are

10  contending that they're using -- they said that

11  they would use it more probably because the

12  survey is fun in its design, and also because

13  the survey has reminded them of fun or familiar

14  features about Snapchat that would make them

15  want to use that application more?

16          MR. NGUYEN:  Objection.  Vague.

17      Misstates prior testimony.  And, again,

18      it's compound.

19          THE WITNESS:  It's reminder -- it's

20      classic reminder advertising of getting

21      someone a little enthusiastic about

22      something they were familiar with before,

23      but you're reminding them.  It's what you

24      would expect.

25  BY MS. XI:

1            THE WITNESS:  I'm saying that
2      virtually all of the people who have a
3      computer also have a smartphone who are in
4      a panel like this.
5   BY MS. XI:
6       Q.    Okay.
7       A.    We typically have the opposite
8   issue, is you try to get them from their
9   smartphone to their computer and you lose about
10  a third of the people.
11            Getting them to use the smartphone
12  has never been a problem in my -- in my
13  experience anyway.
14      Q.    So -- well, going back to my
15  question:  Do you know how many people declined
16  to take the survey after opening an invitation?
17      A.    Because it was on the smartphone?
18      Q.    Yeah.
19      A.    I don't.
20      Q.    Okay.  But those people, would you
21  agree, had been excluded from the survey
22  effectively?
23      A.    Well, as I say, whenever you do a
24  survey, you start with the screening for what
25  platform it's going to be on, and either send

1   your survey?

2       A.   I didn't understand the question.

3       Q.   Oh, sorry.  Did minors complete your
4   survey and the survey was designed to have
5   folks aged 13 to 17 to complete it?

6       A.   Yes, they're one of the key groups
7   of users.

8       Q.   You had a quota for them, right?

9       A.   I did.

10      Q.   And remind me how you reach -- you
11  were able to reach them to take the survey?

12      A.   Well, they're reached through their
13  parents.  So what you have to do is greatly
14  over sample the parents, mostly with the
15  households or the -- excuse me, where the head
16  of household 35 plus, who is the panel member,
17  and then you have to see if you can recruit
18  their child to take them as an alternative for
19  those households.

20      Q.   Okay.  And then after you identified
21  a parent of a child 13 to 17 who said that they
22  would grant permission to have their child take
23  the survey, the child was able to take the
24  survey and that's how you got your quotas for
25  13 to 17?

1  gave them is the rating they deserve.  I don't
2  understand.
3       Q.   Not a reason to exclude, right?
4       A.   Well, no.
5       Q.   Okay.  What about Response ID 1337,
6  Group No. 9:  "I like it.  It's cool stuff.  I
7  like it, but it's okay.  Cool stuff to, and it
8  has to be the a."
9       A.   Okay.  And these are done on a
10 screen, so what they mean -- there's some typos
11 involved.  I did not change things or edit
12 typos.
13      Q.   Yeah.  No, I understand.
14      A.   Just so you understand that.
15      Q.   I do.
16      A.   So some of these, I'm not sure what
17 they meant, but I would not exclude it.
18      Q.   I just had a total crash.  Okay.
19 Let's move on to one of the questions that I
20 wanted to come back to.
21           Earlier,we discussed the advertising
22 effect.  Do you remember advertising effect?
23      A.   Yes.
24      Q.   And we discussed that the
25 advertising effect caused the respondents to

Page 220

```
 1    say that they would use Snap more because they
 2    got familiarized with the same experience that
 3    they currently have.
 4              Do you remember that discussion?
 5         A.   I do.
```

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████

```
14         A.   I don't know.
15         Q.   What about, do you know what
16    percentage of those respondents in the same
17    group in the category we're talking about said
18    that they would use Snapchat more in the
19    alternative feature that they reviewed?
20         A.   I don't know.
21         Q.   If respondents are basing their
22    answers on the supposed advertising effect,
23    would they still be evaluating the feature that
24    you're presenting to them?
25         A.   Absolutely.
```

```
 1                 C E R T I F I C A T E
 2
 3   STATE OF WASHINGTON   )
 4                         ) ss.:
 5   COUNTY OF SNOHOMISH   )
 6
 7           I, Connie Recob, CCR 2631, RMR, CRR,
 8      a Notary Public within and for the State of
 9      Washington, do hereby certify:
10           That PHILIP JOHNSON, the witness
11      whose deposition is hereinbefore set forth,
12      was duly sworn by me and that such
13      deposition is a true record of the
14      testimony given by such witness.
15           I further certify that I am not
16      related to any of the parties to this
17      action by blood or marriage; and that I am
18      in no way interested in the outcome of this
19      matter.
20           IN WITNESS WHEREOF, I have hereunto
21      set my hand this 26th day of November,
22      2019.
23
24      ------------------------
25           Connie Recob, CCR 2631, RMR, CRR
```