UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VAPORSTREAM, INC.,<br><br>         Plaintiff,<br><br>v.<br><br>SNAP INC. d/b/a/ Snapchat, Inc.,<br><br>         Defendant. | Case No.: 2:17-cv-00220-MLH (KSx)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S DAUBERT MOTION TO EXCLUDE; AND**<br><br>[Doc. No. 182.]<br><br>**(2) DENYING PLAINTIFF'S DAUBERT MOTION TO EXCLUDE**<br><br>[Doc. No. 210.] |

On November 12, 2019, Defendant Snap Inc. filed a Daubert motion to exclude the damages opinions and testimony of Plaintiff Vaporstream, Inc.'s damages expert, Mr. Walter Bratic. (Doc. No. 182.) On November 26, 2019, Vaporstream filed a response in opposition to Snap's Daubert motion. (Doc. No. 195.) On December 6, 2019, Snap filed a reply. (Doc. No. 207.)

On December 6, 2019, Vaporstream filed a Daubert motion to exclude the survey and related testimony of Snap's survey expert, Mr. Philip Johnson. (Doc. No. 210.) On

1

December 16, 2019, Snap filed a response in opposition to Vaporstream's <u>Daubert</u> motion. (Doc. No. 216.) On December 23, 2019, Vaporstream filed a reply. (Doc. No. 219.)

The Court held a hearing on the matter on January 10, 2020. Meng Xi appeared for Plaintiff Vaporstream. Heidi L. Keefe, Michael A. Attanasio, Reuben H. Chen, Elizabeth L. Stameshkin, and Lam K. Nguyen appeared for Defendant Snap. For the reasons below, the Court grants in part and denies in part Snap's <u>Daubert</u> motion, and the Court denies Vaporstream's <u>Daubert</u> motion.

## Background

On January 10, 2017, Plaintiff Vaporstream filed a complaint for patent infringement against Defendant Snap, alleging infringement of U.S. Patent Nos. 8,886,739, 8,935,351, 9,306,885, 9,306,886, 9,313,155, 9,313,156, 9,313,157, 9,338,111, and 9,413,711. (Doc. No. 1.) On June 26, 2017, Snap filed an answer to the complaint. (Doc. No. 61.)

On February 27, 2018, the Court issued a claim construction order. (Doc. No. 118.) On February 27, 2018, the Court also denied Snap's motion for summary judgment that the patents-in-suit are invalid under 35 U.S.C. § 101. (Doc. No. 117.)

Starting on June 6, 2018, the Patent Trial and Appeal Board instituted *inter partes* review of the challenged claims for each of the patents-in-suit. See <u>Snap Inc. v. Vaporstream, Inc.</u>, Case Nos. IPR2018-00200, IPR2018-00312, IPR2018-00369, IPR2018-00397, IPR2018-00404, IPR2018-00408, IPR2018-00416, IPR2018-00439, IPR2018-00455, IPR2018-00458. On June 12, 2018, the parties filed a joint motion to stay the action pending the IPR proceedings as to the patents-in-suit. (Doc. No. 148.) On June 13, 2018, the Court granted the parties' joint motion and stayed the action pending the last final written decision by the PTAB in the IPR proceedings for the patents-in-suit. (Doc. No. 150.)

Between June 4, 2019 and August 30, 2019, the PTAB issued final written decisions in each of the IPR proceedings for the patents-in-suit. In those decisions, the PTAB held that the challenged claims from the '739 patent, the '885 patent, the '155 patent, the '351 patent, and the '156 patent are all unpatentable, and the PTAB held that the challenged

claims from the '886 patent, the '111 patent, the '711 patent, and the '157 patent had not been shown to be unpatentable. (Doc. Nos. 156-1, 157-1, 158-1, 158-2, 158-3, 158-4, 159-1.)

In light of this, on September 13, 2019, the Court partially lifted the stay of the action. (Doc. No. 160.) The Court lifted the stay as to the '886 patent, the '111 patent, the '711 patent, and the '157 patent. (Id. at 3.) The Court continued the stay of the action as to the '739 patent, the '885 patent, the '155 patent, the '351 patent, and the '156 patent. (Id.) By the present motions, (1) Snap moves to exclude the damages opinions and testimony of Vaporstream's damages expert, Mr. Walter Bratic; and (2) Vaporstream moves to exclude the survey and related testimony of Snap's survey expert, Mr. Philip Johnson. (Doc. No. 181-1 at 1, 9; Doc. No. 210 at 1, 10.)

## Discussion

### I. Legal Standards for Daubert Motions

A district court's decision to admit expert testimony under Daubert in a patent case is governed by the law of the regional circuit. Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1294 (Fed. Cir. 2015). When considering expert testimony offered pursuant to Rule 702, the trial court acts as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable." Elsayed Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002); see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); Daubert, 509 U.S. at 597. Under Rule 702 of the Federal Rules of Evidence, a court may permit opinion testimony from an expert only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The test for reliability of expert testimony is flexible and depends on the particular circumstances of the case. Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 969 (9th Cir. 2013).

"Under Daubert, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony." Primiano v. Cook, 598 F.3d 558, 564-65 (9th Cir. 2010). "'[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology.'" Primiano, 598 F.3d at 564. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Id. (citing Daubert, 509 U.S. at 594, 596); accord Summit 6, 802 F.3d at 1296. "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." Alaska Rent-A-Car, 738 F.3d at 969. Further, the Ninth Circuit has explained that "Rule 702 should be applied with a 'liberal thrust' favoring admission." Messick, 747 F.3d at 1196.

Whether to admit or exclude expert testimony lies within the trial court's discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-42 (1997); United States v. Verduzco, 373 F.3d 1022, 1032 (9th Cir. 2004) ("We . . . have stressed that the 'trial court has broad discretion to admit or exclude expert testimony'."). The Ninth Circuit has explained that "[a] trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011).

**II.  Snap's Daubert Motion to Exclude Mr. Bratic's Opinions**

Snap argues that the Court should exclude the damages testimony of Vaporstream's damages expert, Mr. Bratic. (Doc. No. 181-1 at 1, 9.) In support of this contention, Snap raises four challenges to Mr. Bratic's damages analysis. (Id. at 3-9.) The Court addresses each of these challenges in turn below.

    A.    Reasonable Royalty Rate Opinion

Snap argues that the Court should exclude Mr. Bratic's damages analysis because the 50/50 profit split reached in his reasonable royalty rate analysis is untethered to the facts of the case. (Doc. No. 181-1 at 3-4.) Specifically, Snap argues that Mr. Bratic's

50/50 profit split opinion is impermissible under the Federal Circuit's decision in VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308 (Fed. Cir. 2014). (Doc. No. 181-1 at 3.) In response, Vaporstream argues that Mr. Bratic sufficiently tied his profit split analysis to the facts of the case. (Doc. No. 201 at 2-5.)

"Upon a finding of infringement, the patentee is entitled to 'damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.'" AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1329–30 (Fed. Cir. 2015) (quoting 35 U.S.C. § 284). "The most common method for determining a reasonable royalty is the hypothetical negotiation approach, which 'attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.'" VirnetX, 767 F.3d at 1326 (quoting Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009)). The Federal Circuit has "has sanctioned the use of the Georgia–Pacific factors to frame the reasonable royalty inquiry." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011).

"To be admissible, expert testimony opining on a reasonable royalty must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (quoting Uniloc, 632 F.3d at 1315); see also Fed. R. Evid. 702 (requiring that expert testimony be "based on sufficient facts or data" and "reliably appl[y] the principles and methods to the facts of the case"). Thus, "expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" Uniloc, 632 F.3d at 1317 (quoting ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010)). "'If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded.'" Exmark, 879 F.3d at 1349 (quoting Uniloc, 632 F.3d at 1315).

The Federal Circuit's decisions in Uniloc and VirnetX are instructive on this last point. In Uniloc, the Federal Circuit rejected a damages expert's use of a "25 percent rule

of thumb" as a starting point for the expert's reasonable royalty rate analysis. 632 F.3d at 1312–18. The Federal Circuit explained that "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." Id. at 1317. "The 25 percent rule of thumb as an abstract and largely theoretical construct fails to satisfy this fundamental requirement. The rule does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party." Id.; see also VirnetX, 767 F.3d at 1332 ("The problem was that the 25% rule made too crude a generalization about a vastly more complicated world."). "Evidence relying on the 25 percent rule of thumb is thus inadmissible under Daubert and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue." Uniloc, 632 F.3d. at 1315 ("[T]he 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation.").

Similarly, in VirnetX, the Federal Circuit rejected a damages expert's use of a 50/50 split of incremental profits based on the Nash Bargaining Solution as a starting point for his reasonable royalty rate analysis. 767 F.3d at 1331–34. The Federal Circuit explained that "the invocation of a 50/50 starting point based on the Nash Bargaining Solution is akin to the '25 percent rule of thumb' that w[as] rejected in Uniloc as being insufficiently grounded in the specific facts of the case." Id. at 1331. The Federal Circuit reiterated that expert testimony on damages must be "tied to the particular facts." Id. at 1333. Use of the Nash 50/50 theorem as a starting point for the reasonable royalty rate, like use of the 25% rule was "an inappropriate 'rule of thumb.'" Id. at 1332. Thus, a damages expert's use of a 50/50 starting point based on the Nash Bargaining Solution—"even when adjusted to account for certain individual circumstances—is insufficiently tied to the facts of the case, and cannot be supported." Id. at 1334.

In his expert report, Mr. Bratic performs an analysis of the fifteen Georgia–Pacific factors. (See Doc. No. 185-2, Ex. B Bratic Expert Report ¶¶ 68-174.) Mr. Bratic then opines as to the reasonable royalty rate the parties would have agreed to at the hypothetical

negotiation. (See id. ¶¶ 175-81.)

Mr. Bratic begins by stating: "The parties to the hypothetical negotiation would have considered [his ]discussed analysis of the Georgia-Pacific Factors at the time of the hypothetical negotiation in determining a reasonable royalty." (Id. ¶ 175.) Mr. Bratic then opines: "As a prudent negotiator, Vaporstream would have sought a reasonable royalty that was more than one-half of Snap's benefits attributable to the Patents-in-Suit. Snap, on the other hand, would have sought to minimize its royalty obligation and pay less than one-half of its apportioned benefits in royalties to Vaporstream." (Id. ¶ 176.)

Mr. Bratic then opines that Vaporstream would have had more bargaining leverage than Snap at the hypothetical negotiation. (Id. ¶ 178.) Mr. Bratic supports this opinion regarding the parties' bargaining positions by noting that "as of the date of first alleged infringement, there were no available, acceptable non-infringing alternatives to the Patents-in-Suit that provided the same or similar functionality and benefits as taught by the Patents-in-Suit." (Id. ¶ 177.) In light of this, Mr. Bratic concludes: "Therefore, the parties would have agreed to a reasonable royalty rate based on a 50/50 split of Snap's apportioned benefits attributable to the Patents-in-Suit and would have recognized that this would be fair and reasonable to both parties." (Id. ¶ 179.)

Snap argues that Mr. Bratic's analysis is impermissible under the Federal Circuit's decision in VirnetX. (Doc. No. 181-1 at 3.) The Court agrees. Although Mr. Bratic does not expressly refer to his 50/50 profit split opinion as use of the Nash Bargaining Solution, his starting point for his reasonable royalty rate opinion is akin to and as problematic as the 50/50 starting point that was rejected by the Federal Circuit in VirnetX.

At the start of his reasonable royalty rate analysis, Mr. Bratic opines: "As a prudent negotiator, Vaporstream would have sought a reasonable royalty that was more than one-half of Snap's benefits attributable to the Patents-in-Suit. Snap, on the other hand, would have sought to minimize its royalty obligation and pay less than one-half of its apportioned benefits in royalties to Vaporstream." (Doc. No. 185-2, Ex. B Bratic Expert Report ¶ 176.) This "more than one-half"/"less than one half" (i.e., 50/50) starting point—like the starting

points in Uniloc and VirnetX—is "an arbitrary, general rule, unrelated to the facts of this case." Uniloc, 632 F.3d at 1318. In providing this starting point, Mr. Bratic fails to support it with any particular facts regarding the "technology, industry, or part[ies]" at issue. Uniloc, 632 F.3d at 1317; accord VirnetX, 767 F.3d at 1331. Rather, Mr. Bratic simply asserts that the parties would have started at that point because Vaporstream is "a prudent negotiator" and Snap "would have sought to minimize its royalty obligation." (Doc. No. 185-2, Ex. B Bratic Expert Report ¶ 176.) This is insufficient. "Such conclusory assertions cannot form the basis of a jury's verdict." VirnetX, 767 F.3d at 1333.

Vaporstream argues that Mr. Bratic's 50/50 profit split opinion is proper and sufficiently tied to the facts of this case because he reached that conclusion only after he conducted a comprehensive analysis of the 15 Georgia-Pacific factors and considered specific facts in this case. (Doc. No. 201 at 2-3.) This argument fails for several reasons. First, even assuming Mr. Bratic considered the particular facts of this case in reaching his ultimate reasonable royalty rate conclusion, that does not negate the fact that he began that analysis with an arbitrary "more than one-half"/"less than one half" starting point that was unsupported by any facts in the case. In Uniloc, the Federal Circuit explained: "It is of no moment that the 25 percent rule of thumb is offered merely as a starting point to which the Georgia–Pacific factors are then applied to bring the rate up or down. Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." 632 F.3d at 1317; see VirnetX, 767 F.3d at 1332–33 ("[W]e do not believe that the reliability of this methodology is saved by Weinstein's attempts to account for the unique facts of the case in deviating from the 50/50 starting point.").

Second, the Court acknowledges that prior to opining that the parties would have begun with a "more than one-half"/"less than one half" starting point, Mr. Bratic conducts a full analysis of the 15 Georgia-Pacific factors and states: "The parties to the hypothetical negotiation would have considered the above-discussed analysis of the Georgia-Pacific Factors at the time of the hypothetical negotiation in determining a reasonable royalty."

(Doc. No. 185-2, Ex. B Bratic Expert Report ¶ 175.) But the Federal Circuit has explained that "a 'superficial recitation of the Georgia–Pacific factors, followed by conclusory remarks, [cannot] support [a] jury's verdict.'" Exmark, 879 F.3d at 1350. Thus, Mr. Bratic's recitation of the Georgia-Pacific factors followed by the use of an arbitrary, unsupported starting point for his reasonable royalty rate determination is insufficient.

Finally, the Court notes that the only specific fact that Mr. Bratic appears to rely on to support his 50/50 profit split conclusion is the parties' relative bargaining positions at the hypothetical negotiation based on the contested fact that there were no available, acceptable, non-infringing alternatives that would provide the same or similar benefits at the time of first infringement.[1] (See Doc. No. 185-2, Ex. B Bratic Expert Report ¶¶ 177-79.) But Mr. Bratic fails to sufficiently tie this fact to his 50/50 profit split conclusion. Mr. Bratic does not explain why Vaporstream's purported bargaining leverage based on the fact there were no non-infringing alternatives necessarily leads to the conclusion that the parties would have agreed to a 50/50 split, and why a 40/60, 30/70, 20/80 or any other split would not have been appropriate. There is "'simply too great an analytical gap'" between Mr. Bratic's 50/50 conclusion and the facts he attempts to rely on.[2] See VirnetX, 767 F.3d

---

[1] In its briefing, Vaporstream contends that in forming his opinion, Mr. Bratic also considered "the evolution and competitiveness of the ephemeral messaging market and industry" and "the extent of use and value of the accused functionality that is attributable to the teachings of the of the asserted patents." (Doc. No. 201 at 3.) But in his expert report, Mr. Bratic does not actually state that he relied on those specific facts in reaching his 50/50 profit split conclusion. (See Doc. No. 185-2, Ex. B Bratic Expert Report ¶ 175-79.)

[2] In addition, the Court rejects Vaporstream's reliance on the decisions in Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283 (Fed. Cir. 2015) and Salazar v. HTC Corp., No. 216CV01096JRGRSP, 2018 WL 1783157, at *2 (E.D. Tex. Apr. 13, 2018). In Summit 6, the Federal Circuit expressly noted: "On appeal, Samsung does not challenge Mr. Benoit's use of Nash Bargaining." 802 F.3d at 1297 n.3. Thus, the present case is distinguishable because the defendant in this case, unlike the defendant in Summit 6, does challenge the damages expert's reasonable royalty rate determination as being impermissible under VirnetX.

Salazar is also distinguishable from the present case. In Salazar, the district court declined to exclude the damages expert's analysis because the court found that the damages expert "did not start with an arbitrary split and then adjust (or not adjust) that split based on his analysis." 2018 WL 1783157, at *2. That is not the case here. Mr. Bratic began his analysis with an arbitrary "more than one-half"/"less

at 1333 (quoting Gen. Elec., 522 U.S. at 141) (rejecting an expert's reliance on the parties' bargaining power to support his proposed profit split); see also LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67 (Fed. Cir. 2012) ("A damages theory must be based on 'sound economic and factual predicates.'").

In sum, Mr. Bratic's 50/50 profit split opinion "is insufficiently tied to the facts of the case," and must be excluded. VirnetX, 767 F.3d at 1334; see Exmark, 879 F.3d at 1349. As such, the Court grants this portion of Snap's Daubert motion, and the Court excludes Mr. Bratic's 50/50 profit split reasonable royalty rate opinion.

B.   "Snap Send No Source Camera" Data

Snap argues that Mr. Bratic's damages analysis should be excluded because he improperly relies on non-infringing methods of sending a Snap in his damages calculations. (Doc. No. 181-1 at 5.) Snap explains that it produced two data sets in this case: "the first consisting of all Snaps sent ('snap_send'), and the second comprising a subset of Snaps sent ('snap_send_no_source_camera')." (Doc. No. 181-1 at 5.) Snap further explains that its 30(b)(6) witness, Mr. Sellis, explained that the "snap_send_no_source_camera" data corresponds to Snaps sent where "the name of the recipient appears on the camera," and Vaporstream's infringement expert, Mr. Hicks, has confirmed that this is a non-infringing method of sending a Snap. (Id. (citing Doc. No. 185-6, Ex. G at 157:14-23; Doc. No. 181-5, Ex. F at 62:6-16).) Snap argues, therefore, that it was improper for Mr. Bratic to utilize the total number of Snaps in his damages calculations without first subtracting out the non-infringing "snap_send_no_source_camera" data. (Id. at 5-6.)

In response, Vaporstream argues that it was proper for Mr. Bratic to include the "snap_send_no_source_camera" data in his damages analysis because, in doing so, Mr. Bratic relied on Mr. Sellis's initial testimony that the data corresponds to: "when the snap originated there's no source at the bottom or no recipient's name at the bottom." (Doc. No.

---

than one half' starting point. (Doc. No. 185-2, Ex. B Bratic Expert Report ¶ 176.) In addition, Salazar is a non-binding out-of-circuit district court opinion that the Court is not required to follow.

201 at 6 (citing Doc. No. 185-6, Ex. G at 141:3-12).) Vaporstream explains that, nevertheless, "if Snap is prepared to submit a declaration supported by evidence clarifying that the values under 'snap_send_no_source_camera' refer to the unaccused 'double-tap to reply' Snapchat features," then Mr. Bratic is "prepared to issue a revised report adjusting the calculations to reflect the removal of 'snap_send_no_source_camera' numbers from the accused 'snap_send' numbers." (Id.) In reply, Snap represents that it has provided a declaration from Mr. Sellis specifically testifying that the "snap_send_no_source_camera" data "represents the total number of Snaps sent where the recipient name appears on the same display as the image or video content of a Snap." (Doc. No. 212 at 2; Doc. No. 207-1, Sellis Decl. ¶ 2.) In light of this, the Court denies this portion of Snap's Daubert motion as moot.

### C. LTV numbers

Snap argues that Mr. Bratic's damages analysis should be excluded because it relies on LTV numbers that are speculative and unreliable. (Doc. No. 181-1 at 7-8.) In response, Vaporstream argues that Snap's criticism of Mr. Bratic's LTV numbers is an issue appropriate for cross-examination—not a basis for exclusion under Daubert. (Doc. No. 201 at 7-8.) The Court agrees with Vaporstream.

In analyzing Georgia-Pacific Factor 11, Mr. Bratic explains in his export report that he utilized a measure of the value of Snapchat users called lifetime value ("LTV"). (Doc. No. 185-2, Ex. B Bratic Expert Report ¶ 129.) Specifically, Mr. Bratic explains that for the purposes of his damages analysis, he assumed that each U.S. Snapchat user has a LTV of $50 and that each non-U.S. Snapchat user has a LTV of $25. (Id. ¶¶ 132-33.)

To support these specific LTV numbers, Mr. Bratic cites to testimony from Snap's Director of Revenue Product and designated 30(b)(6) witness Mr. Sellis. (See id. ¶¶ 129-33) Specifically, Mr. Bratic notes that "Mr. Sellis testified he has 'seen lifetime values on the order of between ten and $50 as well as low as less than $1,'" and "Mr. Sellis testified that the countries with the highest LTVs were '[t]ypically the United States, Canada, the U.K., France, Germany, [and] Australia.'" (Id. ¶¶ 131-32.) Mr. Bratic also notes that Mr.

Sellis testified that "Snap's U.S. LTV was closer to the $50 end of the LTV range he testified to." (Id. ¶ 132; see Doc. No. 185-6 Ex. G at 42:5-7 ("I have seen [LTV] for the United States it was at, I believe it was at the higher end of the range I gave you before.")). Here, Mr. Bratic has set forth a sufficient factual basis to support the LTV numbers he uses in his damages analysis.

Snap argues that it was improper for Mr. Bratic to rely on Mr. Sellis's testimony in formulating his LTV opinions. (Doc. No. 181-1 at 7-8.) Specifically, Snap argues that Mr. Bratic should have relied on the LTV numbers contained in a Snap PowerPoint presentation rather than Mr. Sellis' purportedly "vague testimony." (Id.; see Doc. No. 212 at 3-4.) But Snap's argument that Mr. Bratic should have relied on different evidence in the record to formulate his LTV numbers, at best, goes to the weight or credibility of Mr. Bratic's LTV analysis, not its admissibility. See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) (explaining that disagreements with "the factual assumptions and considerations" underlying an expert's conclusions "go to the weight to be afforded the testimony and not its admissibility"); VirnetX, 767 F.3d at 1328 ("[Q]uestions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury."); see also United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011) ("As a general rule, '[t]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'"). Snap's challenges to Mr. Bratic's LTV numbers are more appropriately addressed through "cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Primiano, 598 F.3d at 564; accord Summit 6, 802 F.3d at 1296. As such, the Court denies this portion of Snap's Daubert motion without prejudice to a contemporaneous objection at trial.

D. Total Market Capitalization, Revenues, and Profits

Finally, Snap argues that Mr. Bratic's damages analysis should be excluded because his analysis includes improper references to large numbers, such as Snap's market capitalization, Snap's total revenues, Snap's total incremental profits, and the report values

of acquisition offers from Facebook and Google. (Doc. No. 181-1 at 8-9.) In response, Vaporstream argues that Snap's market capitalization, acquisition offers received, total revenues, and total incremental profits are all relevant to Mr. Bratic's reasonable royalty analysis under the Georgia-Pacific factors. (Doc. No. 201 at 8-9.)

Mr. Bratic has testified that his damages analysis is not based on the "entire market value" of the accused products. (Doc. No. 212-1, Ex. I at 127:12-15.) In light of this, even assuming Snap's market capitalization, acquisition offers received, total revenues, and total incremental profits have some relevance to Mr. Bratic's reasonable royalty analysis, these large numbers carry a substantial danger of unfair prejudice to Snap by "skew[ing] the damages horizon for the jury."[3] See Fed. R. Evid. 403; Uniloc, 632 F.3d at 1320 ("The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue."). As a result, these numbers are excluded from Mr. Bratic's analysis.

Vaporstream argues that any potential prejudice caused by Mr. Bratic's consideration of these numbers could be remedied by a limiting instruction to the jury rather than by preclusion. (Doc. No. 201 at 10.) The Court disagrees. In Uniloc, the Federal Circuit explained that once the jury in that case was presented with the disclosure that defendant made $19 billion in revenue, "'[t]he $19 billion cat was never put back into the bag even . . . in spite of a final instruction that the jury may not award damages based on Microsoft's entire revenue from all the accused products in the case.'" 632 F.3d at 1320. In sum, the Court grants this portion of Snap's Daubert motion, and the Court precludes Mr. Bratic from referencing in his damages analysis Snap's market capitalization, acquisition offers received, total revenues, and total incremental profits.

---

[3] Vaporstream also argues that Snap's market capitalization, acquisition offers received, total revenues, and total incremental profits are relevant to the issues of willfulness and enhanced damages. (Doc. No. 201 at 9.) The Court will grant Snap's motion for summary judgment of no willful infringement. As such, the Court rejects Vaporstream's additional relevancy argument.

### III. Vaporstream's <u>Daubert</u> Motion to Exclude Mr. Johnson's Survey

Snap argues that the Court should exclude the survey and related testimony from Snap's survey expert, Mr. Johnson. (Doc. No 210 at 1, 10.) In its motion, Vaporstream argues that the survey should be excluded for three reasons. (Id. at 1.) The Court addresses each of challenges in turn below.

#### A. Legal Standards for Survey Evidence

The Ninth Circuit has "long held that survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.'" Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1036 (9th Cir. 2010). The Ninth Circuit has explained that:

> Treatment of surveys is a two-step process. First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge. Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues for a jury or, in a bench trial, the judge.

Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001); see also Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility."); Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of California, 694 F.2d 1150, 1156 (9th Cir. 1982) ("Technical unreliability goes to the weight accorded a survey, not its admissibility.").

#### B. Relevance

Vaporstream argues that the Johnson survey should be excluded because it is irrelevant. (Doc. No. 210 at 3-5.) Specifically, Vaporstream argues that because the survey tested five attributes that are unrelated to the claimed invention, the survey's results are irrelevant to the issues in this case. (Id.) In response, Snap argues that the Johnson survey is relevant and that Mr. Johnson appropriately tested the acceptability of the accused product and non-infringing alternatives. (Doc. No. 218 at 3-6.)

The Federal Circuit has noted that consumer surveys can be relevant to reasonable royalty damages analysis. See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1334 (Fed. Cir. 2009); see, e.g., i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010). Here, Snap argues that Mr. Johnson's survey is relevant to the determination of whether or not the alleged invention provides any benefits compared to non-infringing alternatives, which is relevant to the reasonable royalty determination. (Doc. No. 218 at 3.) Snap is correct. Georgia-Pacific factor 9 considers "[t]he utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;" and Georgia-Pacific factor 10 considers "[t]he nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." Georgia-Pac. Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). As such, the Johnson survey is relevant to the reasonable royalty analysis in this case and specifically to Georgia-Pacific factors 9 and 10.[4]

Vaporstream notes that in designing the survey, Mr. Johnson chose to ask survey respondents about the following five "attributes" of the products: "ease of use," "speed and efficiency," "clarity and readability," "informational content," and "fun and entertaining." (Doc. No. 210 at 3 (citing Doc. No. 213-1, Ex. A Johnson Expert Report ¶ 26).) Vaporstream argues that these five attributes are entirely unrelated to the purported benefits of the patents-in-suit (i.e., how the claimed methods help in "reducing [the] traceability" of electronic messages), and, therefore, the Johnson survey is irrelevant to the issues in this case. (Id. at 3-4.) The Court disagrees.

In his survey, Mr. Johnson provided respondents with a video either showing the current version of Snapchat or showing an alternate non-infringing version of Snapchat. (Doc. No. 213-1, Ex. A Johnson Expert Report ¶ 22.) Mr. Johnson then asked the

---

[4] Indeed, the Court notes that Vaporstream's own damages expert, Mr. Bratic, considers whether there are non-infringing alternatives as part of his analysis of Georgia-Pacific factors 9 and 10. (See Doc. No. 218-1, Bratic Expert Report ¶ 105.)

respondents to rate the performance of the user experience exhibited in the video across "five different mobile app attributes on a 5-point scale." (Id. ¶¶ 26, 31.) As such, the survey is relevant to an analysis of the benefits of the claimed invention over non-infringing alternatives, which is relevant to Georgia-Pacific factors 9 and 10 as Vaporstream's own expert asserts. Any criticism of the particular questions that Mr. Johnson chose to ask the surveyed respondents goes to the weight of the survey, not its admissibility. See Fortune Dynamic, 618 F.3d at 1036 ("[T]echnical inadequacies" in a survey, "including the format of the questions . . . , bear on the weight of the evidence, not its admissibility."); Clicks Billiards, 251 F.3d at 1263 (explaining that "survey design" goes to "the weight of the survey rather than its admissibility"). In sum, the Court rejects Vaporstream's relevancy challenges to the Johnson survey.

        C.     Survey Design

Vaporstream argues that the Johnson survey should be excluded as unreliable, confusing, and unduly prejudicial because its flawed design produced answers that show that a significant percentage of respondents either did not understand the questions asked in the survey or were unable to accurately provide answers. (Doc. No. 210 at 6-8.) In response, Snap argues that Mr. Johnson's survey design was appropriate and that Vaporstream's criticisms go to the issue of weight, not admissibility. (Doc. No. 218 at 6-7.)

In conducting his survey, Mr. Johnson presented respondents who were current Snapchat users with one of 12 user experience exhibit videos, with 4 of the 12 videos showing the current version of Snapchat (*i.e.*, the "Status Quo") and 8 of the 12 videos showing an alternate non-infringing version of Snapchat. (Doc. No. 213-1, Ex. A Johnson Expert Report ¶ 22.) Vaporstream notes that of the 605 current Snapchat users who saw a vignette that showed them the current "Status Quo" user experience, 35% responded that they would use Snapchat more often based on the "Status Quo" vignette they were shown and 8% responded that they would use it less often. (Doc. No. 210 at 6 (citing Doc. No. 213-3, Ex. C Stec Expert Report at 18 & Ex. 5.50).) Vaporstream argues that these specific

responses are nonsensical and suggest that 43% of the current-user respondents were unable to fully comprehend the question asked, the task presented, or the vignette shown, or were otherwise unable to accurately provide answers to the survey questions. (Id. at 6-7.)

In response, Snap notes that during his deposition Mr. Johnson explained that the third of current Snapchat users who responded that they would use Snapchat more often based on the "Status Quo" vignette was not abnormal in light of the "advertising effect." (Doc. No. 218 at 6 (citing Doc. No. 218-3, Ex. 4 at 95:5-19; Doc. No. 216-1, Johnson Decl. ¶ 7 ("[W]hen existing product features and functionality are showcased to a user it can 're-excite' them about a product they already use.")).) Snap further argues that Vaporstream's criticisms of Mr. Johnson's survey design go to the weight of the survey, not its admissibility. (Id. at 6.) The Court agrees with Snap. See Clicks Billiards, 251 F.3d at 1263 (explaining that "survey design" goes to "the weight of the survey rather than its admissibility"). Vaporstream's criticisms of Mr. Johnson's survey design is best addressed through cross-examination and contrary evidence, not through exclusion. See Microsoft Corp. v. Motorola, Inc., 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) ("[T]he clarity of the survey questionnaire is a question of fact, best resolved at trial through cross examination."). As such, the Court declines to exclude the Johnson survey on this basis.

D. Sampling Method

Vaporstream argues that the Johnson survey should be excluded because Mr. Johnson failed to properly identify and select respondents in the relevant target population. (Doc. No. 210 at 8-10.) In response, Snap argues that Mr. Johnson's sampling was appropriate and consistent with proper survey methodology. (Doc. No. 218 at 9-10.)

In conducting a reliable survey, a survey expert should "select an appropriate sample of the total population from which to take the survey." Hostetler v. Johnson Controls, Inc., No. 3:15-CV-226 JD, 2016 WL 3662263, at *11 (N.D. Ind. July 11, 2016). "'For the survey's results to be accurate, it must use a sampling method that ensures the sample is representative of the entire population . . . .'" Id. (quoting Hurt v. Commerce Energy, Inc.,

No. 1:12-CV-00758, 2015 WL 410703, at *5 (N.D. Ohio Jan. 29, 2015)); see also Water Pik, Inc. v. Med-Sys., Inc., No. 10-CV-01221-PAB-CBS, 2012 WL 27598, at *6 (D. Colo. Jan. 5, 2012) ("In a representative survey, the goal is to design a sample that is representative of the underlying target population."). Vaporstream argues that Mr. Johnson's sampling was improper for two reasons.

First, Vaporstream argues that Mr. Johnson excluded a large portion of the relevant target population by choosing to only allow respondents to take the survey on their smartphone. (Doc. No. 2010 at 9.) But even assuming this is true, the use of a sampling frame that is purportedly underinclusive "does not preclude admissibility."[5] United States v. 400 Acres of Land, more or less situate in Lincoln Cty. Nevada, No. 215CV01743MMDNJK, 2017 WL 4797517, at *7 (D. Nev. Oct. 24, 2017); see Reynolds v. Giuliani, 118 F. Supp. 2d 352, 367 (S.D.N.Y. 2000). The Court acknowledges that "[u]nderinclusive sampling may affect a survey's probative value: 'If the coverage is underinclusive, the survey's value depends on the proportion of the target population that has been excluded from the sampling frame and the extent to which the excluded population is likely to respond differently from the included population.'" 400 Acres of Land, 2017 WL 4797517, at *7; accord Reynolds, 118 F. Supp. 2d at 367. But, here, Vaporstream fails to provide any explanation of how or why people who refused to take the survey on their smartphone would be expected to respond differently from those who did take the survey on their smartphone. As such, this criticism of Mr. Johnson's sampling at best goes to the weight of the survey, not its admissibility.[6] See 400 Acres of Land, 2017

---

[5] "'The sampling frame is the source (or sources) from which the sample actually is drawn.'" 400 Acres of Land, 2017 WL 4797517, at *7.

[6] In addition, the Court notes that it is not clear that Vaporstream is correct in asserting that Mr. Johnson has excluded a large portion of the relevant target population by only allowing respondents to take the survey on their smartphone. In its reply, Vaporstream contends that the respondent data produced by Mr. Johnson shows that "more than 1,000 members in the target population were potentially terminated for attempting to enter the survey on a desktop, laptop, or tablet—as opposed to a smartphone." (Doc. No. 291 at 5.) But that same data shows that this approximately 1,000 members who were potentially terminated is out of 10,741 respondents. (See Doc. No. 219-2 Ex. E.)

WL 4797517, at *7–8; Dataquill Ltd. v. Huawei Techs. Co., No. 2:13-CV-633, 2015 WL 12912360, at *2–3 (E.D. Tex. June 11, 2015); see also Fortune Dynamic, 618 F.3d at 1036 (explaining that challenges to "the manner in which [the survey] was taken bear on the weight of the evidence, not its admissibility").

Second, Vaporstream argues that Mr. Johnson excluded a significant number of respondents who had a child, 13 to 17 years of age, who they allowed to take the survey. (Doc. No. 210 at 10.) Vaporstream argues that in doing so, Mr. Johnson improperly excluded some parents who were current or prospective Snapchat users and were willing to take the survey. (Id.) During his deposition, Mr. Johnson explained that in order to reach a sufficient amount of 13-17 year old children, a key group of users, he initially oversampled parents of 13-17 year old children in his survey. (Doc. No. 218-3, Ex. 4 at 173.)

Vaporstream's second criticism of Mr. Johnson's sampling again criticizes the sampling as being under-inclusive. But under-inclusiveness "does not preclude admissibility." 400 Acres of Land, 2017 WL 4797517, at *7; see Reynolds, 118 F. Supp. 2d at 367. In particular, here, where the purported under-inclusiveness at issue was addressed by the survey expert by initially "oversampling" the particular portion of the target population at issue, and the survey expert provided a reasonable basis for engaging in that initial oversampling. In sum, Vaporstream's criticism of Mr. Johnson's sampling at best goes to the weight of his survey, not its admissibility, and the Court declines to exclude the Johnson survey based on its sampling. See Prudential, 694 F.2d at 1156 ("Technical unreliability goes to the weight accorded a survey, not its admissibility."); Water Pik, Inc. v. Med-Sys., Inc., No. 10-CV-01221-PAB-CBS, 2012 WL 202782, at *4 (D. Colo. Jan. 24, 2012) ("Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility.").

///

///

## Conclusion

For the reasons above, the Court:

(1) grants in part and denies in part Snap's Daubert motion to exclude Mr. Bratic's expert opinions; and

(2) denies Vaporstream's Daubert motion to exclude the Johnson survey and the related testimony.

Specifically, the Court excludes Mr. Bratic's 50/50 profit split reasonable royalty rate opinion, and the Court precludes Mr. Bratic from referencing in his damages analysis Snap's market capitalization, acquisition offers received, total revenues, and total incremental profits. The Court denies the remainder of the parties' Daubert motions without prejudice to a contemporaneous objection at trial.

**IT IS SO ORDERED.**

DATED: January 10, 2020

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT